**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| | | |
|---|---|---|
| ESTATE OF KENNETH G. VONRONN; DEBRA A. VONRONN, INDIVIDUALLY, AND ON BEHALF OF THE ESTATE OF KENNETH G. VONRONN; SAMANTHA BORMAN; COURTNEY VONRONN; GINA HOWARD; NORMAN J. VALDEZ, JR.; DANIEL SUGDEN; ALEXANDER MUNOZ; BIANKA N. MUNOZ; GABRIELLA MUNOZ; MARLENE COLON SOLER; WILLIAM BRENNAN; JOHN F. DETRO; BRETT JENKINS; TODD HAZLETT; THOMAS VORMWALD; THOMAS E. VORMWALD; PENNY VORMWALD; CHARLES KAUFFMAN; TONY RIOS; CALVIN V. EDWARDS; LINDA DOREEN EDWARDS; MARCUS N. HERNDON; ANTHONY J. DURSO; CRYSTAL LYNN DURSO; KIRK ALLEN DURSO; KELLY LOUISE ASHLEY; KERIGAN ELIZABETH DURSO; KATHLEEN J. DOMINICK; JACK GURNEY; DAVID RAINES; JEFFERY I. WHALEY; ANTHONY JOHNSON; KEELAN A. BANKS; JASON YOUNG; CORBIN CHRISTOPHER YOUNG; ERIC L. WAGNER; ROBERT SPADONI; MICHAEL J. DIEHN; DAVID DIEHN; BARBRA DIEHN; LAURA PAULSEN, INDIVIDUALLY, AND ON BEHALF OF THE ESTATE OF NICHOLAS SKINNER; DEXTER HAMANN; RANDY SKINNER; ELIZABETH LYNN IBARRA; LINDA SKINNER; STEPHANIE SKINNER; MATTHEW C. ALLGOOD; ANGALENE M. SNIPES, INDIVIDUALLY, AND ON BEHALF OF THE ESTATE OF DENNIS JAMES VEATER; DOMINICK SNIPES; OXANA SMITH, INDIVIDUALLY, AND ON BEHALF OF THE ESTATE OF MICHAEL JAMES SMITH; MICHELLE LOUISE KANE, INDIVIDUALLY, AND ON BEHALF OF THE ESTATE OF JOSEPH MICHAEL KANE; BRENDAN KANE; DANIEL KANE; MIKAYLA COFFIN; MICHELE CHASTINE BUZZARD, INDIVIDUALLY, AND ON BEHALF OF THE ESTATE OF JASON JAMES BUZZARD; JUSTIN BURGHART; KIMBERLEE ANNETTE BURGHART; DEBORAH KATHLEEN COFFELT, INDIVIDUALLY, AND ON BEHALF OF THE ESTATE OF RONALD LEE COFFELT; DANIEL CHERADON PHILLIPS; ALEXANDER PAUL PHILLIPS; RACHEL NICOLE PHILLIPS-COFFELT; JOHNATHAN WAYNE | § § § § § § § § § § § § § § § § § § § § § § § § § § § § § § § § § § § § § § § § § § § § | Case No.:<br><br>**PLAINTIFFS' COMPLAINT** |

| | | |
|---|---|---|
| COFFELT; HANNAH MAKAYLA LEE COFFELT; JUSTIN HUMPHREYS; KATRINA LYNN BISHOP MARTIN, INDIVIDUALLY, AND ON BEHALF OF THE ESTATE OF JASON LEE BISHOP; BRIAN M. BUITH; JONATHAN FLOOD; MARK TOCCI, INDIVIDUALLY, AND ON BEHALF OF THE ESTATE OF PETER JAY TOCCI; LUIS M. VEGA MIRANDA; NORKA VEGA MIRANDA; LUIS VEGA; JAMIE BROWN; ALICIA LYN BROWN; PAUL DAVID SPERRY; TYLER CHRISTOPHER SPERRY; XIOMARA MENA, INDIVIDUALLY, AND ON BEHALF OF THE ESTATE OF ANDY ANDERSON; RAFAEL ANDERSON; RANDALL ANDERSON; DANN DUANE DIXON; CARIN COLLEEN DIXON; SYDNEY LAYNE DIXON; GARRETT ALEXANDER DIXON; JASON RUSK; NICOLE BROOKS, INDIVIDUALLY, AND ON BEHALF OF THE ESTATE OF PAUL FARRIS BROOKS; CODY STAGNER; ADAM PETTIT; BRENNA PETTIT; CRYSTAL PETTIT; MICHAEL MATTHEWS; JEROME YOUNG; JENIFER YOUNG; LATOYA TRACY YOUNG; CHARLES W. ADKINS, JR.; KATHY LYNN ADKINS; JIMMY OATES; ANTWAIN VAUGHN; RENAL VAUGHN; DONALD MADDOX; MORRIS RAY; TEJA RAY; MORRIS RAY, SR.; STEPHEN TIEMEYER RAY; DEVYN M. RAY; DEJA A. RAY; BENJAMIN DELLINGER; MATTHEW A. SWEIGART; REBECCA LYNNE WERNHOLM; KELLY DAWN THORNE; TAMIYA ALLAJAH BARTHOLOMEW; MARQUS ANTHONY YIP; ARACELI CABRAL; ANTHONY LEE DETRO; DAWN MARIE HIBBS; DONALD HIBBS; FAYE LYNN CUSHING; JOSH JAMES PALMER; TIMOTHY SPEARS, ON BEHALF OF THE ESTATE OF MARIE A. SPEARS; WILLIE EARL KIRKSEY; KAYLEE FAYE YOUNG; KENNITH EUGENE ALLGOOD; ANJA ALLGOOD; CHRISTOPHER K. ALLGOOD; MICHALA RAE BUZZARD; TRISTIN BUZZARD; RICHARD ALLEN STAGNER; CARMEN MARIA STAGNER; STEVEN RICK STAGNER; THOMAS ANDREW NORRIS; ANDREA Y. PRINGLE, INDIVIDUALLY, AND ON BEHALF OF THE ESTATE OF ANTWAN L. WALKER; TIFFNEY WALKER; HAROLD PRINGLE; OTTAH KHALFANI; PAULA ZWILLINGER; GREGORY MININGER; THOMAS MININGER; ASHLEY JEAN MILES; | § § § § § § § § § § § § § § § § § § § § § § § § § § § § § § § § § § § § § § § § § § § § § | |

| | | |
|---|---|---|
| MARY ANN WATSON; MONIQUE MARIE YOUNG; and MICHAEL S. RAY;<br>Plaintiffs,<br>v.<br><br>ISLAMIC REPUBLIC OF IRAN<br>The Ministry of Foreign Affairs<br>Imam Khomeini Street<br>Imam Khomeini Square<br>Tehran, Iran<br>1136914811<br><br>ISLAMIC REVOLUTIONARY GUARD CORPS ("IRGC")<br>Armed Forces Headquarters Iran<br>Tehran – Zone 7 – Shariati<br>Ghoddoosi Square (Ghaar)<br>Tehran, Iran<br><br>IRANIAN MINISTRY OF INTELLIGENCE & SECURITY<br>(a/k/a Vezarat-e Ettela'at Va Amniat-e Keshvar a/k/a VEVAK a/k/a VAJA)<br>Second Negarestan Street<br>Pasdaran Avenue<br>Tehran, Iran<br><br>BANK MARKAZI JOMHOURI ISLAMI IRAN<br>(a/k/a The Central Bank of the Islamic Republic of Iran)<br>Mirdamad Boulevard<br>No. 198<br>Tehran, Iran<br>P.O. Box: 15875/7177<br><br>BANK MELLI IRAN<br>Ferdowsi Avenue<br>10 Building<br>Tehran, Iran<br>1135931596<br>Mail Box 11365.144<br>NATIONAL IRANIAN OIL COMPANY<br>Roodsar Street No. 18<br>District 6<br>Tehran, Iran<br>Defendants. | §<br>§<br>§<br>§<br>§<br>§<br>§<br>§<br>§<br>§<br>§<br>§<br>§<br>§<br>§<br>§<br>§<br>§<br>§<br>§<br>§<br>§<br>§<br>§<br>§<br>§<br>§<br>§<br>§<br>§<br>§<br>§<br>§<br>§<br>§<br>§<br>§<br>§<br>§<br>§<br>§<br>§<br>§<br>§<br>§ | |

**TABLE OF CONTENTS**

I. NATURE OF THE CASE ....................................................................................1

II. JURISDICTION AND VENUE ...........................................................................4

A. THIS COURT HAS JURISDICTION OVER ALL CLAIMS AND ALL PARTIES....5

B. THIS COURT MAY EXERCISE JURISDICTION OVER THE SUBJECT MATTER OF ALL CLAIMS ASSERTED HEREIN.......................................................5

*i.* *Foreign Sovereign Immunities Act*....................................................5

C. THIS COURT MAY EXERCISE PERSONAL JURISDICTION OVER ALL PARTIES ..............................................................................................6

D. VENUE IS PROPER IN THIS COURT...........................................................7

III. LEGISLATIVE BACKGROUND......................................................................8

IV. THE DEFENDANTS ......................................................................................10

A. THE ISLAMIC REPUBLIC OF IRAN ...........................................................10

B. ISLAMIC REVOLUTIONARY GUARD CORPS .............................................14

C. THE IRANIAN MINISTRY OF INTELLIGENCE & SECURITY (MOIS) ........16

D. BANK MARKAZI JOMHOURI ISLAMI IRAN.........................................21

E. BANK MELLI IRAN....................................................................................23

F. NATIONAL IRANIAN OIL COMPANY.......................................................29

V. FACTUAL ALLEGATIONS ..........................................................................32

A. IRAN'S LONG HISTORY OF MATERIALLY SUPPORTING AND ENCOURAGING ACTS OF INTERNATIONAL TERRORISM.........................33

B. IRAN'S SPONSORSHIP AND MATERIAL SUPPORT OF TERRORISM IN IRAQ..................................................................................37

C. ISLAMIC REVOLUTIONARY GUARD CORPS—
QODS FORCE (IRGC-QF) ....................................................................................41

D. HEZBOLLAH.........................................................................................................44

E. IRAN'S MINISTRY OF DEFENSE AND ARMED FORCES LOGISTICS
(MODAFL) ..............................................................................................................51

F. ANSAR AL ISLAM ..................................................................................................54

G. AL QAEDA NETWORK ...........................................................................................60

1. ABU MUSAB ZARQAWI AND THE RISE OF AL QA'EDA
IN IRAQ ("AQI") ........................................................................................................67

H. THE SPECIAL GROUPS ............................................................................................72

1. THE BADR CORPS/BADR ORGANIZATION ...........................................................77

2. KATA'IB HIZBALLAH ..............................................................................................79

3. JAYSCH AL MAHDI & THE PROMISED DAY BRIGADES..........................................86

4. ASA'IB AHL AL HAQ ................................................................................................88

I. IRANIAN SIGNATURE WEAPONS USED IN THE
TERRORIST ATTACKS ..................................................................................................90

1. EXPLOSIVELY FORMED PENETRATORS ...............................................................90

2. IMPROVISED ROCKET ASSISTED MUNITIONS ......................................................99

J. IRAN EVADES SANCTIONS & COMMITS ACTS OF TERRORISM THROUGH
ITS AGENTS/PROXIES ..................................................................................................101

1. ISLAMIC REPUBLIC OF IRAN SHIPPING LINES.....................................................102

2. MAHAN AIR.............................................................................................................106

3. NATIONAL IRANIAN OIL COMPANY (NIOC)..........................................................109

4. KHATAM AL-ANBIYA CONSTRUCTION COMPANY & THE HEADQUARTERS FOR THE RESTORATION OF HOLY SHRINES ............111

VI. THE PLAINTIFFS & THE TERRORIST ATTACKS .......................................119

**THE SEPTEMBER 19, 2003 ATTACK – MOSUL ......................................121**

**MICHAEL MATTHEWS .........................................................................121**

**THE OCTOBER 6, 2003 ATTACK – RAMADI ..........................................123**

**MICHAEL J. DIEHN AND FAMILY ...............................................123**

**THE MARCH 16, 2004 ATTACK – FALLUJAH ........................................124**

**WILLIAM BRENNAN.............................................................................124**

**THE MARCH 21, 2004 ATTACK – ISKANDARIYAH ..............................125**

**ADAM PETTIT AND FAMILY.........................................................125**

**THE APRIL 8, 2004 ATTACK – AL ANBAR PROVINCE........................126**

**LUIS M. VEGA MIRANDA AND FAMILY ...................................126**

**JAMIE BROWN AND FAMILY ......................................................127**

**THE APRIL 9, 2004 ATTACK – BAYJI ......................................................128**

**ANTHONY JOHNSON AND FAMILY ...........................................128**

**THE JUNE 22, 2004 ATTACK – TAL AFAR..............................................129**

**JOHN F. DETRO AND FAMILY .....................................................129**

**THE JUNE 24, 2004 ATTACK – BAGHDAD ............................................130**

**JEROME YOUNG AND FAMILY...................................................130**

**THE JULY 30, 2004 ATTACK – FALLUJAH ............................................131**

**ALEXANDER MUNOZ AND FAMILY ..........................................131**

**THE AUGUST 1, 2004 ATTACK – SAMADA ............................................132**

CHARLES KAUFFMAN ..... 132

THE AUGUST 26, 2004 ATTACK – NAJAF ..... 133

ESTATE OF NICHOLAS SKINNER AND FAMILY ..... 133

THE NOVEMBER 4, 2004 ATTACK – LSA ANACONDA ..... 134

NORMAN J. VALDEZ, JR ..... 134

THE DECEMBER 11, 2004 ATTACK – FALLUJAH ..... 135

ROBERT SPADONI ..... 135

THE JANUARY 6, 2005 ATTACK – TAJI ..... 136

ESTATE OF KENNETH G. VONRONN AND FAMILY ..... 136

THE JANUARY 11, 2005 ATTACK – RAMADI ..... 137

ESTATE OF MICHAEL JAMES SMITH AND FAMILY ..... 137

THE APRIL 23, 2005 ATTACK – BAGHDAD ..... 138

CODY STAGNER AND FAMILY ..... 138

THE APRIL 28, 2005 ATTACK – TIKRIT ..... 139

THOMAS ANDREW NORRIS ..... 139

THE MAY 22, 2005 ATTACK – TIKRIT ..... 140

MATTHEW A. SWEIGART ..... 140

THE JULY 3, 2005 ATTACK – BAGHDAD ..... 140

ERIC L. WAGNER ..... 140

THE AUGUST 1, 2005 ATTACK – NAJAF ..... 141

TODD HAZLETT ..... 141

THE AUGUST 11, 2005 ATTACK – SOUTHERN IRAQ ..... 142

MARCUS N. HERNDON ..... 142

THE AUGUST 31, 2005 ATTACK – SAMARRA ........................................143

JIMMY OATES ........................................143

ANTWAIN VAUGHN AND FAMILY ........................................144

MORRIS RAY AND FAMILY ........................................145

THE SEPTEMBER 19, 2005 ATTACK – MOSUL ........................................146

ESTATE OF PETER JAY TOCCI AND FAMILY ........................................146

THE OCTOBER 14, 2005 ATTACK – BALAD ........................................147

DAVID RAINES ........................................147

THE OCTOBER 25, 2005 ATTACK – CAMP STRIKER ........................................148

ANTHONY J. DURSO AND FAMILY ........................................148

THE JANUARY 1, 2006 ATTACK – AS SINIYAH, BAYJI ........................................150

ESTATE OF JASON LEE BISHOP AND FAMILY ........................................150

THE JANUARY 5, 2006 ATTACK – RAMADI ........................................150

JASON RUSK ........................................150

THE FEBRUARY 27, 2006 ATTACK – RAMADI ........................................151

BRETT JENKINS ........................................151

THE APRIL 12, 2006 ATTACK – MSR TAMPA ........................................152

KEELAN A. BANKS ........................................152

THE APRIL 13, 2006 ATTACK – YUSUFIYA ........................................153

DANN DUANE DIXON AND FAMILY ........................................153

THE JUNE 6, 2006 ATTACK – CAMP RAMADI ........................................154

ESTATE OF ANDY ANDERSON AND FAMILY ........................................154

THE JUNE 15, 2006 ATTACK – RAMADI ........................................155

THOMAS VORMWALD AND FAMILY ....................................... 155

THE JUNE 21, 2006 ATTACK – BAGHDAD ....................................... 156

ESTATE OF JASON JAMES BUZZARD AND FAMILY ............. 156

THE AUGUST 6, 2006 ATTACK – AL ANBAR PROVINCE ................... 157

JEFFERY I. WHALEY AND FAMILY ....................................... 157

THE AUGUST 27, 2006 ATTACK – BAGHDAD ....................................... 158

JONATHAN FLOOD ....................................... 158

THE SEPTEMBER 11, 2006 ATTACK – AL ANBAR PROVINCE .......... 159

JACK GURNEY ....................................... 159

THE SEPTEMBER 28, 2006 ATTACK – BAGHDAD ....................................... 159

BRIAN M. BUITH ....................................... 159

THE OCTOBER 14, 2006 ATTACK – BAGHDAD ....................................... 160

JASON YOUNG AND FAMILY ....................................... 160

ESTATE OF JOSEPH MICHAEL KANE AND FAMILY ............ 162

THE DECEMBER 27, 2006 ATTACK – AL-KARMAH ....................................... 163

CHARLES W. ADKINS, JR. AND FAMILY ....................................... 163

THE FEBRUARY 16, 2007 ATTACK – AL KUT ....................................... 164

TONY RIOS ....................................... 164

THE MARCH 9, 2007 ATTACK – FALLUJAH ....................................... 165

ESTATE OF DENNIS JAMES VEATER AND FAMILY ............. 165

JUSTIN BURGHART AND FAMILY ....................................... 166

THE MAY 2, 2007 ATTACK – BAGHDAD ....................................... 167

BENJAMIN DELLINGER ....................................... 167

THE MAY 4, 2007 ATTACK – ROUTE SWORD ........................................168

MATTHEW C. ALLGOOD AND FAMILY....................................168

THE JUNE 8, 2007 ATTACK – CAMP WAR HORSE ...............................169

CALVIN V. EDWARDS AND FAMILY..........................................169

THE JUNE 10, 2007 ATTACK – AL-DORA ..................................................170

PAUL DAVID SPERRY AND FAMILY..........................................170

THE JULY 19, 2007 ATTACK – BAGHDAD ..............................................171

ESTATE OF RONALD LEE COFFELT AND FAMILY ...............171

JUSTIN HUMPHREYS ......................................................................172

THE FEBRUARY 1, 2008 ATTACK – SOUTH BAGHDAD......................173

DANIEL SUGDEN ..............................................................................173

THE MAY 21, 2009 ATTACK – DORA, BAGHDAD.................................174

ESTATE OF PAUL FARRIS BROOKS AND FAMILY ................174

THE APRIL 23, 2007 ATTACK – AS SADAH............................................174

FAMILY OF MAX FIRBY..................................................................174

THE JULY 17, 2010 ATTACK – TAL AFAR..............................................175

FAMILY OF JOHN CARROLL BARTHOLOMEW II.................175

THE MAY 19, 2006 ATTACK – RAMADI..................................................176

FAMILY OF ANTHONY E. YIP, JR...............................................176

THE AUGUST 25, 2008 ATTACK – BAGHDAD .......................................176

FAMILY OF VICTOR D. CABRAL...................................................176

THE NOVEMBER 12, 2004 ATTACK – BAGHDAD .................................177

FAMILY OF TRAVIS JOE PALMER .............................................177

**THE MAY 18, 2005 ATTACK – RAMADI ....................................................177**

**ESTATE OF ANTWAN L. WALKER AND FAMILY ...................177**

**THE JUNE 6, 2005 ATTACK – FALLUJAH ..............................................178**

**FAMILY OF ROBERT T. MININGER..........................................178**

**THE OCTOBER 23, 2005 ATTACK – RAMADI .......................................179**

**FAMILY OF JONATHAN ROSS SPEARS ....................................179**

**THE FEBRUARY 2, 2007 ATTACK – MAHMUDIYAH ...........................180**

**CHRISTOPHER K. ALLGOOD AND FAMILY............................180**

**THE APRIL 26, 2004 ATTACK – BAGHDAD ...........................................181**

**FAMILY OF DARREN MILES.......................................................181**

VII. ALL OF THE TERRORIST ATTACKS WERE ACTS OF INTERNATIONAL TERRORISM..........................................................................................181

VIII. THE ACTS OF IRAN CAUSED PLAINTIFFS' INJURIES AND DEATHS ....184

IX. CLAIMS FOR RELIEF ..........................................................................185

1. FIRST CLAIM FOR RELIEF ..................................................................185

2. SECOND CLAIM FOR RELIEF .............................................................187

3. THIRD CLAIM FOR RELIEF ..................................................................188

PRAYER FOR RELIEF ...............................................................................189

**INDEX OF ACRONYMS**

**AAH** – Asa'ib Ahl Al Haq or the "League of the Righteous"

**AAI** – Ansar al Islam

**AEDPA** – Antiterrorism and Effective Death Penalty Act of 1996

**AIO** – Aerospace Industries Organization

**AQ** – Al Qaeda (a/k/a Al-Qaeda or Al-Qa'ida)

**AQI** – Al Qaeda In Iraq (a/k/a Al-Qaeda In Iraq or Al-Qa'ida In Iraq)

**ASV** – Armored Security Vehicle

**ATA** – Anti-terrorism Act, 18 U.S.C. § 2333, et seq.

**BAS** – Battalion Aid Station

**BBC** – British Broadcasting Company

**BFV** – Bradley Fighting Vehicle

**CBI** – Central Bank of Iran

**CISADA** – Comprehensive Iran Sanctions, Accountability, and Divestment Act of 2010

**COP** – Combat Outpost

**DFAC** – Dining Facility

**DIO** – Defense Industries Organization

**EFP** – Explosively formed penetrators

**EJK –** Extrajudicial Killing

**FinCEN** – Financial Crimes Enforcement Network

**FOB** – Forward Operating Base

**FSIA** – Foreign Sovereign Immunities Act, 28 U.S.C. § 1602, et seq.

**FTO** – Foreign Terrorist Organization

**HAMAS** – Ḥarakat al-Muqāwamah al-ʾIslāmiyyah Islamic Resistance Movement

**HMMWV** – High Mobility Multipurpose Wheeled Vehicle

**HRHS** – The Headquarters for the Restoration of Holy Shrines

**IAIO** – Iran Aviation Industries Organization

**IAV** – Interim Armored Vehicle

**ICEI** – Imensazen Consultant Engineers Institute

**IED** – Improvised explosive device

**IFV** – Infantry Fighting Vehicle

**IRAM** – Improvised Rocket Assisted Munitions

**IRGC** – Islamic Revolutionary Guard Corps

**IRGC-QF** – Islamic Revolutionary Guard Corps-Qods Force

**IRISL** – Islamic Republic of Iran Shipping Lines

**ISIL** – Islamic State of Iraq and the Levant aka "ISIS" or "Daesh" ITRSHRA – Iran Threat Reduction and Syria Human Rights Act of 2012 JAM – Jaysch al Mahdi or the "Mahdi Army"

**JASTA** – Justice Against Sponsors of Terrorism Act, Pub. L. 114-222, Sept. 28, 2016, 130 Stat. 852

**KAA** – Khatam al-Anbiya Construction Company

**KH** – Kata'ib Hizballah

**KRG** – Kurdistan Regional Government LMTV – Light Medium Tactical Vehicle LSA – Logistical Support Area

**MNF-I** – Multi National Forces in Iraq

**MOD** – Ministry of Defense

**MODAFL** – Iran's Ministry of Defense and Armed Forces Logistics

**MOIS** – The Iranian Ministry of Intelligence and Security a/k/a "Vezarat-e Ettela'at Va Amniat-e Keshvar" a/k/a "VEVAK" a/k/a "VAJA"

**MRAP** – Mine-Resistant Ambush Protected

**MSR** – Main Supply Route

**MTC** – Medium Transport Company NIOC – National Iranian Oil Company OFAC – Office of Foreign Assets Control OP – Observation Point

**PDB** – Promised Day Brigades

**PTSD** – Post Traumatic Stress Disorder

**QRF** – Quick Response Force

**RJF** – Reformation and Jihad Front

**RPG** – Rocket Propelled Grenade

**SDGT** – Specially Designated Global Terrorist

**SDN** – Specially Designated National SDT – Specially Designated Terrorist TBI – Traumatic Brain Injury

**TTP** – Tactics, Techniques, and Procedures

**UBL** – Usama bin Laden

**WMD** – Weapons of Mass Destruction

## PLAINTIFFS' COMPLAINT

COMES NOW the above-captioned Plaintiffs (hereinafter collectively referred to as "Plaintiffs"), by and through their attorneys, and for their Complaint against Defendants the Islamic Republic of Iran, the Islamic Revolutionary Guard Corps ("IRGC"), Iranian Ministry of Intelligence & Security, allege as follows:

## I. NATURE OF THE CASE

1. In western tradition, war is the continuation of political policy by other means. For the Islamic Republic of Iran ("Iran") however, political policy is an expression of war itself. Since 1979, the Iranian Regime has enabled a world-wide strategy of unconventional warfare using a campaign of state sponsored terrorism as a methodology of international conflict with the aim of undermining the United States and its allies in the Middle East and around the world. Through the use of terrorism as a technique to militarily engage U.S. Nationals, Iran historically sought to materially support and promote violence to accomplish its own national aims. Beginning with the Beirut bombing of the U.S. Marine Barracks on October 23, 1983, in which 241 U.S. Service Members were killed, Iran continues to demonstrate a propensity for violence against American citizens who operate in the Middle East. With the U.S. led invasion in 2003 to liberate Iraq from the barbarity of Sadaam Hussein, Iran increased its support activities to all insurgent and terrorist organizations that actively fought U.S. Forces and their subsequent stabilization efforts in Iraq. While the Iranian regime recognizes the vast national strength of the United States and does not seek to accomplish its aims though the use of war with conventional military forces, Iran continues to employ an asymmetric military strategy using Special Operations Forces or "Special Groups" to tactically train, advise and assist proxy forces in places such as Lebanon, Syria and Iraq using

strategic revenue and resources to support the wounding and killing of U.S. Forces operating in the Middle East.

2. To effectuate its campaign of terror against the citizens of Iraq and the coalition forces serving there, Iran deployed and employed their agents and instrumentalities, including its state-owned or state-controlled financial institutions, and government agencies.

3. In order to fund a terror campaign in Iraq, Iran directed its state owned and/or operated banks, including Defendants Bank Markazi Jomhouri Islami Iran ("Bank Markazi," "Central Bank of Iran" or "CBI"), Bank Melli Iran, and the state- owned and operated National Iranian Oil Company ("NIOC") to conspire with an assortment of Western financial institutions willing to substantially assist Iran to evade U.S. and international economic sanctions, conduct illicit trade-finance transactions, and illegally disguise financial payments to and from U.S. dollar- denominated accounts.

4. Defendant Iran's aforementioned agents included the U.S.-designated Foreign Terrorist Organization ("FTO") (as that term is defined in 8 U.S.C. § 1189 of the Antiterrorism and Effective Death Penalty Act of 1996 ("AEDPA")) Hezbollah; Defendant the Islamic Revolutionary Guard Corps ("IRGC"), whose subdivision known as the Islamic Revolutionary Guard Corps-Qods Force ("IRGC-QF") is a U.S.-designated Specially Designated Global Terrorist ("SDGT"); Iran's Ministry of Intelligence and Security ("MOIS") (an SDGT and Specially Designated National, "SDN"), and other terrorist agents that included a multitude of Iraqi Shi'a terror groups referred to herein collectively as "Special Groups."[1,2]

---

[1] Discussed in more detail below, Special Groups are terrorist organizations established and funded by Iran.

[2] The pronunciation and spelling of "Hezbollah" (also known as "Hizbollah" and "Hizbu'llah), is based on region and dialect, but all translate to the "Party of Allah." As used herein, Hezbollah

5. Iran also conspired with and materially supported Sunni FTOs Ansar al Islam ("AAI") and Al Qaeda ("AQ") to terrorize the people of Iraq and Coalition Forces, seeking to disrupt the peacekeeping process and prevent the establishment of free and democratic Iraq.[3]

6. The acts of international terrorism at issue in this Action (the "Terrorist Attacks") were perpetrated by agents of Iran- the Special Groups, AAI, AQ, and other terrorist groups("Terrorist Groups"), all of whom were materially (and substantially) supported, directly and/or indirectly, by Defendants.[4]

7. The Terrorist Attacks resulted in the deaths, maiming, and/or otherwise injury to Plaintiffs and/or Plaintiffs' family members.

8. This is a civil action pursuant to the Foreign Sovereign Immunities Act, 28 U.S.C. §§ 1602–1611 (hereinafter "FSIA") for wrongful death, personal injury and related torts, by the estates and families of United States' nationals and/or members of the U.S. armed forces (as defined in 10 U.S.C. § 101) who were killed or injured by Defendants and/or their agents in Iraq

---

and Hizbollah refer to a Shiite Muslim political party and militant group the United States and European Union consider a foreign terrorist organization.

[3] The U.S. Dept. of State designated Al Qa'ida, Ansar al Islam, and Al-Qa'ida in Iraq ("AQI") as Foreign Terrorist Organizations on October 8, 1999, March 22, 2004, and December 17, 2004, respectively. These groups facilitated and employed Iranian war materials in support of extremist ends.

[4] As used herein, the term "international terrorism" shall have the same meaning as set forth at 18 U.S.C. § 2331(1), which defines international terrorism as "activities that (A) involve violent acts or acts dangerous to human life that are a violation of the criminal laws of the United States or of any State, or that would be a criminal violation if committed within the jurisdiction of the United States or of any State; (B) appear to be intended (i) to intimidate or coerce a civilian population; (ii) to influence the policy of a government by intimidation or coercion; or (iii) to affect the conduct of a government by mass destruction, assassination or kidnapping; and (C) occur primarily outside the territorial jurisdiction of the United States, or transcend national boundaries in terms of the means by which they are accomplished, the persons they appear intended to intimidate or coerce, or the locale in which their perpetrators operate or seek asylum."

from 2003 to 2011 (the "Relevant Period").

9. None of the Terrorist Attacks were acts occurring in the course of (A) declared war; (B) armed conflict, whether or not war has been declared, between two or more nations; or (C) armed conflict between military forces of any origin.

10. Iran serves as a command, financial and/or logistical conduit for various terrorist groups, including the Terrorist Groups and FTOs named herein, and their terrorist activities, specifically including the Terrorist Attacks which killed or injured Plaintiffs or Plaintiffs' family members. Defendants knew they were supporting terrorists and FTOs to accomplish Iranian strategic end states.

11. As detailed below, the Defendants herein directed millions of U.S. dollars in arms, equipment and material to Hezbollah, MOIS, the IRGC, and the IRGC-QF, which, in turn, trained, armed, supplied and funded Iran's terrorist agents in Iraq in carrying out their attacks against Plaintiffs and their family members.

12. At all relevant times, Defendants intentionally, knowingly and/or recklessly provided material support, directly or indirectly, to the Special Groups, Ansar al Islam, Al Qaeda and other terrorists, that, at all relevant times, engaged in acts of international terrorism against the United States and nationals of the United States, including Plaintiffs.

13. At all relevant times, Defendants intentionally, knowingly and/or recklessly contributed substantial and material support and/or resources, directly and/or indirectly, to persons and/or organizations that posed a significant risk of committing acts of terrorism that threatened the security of nationals of the United States.

14. Plaintiffs' claims arise from separate acts of international terrorism that occurred throughout Iraq between 2003 and 2011.

## II. JURISDICTION AND VENUE

### A. THIS COURT HAS JURISDICTION OVER ALL CLAIMS AND ALL PARTIES.

15. Jurisdiction and venue are proper in this Court.

16. This Court may exercise personal jurisdiction over all parties to this Action.

17. This Court has jurisdiction over the subject matter of this Action and Defendants pursuant to 28 U.S.C. §§ 1330(a)–(b), 1331, 1332(a)(2), and the FSIA, 28 U.S.C. § 1605(a)(2).

### B. THIS COURT MAY EXERCISE JURISDICTION OVER THE SUBJECT MATTER OF ALL CLAIMS ASSERTED HEREIN.

18. This Court may exercise its original jurisdiction over claims against the Islamic Republic of Iran pursuant to 28 U.S.C. § 1330(a), 28 U.S.C. § 1331, and 28 U.S.C. § 1332(a)(2).

19. This a nonjury civil action for relief in personam in the form of money damages against a foreign state as defined in 28 U.S.C. § 1603(a) for personal injury or death that was caused by an act, extrajudicial killing, or the provision of material support or resources for such an act.[5]

#### *i. Foreign Sovereign Immunities Act*

20. This action arises under the Foreign Sovereign Immunities Act ("FSIA"), 28 U.S.C. §§ 1602–1611.

---

[5] 28 U.S.C. § 1603(a) defines "foreign state" to include "a political subdivision of a foreign state or an agency or instrumentality of a foreign state." The statute defines an "agency or instrumentality of a foreign state as any entity - (1) which is a separate legal person, corporate or otherwise, and (2) which is an organ of the foreign state or political subdivision thereof, or a majority of whose shares or other ownership interest is owned by the foreign state or political subdivision thereof, and (3) which is neither a citizen of a State of the United States as defined in section 1332(c) and (e), nor created under the laws of any third country." 28 U.S.C. § 1603(a)–(b).

19. Plaintiffs seek money damages for personal injury and death caused by: a. acts of extrajudicial killing; b. the provision of material support or resources for such acts; and c. other tortious acts for which a foreign state is not immune under 28 U.S.C. § 1605A.

20. 28 U.S.C. § 1605A exempts the Islamic Republic of Iran from foreign sovereign immunity because it is a designated State Sponsor of Terrorism. Further, 28 U.S.C. § 1605A(c) provides a federal private right of action against a foreign state that is or was a State Sponsor of Terrorism, and also against any official, employee or agent of that foreign state while acting within the scope of his or her office, employment or agency, for wrongful death, personal injury, and related tort.

21. The United States officially designated Iran a State Sponsor of Terrorism on January 19, 1984, pursuant to § 6(j) of the Export Administration Act, § 40 of the Arms Export Control Act, and § 620A of the Foreign Assistance Act, and has renewed said designation annually.

22. Iran was designated as a State Sponsor of Terrorism at all times during the Relevant Period.

23. At all relevant times, Plaintiffs were United States nationals, members of the U.S. armed forces, U.S. government contractors, or the legal representative thereof, as defined under § 1605A(c).

24. None of the attacks alleged herein occurred within the territory of the Islamic Republic of Iran; therefore, Plaintiffs are not required to afford Defendants an opportunity to arbitrate under the FSIA.

## C. THIS COURT MAY EXERCISE PERSONAL JURISDICTION OVER ALL PARTIES.

25. Plaintiffs consent to this Court's exercise of personal jurisdiction over them.

26. The Court has personal jurisdiction over all Defendants pursuant to 28 U.S.C. §§ 1330(a)–(b), 1331, 1332(a)(2), and 1605A(a)(1), which create subject-matter and personal jurisdiction for civil actions for wrongful death and personal injury against State Sponsors of Terrorism and their officials, employees and agents).

27. This Court may exercise personal jurisdiction over the Islamic Republic of Iran pursuant to 28 U.S.C. § 1330(b) and the applicable exception to immunity in 28 U.S.C. § 1605A(a)(1). Together, these provide for personal jurisdiction over Iran and agents and instrumentalities for claims arising under 28 U.S.C. § 1330(a) upon valid service of process under 28 U.S.C. § 1608

28. Further, that exercise of personal jurisdiction is reasonable; foreign sovereigns and their extensively controlled instrumentalities are not "persons" under the Fifth Amendment's Due Process Clause. That exercise of personal jurisdiction is consistent with the forum's manifest interest in providing effective means of redress for its residents.

29. Once the FSIA's immunity exception applies, personal jurisdiction is established upon proper service under 28 U.S.C. § 1608.

30. Plaintiffs expressly consent to the Court's exercise of personal jurisdiction over them.

**D. VENUE IS PROPER IN THIS COURT**

31. Venue is proper in this district pursuant to 28 U.S.C. § 1391(f).

32. Specifically, § 1391(f)(4) permits civil actions against a foreign state to be brought in this District.

33. Venue is proper in this district as to the Islamic Republic of Iran pursuant to 28 U.S.C. § 1391(f)(4), which provides that civil actions against a foreign state may be brought in the United States District Court for the District of Columbia

## III. LEGISLATIVE BACKGROUND

34. This case is brought by and/or on behalf of U.S. nationals and/or family members of such U.S. nationals who were injured and/or killed in certain acts of international terrorism caused by Defendants.

35. Defendants materially and substantially supported the IRGC, IRGC-QF, MOIS, Hezbollah, Special Groups, Ansar al Islam, Al Qaeda, and other terrorists for the purpose of killing, maiming, and/or otherwise injuring U.S. nationals, including Plaintiffs.

36. In 1996, as part of the AEDPA, Congress amended the FSIA to allow U.S. victims of terrorism to sue designated State Sponsors of Terrorism, such as Iran, for their terrorist acts.[6] Pursuant to the National Defense Authorization Act for Fiscal Year 2008, Public L. No. 110-181, members of the United States armed forces, employees of the U.S. government and individuals performing a contract awarded by the United States Government, acting within the scope of the employee's employment may also bring private claims against State Sponsors of Terrorism.[7]

37. Congress's purpose in lifting the sovereign immunity under the AEDPA was to "affect the conduct of terrorist states outside the U.S. [by promoting] safety of U.S. citizens who travel overseas."[8]

---

[6] 28 U.S.C. § 1605A(a)(1).

[7] 28 U.S.C. §1605A(c).

[8] 44B Am. Jur. 2d *International Law* § 140 (2013).

38. As a result of the AEDPA, foreign states, such as Iran, cannot assert sovereign immunity where a victim claims money damages for personal injuries or death caused by, among other things, the provision of material support or resources.

39. Pursuant to 28 U.S.C. § 1605A(a)(1), "[a] foreign state shall not be immune from the jurisdiction of courts of the United States … in any case … in which money damages are sought against a foreign state for personal injury or death that was caused by an act of torture, extrajudicial killing, aircraft sabotage, hostage taking, or the provision of material support or resources for such an act if such act or provision of material support or resources is engaged in by an official, employee, or agent of such foreign state while acting within the scope of his or her office, employment, or agency."

40. If a foreign state satisfies one of these, or the several other exceptions to immunity, it "shall be liable in the same manner and to the same extent as a private individual under like circumstances."[9]

41. The FSIA provides an exception to sovereign immunity of foreign states where, inter alia, a foreign state is a designated state sponsor of terrorism (such as Iran).

42. Specifically, the FSIA permits U.S. courts to maintain jurisdiction over a foreign state where that state engages in an act of terrorism or provides "material support or resources" to a terrorist organization.[10]

[9] 28 U.S.C. § 1606.

[10] 28 U.S.C. §1605A(c)

43. The FSIA provides that Plaintiffs may bring an action against non-immune foreign states, such as Iran, in the United States District Court for the District of Columbia if the action is brought against a foreign state or political subdivision thereof.[11]

44. During the Relevant Period, including when the Terrorist Attacks occurred and when this Action was filed, Iran was designated a State Sponsor of Terrorism by the United States.

## IV.THE DEFENDANTS

### A. THE ISLAMIC REPUBLIC OF IRAN

45. Plaintiffs assert causes of action against Iran. Iran directed, planned and authorized acts of torture, extrajudicial killing, and hostage taking, and provided material support or resources to Hezbollah, Special Groups, Ansar al Islam, Al Qaeda, and other terrorists that perpetrated the Terrorist Attacks specifically for the purpose of carrying out those Attacks. Iran's actions proximately and directly caused the murders and injuries to Plaintiffs and Plaintiffs' family members in those Terrorist Attacks.

46. Plaintiffs' deaths and injuries were a natural and probable consequence of Iran's actions as set forth herein. Moreover, such deaths and injuries should have been, and in fact, were foreseeable.

47. At all times relevant to this Complaint, Iran is and was a foreign state within the meaning of 28 U.S.C. § 1603 and designated a State Sponsor of Terrorism pursuant to § 6(j) of the Export Administration Act of 1979, 50 U.S.C. app. § 2405.

48. Iran provided material support and resources for the commission of acts of extrajudicial killing, torture and/or hostage taking within the meaning of 28 U.S.C. § 1605A,

---

[11] *Id.*

including the Terrorist Attacks in which Plaintiffs were killed, injured, or maimed, and performed actions that caused the Terrorist Attacks and the harm to Plaintiffs herein.

49. The Government of Iran is politically and ideologically hostile to the United States and its allies, and has consistently provided material support for acts of international terrorism, including extrajudicial killings, torture, and hostage takings, particularly through MOIS, IRGC, IRGC-QF and its Lebanese-based FTO, Hezbollah, which historically have served as Iran's proxies and agents, enabling Iran to project extremist violence and terror throughout the Middle East and around the globe.

50. Both before and during the U.S. liberation and occupation of Iraq and its subsequent peacekeeping mission, Iran supported a massive international asymmetric strategy by using a terror campaign against Iraqi citizens and U.S. nationals, including Plaintiffs.[12]

51. As detailed herein, Iran provided funds, arms, equipment, and material support to Hezbollah, IRGC, IRGC-QF, and MOIS which, in turn, trained, armed, supplied and funded Iran's terrorist agents in Iraq in carrying out their attacks against Plaintiffs and their family members.

52. Iran's efforts to kill and maim U.S. nationals in Iraq, and to thwart U.S. policy objectives in Iraq, were readily apparent and widely reported.[13]

53. In fact, Iran's role in funding militant groups that target and kill Coalition and Iraqi forces and innocent American, British, Iraqi and other civilians was a matter of public record.[14]

---

[12] Seth G. Jones, War by Proxy: *Iran's Growing Footprint in the Middle East*, CSIS Brief, March. 11, 2019, https://www.csis.org/war-by-proxy

[13] Daniel L. Byman, *The Iranian Revolution and its Legacy of Terrorism*, Brookings Institute, January 24, 2019. https://www.brookings.edu/blog/order-from-chaos/2019/01/24/the-iranian-revolution-and-its-legacy-of-terrorism/

[14] "Coalition Forces" refers to the "[…]multinational force under unified command to take all necessary measures to contribute to the maintenance of security and stability in Iraq, including for the purpose of ensuring necessary conditions for the implementation of the timetable and

54. For example, on October 5, 2005, at a press briefing at the Foreign Office in London, William Patey, the British ambassador to Baghdad, blamed the Islamic Revolutionary Guard for helping supply the technology and weapons which has been used in bomb attacks against British troops in the south which claimed the lives of eight British soldiers and two British civilians.

55. On October 10, 2005, the British Broadcasting Company ("BBC") reported that:

> An armor-piercing version of the bomb—blamed for the deaths of eight British soldiers this year—marks the latest advance in the insurgents' arsenal. The UK has accused Iran of supplying the new weapon to militants in southern Iraq, via the Lebanese Hezbollah militia group, although Tehran has denied this.
>
> (Emphasis added).

56. The BBC followed up with multiple reports in 2006 describing the details from military briefings about Iran's material support to Shi'a militia groups that were targeting and killing British and U.S. forces in Iraq, including Plaintiffs.

57. For example, on June 23, 2006, the BBC reported:

> BBC world affairs correspondent, Paul Reynolds, says both the American and British military in Iraq have claimed for some time that Iran, or factions within the Iranian government, have been supporting Shias politically and militarily…
>
> ..."Since January we have seen an upsurge in their support, particularly to the Shia extremist groups," Gen Casey said.
> "They are using surrogates to conduct terrorist operations both against us and against the Iraqi people."
>
> "We are quite confident that the Iranians, through the special operations forces, are providing weapons, IED [improvised explosive device]

---

programme as well as to contribute to the security of the United Nations Assistance Mission for Iraq, the Governing Council of Iraq and other institutions of the Iraqi interim administration, and key humanitarian and economic infrastructure[.]" *See* S.C. Res. 1511, ¶ 13, U.N. SCOR, U.N. Doc. S/RES/1511, at 3 (Oct. 16, 2003).

technology and training to Shia extremist groups in Iraq," he said.

58. In another example, on September 26, 2008, CNN reported that U.S. officials claimed Iran had provided Shi'a militias in Iraq with "millions of dollars" in funding and that:

> The official said that high-grade military explosives and specialized timers are among the "boutique military equipment" moving from Iran into Iraq. Some of the equipment is of the same type that Hezbollah, an Iranian-backed Shiite militia, used against Israeli forces in Lebanon during the summer, the official said. The origin of the weapons was easy to discern because of Iranian markings on it, he said. Because Iran maintains tight control over armaments, he said, shipment of the weapons into Iraq had to involve "elements associated with the Iranian government."
>
> (Emphasis added).

59. Iran, through its agents and instrumentalities, including Defendants herein, provided Explosively Formed Penetrators ("EFPs") (discussed in more detail at Section V(I)1, below), along with other munitions and training in tactics, that were used to injure and kill Plaintiffs. Such bombs are sometimes inaccurately called "improvised explosive devices" ("IEDs"); in reality, the EFPs were not "improvised" but professionally manufactured and specifically designed by Iran and its agents to target and penetrate Plaintiffs and Coalition Forces' armor, and sow terror within the borders and amongst the citizens of Iraq.

60. Because Iran (a State Sponsor of Terror) routinely provided material support to FTOs and Special Groups, AAI, AQ and other terrorists, including those Terrorist Groups and FTOs responsible for the Terrorist Attacks that resulted in the death, maiming, or injury to Plaintiffs and/or Plaintiffs' family members, to advance the terrorist activities of those FTOs and Special Groups and other terrorists, Iran is directly and/or vicariously liable for the personal injuries caused by those FTOs and Terrorist Groups.

61. Iran's pursuit and development of weapons of mass destruction—including IEDs, EFPs, mines and similar explosive munitions — were the subject of numerous news reports, U.S. government reports, and Congressional testimony, as well as U.N. Security Council resolutions and European Union regulations.[15]

## B. ISLAMIC REVOLUTIONARY GUARD CORPS (IRGC)

62. The IRGC was founded in the wake of the 1979 revolution as a branch of the Iranian Armed Forces tasked with protecting the country's Islamic system. Since its origin as an ideologically driven militia, the IRGC has taken an ever more assertive role in virtually every aspect of Iranian society. The IRGC is a special entity unto itself, part military force, part paramilitary force, and part business conglomerate. Its expanded social, political, military, and economic role has led many analysts to argue that its political power has surpassed even that of the Shi'a clerical system.

63. The IRGC is nominally comprised of five branches (Ground Forces, Air Force, Navy, Basij militia, and Qods Force special operations IRGC-QF) in addition to a counterintelligence directorate and representatives of the Supreme Leader.

64. Several of the IRGC's leaders have been sanctioned under U.N. Security Council Resolution 1747.

65. The IRGC is now a vast conglomerate. It controls Iran's missile batteries, its nuclear program, and a business empire.

---

[15] Sudarsan Raghavan, *Iran Said to Support Shiite Militias in Iraq*, WASHINGTON POST, Aug. 15, 2006, http://www.washingtonpost.com/wp-dyn/conten/article/2006/08/14/AR2006081400477.html.

66. The IRGC is the spine of the current political structure and a major player in the Iranian economy.[16] It has expanded well beyond its mandate into a socio-military-political-economic force that deeply penetrates Iran's power structure.[17] The IRGC is a central participant in Iran's concerted efforts to sow terror in Iraq.

67. Even before the U.S. invasion of Iraq in 2003, the IRGC had long cultivated ties to Shi'a opposition groups opposed to Saddam Hussein's brutal regime, including the Badr Corps (discussed in more detail below) that was headquartered in Iran in the 1980s and the 1990s.

68. The IRGC's subversion of Iraq has not been limited to terrorism.

69. The IRGC has also infiltrated Iraqi society, providing "political and ideological support" via charitable associations such as the Khomeini Social Help Committee – in Karbala, Najaf, Kut, and Sadr City – and the Imam Mohammad Bagher Institute in Najaf.

70. The IRGC also purchased or developed seven television stations in Iraq, and at least three radio stations.

71. According to the U.S. State Department's 2005 Country Reports on Terrorism: "[t]he IRGC was increasingly involved in supplying lethal assistance to Iraqi militant groups, which destabilizes Iraq... Senior Iraqi officials have publicly expressed concern over Iranian interference in Iraq, and there were reports that Iran provided funding, safe passage, and arms to insurgent elements."

---

[16] Central Bank of the Islamic Republic of Iran, *General Information*, http://www.cbi.ir/page/GeneralInformation.aspx (last visited Sept. 12, 2017).

[17] Bruno Greg and Jayshree Bajoria, Iran's Revolutionary Guards, Council on Foreign Relations, Oct. 12, 2011.

72. The IRGC-QF's "Department 2000" manages Iran's relationship with Hezbollah, which includes the flow of some of Iran's most sophisticated weapon systems, including military grade EFPs, anti-tank guided missiles, and various rockets, such as the Fajr-5.

73. The IRGC is an "agency or instrumentality" of the government of Iran as defined by 28 U.S.C. § 1603(b) and is owned and controlled by the government of Iran.

74. Defendant Iran authorized, ratified and approved the acts of Defendant IRGC.

75. Accordingly, Defendant Iran is vicariously liable for the acts of Defendant IRGC.

### C. THE IRANIAN MINISTRY OF INTELLIGENCE & SECURITY (MOIS)

76. The Iranian Ministry of Intelligence and Security (a/k/a "Vezarat-e Ettela'at Va Amniat-e Keshvar" a/k/a "VEVAK" a/k/a "VAJA," hereinafter "MOIS") is located at Second Negarestan Street, Pasdarsan Avenue, Tehran, Iran.

77. MOIS headquarters is a facility located in Tehran on the block bounded by Sanati Street on the West, 30th Street on the South, and Iraqi Street on the East.

78. MOIS is the most powerful and well-supported ministry among all Iranian ministries in terms of logistics, finances, and political support. It is a non-military governmental organization that operates both inside and outside of Iran.

79. MOIS functions as the Iranian Intelligence Service and, in this capacity, it is the secret police and primary intelligence agency of the Islamic Republic of Iran. It is the part of the Iranian government's security apparatus responsible for the assassination of Iranian political dissidents inside and outside the country.

80. MOIS uses all means at its disposal to protect the Islamic Revolution of Iran, utilizing such methods as infiltrating internal opposition groups, monitoring domestic threats and expatriate dissent, arresting alleged spies and dissidents, exposing conspiracies deemed

threatening, and maintaining liaison with other foreign intelligence agencies as well as with organizations that protect the Islamic Republic's interests around the world.

81. MOIS operates under the direct supervision of Iran's Supreme Leader, Ayatollah Khamenei, who claims to be the leader of the Muslim world. As noted above, MOIS agents are known as "Unknown Soldiers of Imam Zaman," who is the Twelfth Imam in the succession of Islamic leaders of Shi'a Muslims. However, the organization is not bound by Shi'a beliefs. To advance its goals, MOIS recruits individuals regardless of their beliefs.

82. According to Iran's constitution, all organizations must share information with the Ministry of Intelligence and Security. The ministry oversees all covert operations. The IRGC and IRGC-QF Qods Force share all the information they collect with MOIS.

83. MOIS and the IRGC-QF coordinate through foreign embassies, "charities," and cultural centers in targeted countries.

84. Hezbollah is organizationally linked to MOIS, and is used by MOIS as a proxy in Iran's intelligence operations.

85. In the Middle East, Iran, through MOIS and the IRGC-QF, uses Hezbollah to threaten the United States in Iraq and Afghanistan by backing insurgent groups, including Terrorist Groups who committed the Terrorist Attacks involving Plaintiffs.

86. Specifically, MOIS acted as a conduit for Iran's provision of funds, training and direction to Terrorist Groups for their terrorist activities beyond the borders of Iran including the actions relating to the Terrorist Attacks and Plaintiffs' injuries.

87. MOIS and it agents have routinely been, and are presently designated by the U.S. Treasury as an SDN and SDGT, pursuant to Iranian Financial Sanctions Regulations ("IFSR"), including:

a. Executive Order 13399 of April 25, 2006, *Blocking Property of Additional Persons in Connection With the National Emergency With Respect to Syria*, sanctioning entities and individuals that:

> [H]ave been, involved in the planning, sponsoring, organizing, or perpetrating of: (A) the terrorist act in Beirut, Lebanon, that resulted in the assassination of former Lebanese Prime Minister Rafiq Hariri and the deaths of 22 others; or (B) any other bombing, assassination, or assassination attempt in Lebanon since October 1, 2004, that is related to Hariri's assassination or that implicates the Government of Syria or its officers or agents; (ii) to have obstructed or otherwise impeded the work of the Commission established pursuant to UNSCR 1595; (iii) to have materially assisted, sponsored, or provided financial, material, or technological support for, or goods or services in support of, any such terrorist act, bombing, or assassination attempt, or any person designated pursuant to this order; or (iv) to be owned or controlled by, or acting or purporting to act for or on behalf of, directly or indirectly, any person designated pursuant to this order.

b. Executive Order 13460 of February 13, 2008, Blocking Property of Additional Persons in Connection With the National Emergency With Respect to Syria, sanctioning entities and individuals:

> [R]esponsible for or otherwise significantly contributing to actions taken or decisions made by the Government of Syria that have the purpose or effect of undermining efforts to stabilize Iraq or of allowing the use of Syrian territory or facilities to undermine efforts to stabilize Iraq.
>
> (Emphasis added).

c. Executive Order 13553 of September 28, 2010, designating MOIS and its agents as an "IRAN-HR" entity, responsible for "serious human rights abuses by the government of Iran. In doing so the United States sought to sanction entities and individuals that:

> "[Were] acting on behalf of the Government of Iran (including members of paramilitary organizations) who is responsible for or

> complicit in, or responsible for ordering, controlling, or otherwise directing, the commission of serious human rights abuses against persons in Iran or Iranian citizens or residents, or the family members of the foregoing, on or after June 12, 2009, regardless of whether such abuses occurred in Iran… materially assisted, sponsored, or provided financial, material, or technological support for, or goods or services to or in support of, [such] activities described… or any person whose property and interests in property are blocked pursuant to this order, or owned or controlled by, or to have acted or purported to act for or on behalf of, directly or indirectly, any person whose property and interests in property are blocked pursuant to this order.

d. Executive Order 13606 of April 22, 2012, designating MOIS and its agents as an "HRIT-IR" entity, responsible for "grave human rights abuses by the governments of Iran and Syria via information technology." In doing so, the United States sanctioned entities and individuals that:

> [P]rovided, directly or indirectly, goods, services, or technology to Iran or Syria likely to be used to facilitate computer or network disruption, monitoring, or tracking that could assist in or enable serious human rights abuses by or on behalf of the Government of Iran or Syria… [or] provided, directly or indirectly, goods, services, or technology to Iran or Syria likely to be used to facilitate computer or network disruption, monitoring, or tracking that could assist in or enable serious human rights abuses by or on behalf of the Government of Iran… [or] materially assisted, sponsored, or provided financial, material, or technological support for, or goods or services to or in support of [these] activities… [or] owned or controlled by, or to have acted or purported to act for or on behalf of, directly or indirectly, any person whose property and interests in property are blocked pursuant to this order."

88. MOIS has been involved in kidnappings, assassinations, and terrorism since its inception in 1985.

89. Many of the U.S. State Department reports on global terrorism over the last twenty-five years refer to MOIS as Iran's key facilitator and director of terrorist attacks.

90. In 1995 and again in 1996, Usama Bin Laden approached MOIS and asked to join forces against the United States. Bin Laden's phone records, obtained by U.S. investigators

working on the U.S. embassy bombings in Kenya and Tanzania, show that 10 percent of phone calls made by Bin Laden and his lieutenants were to Iran.

91. Seif al-Adl, one of AQ's top-ranking leaders at the time, was the liaison between Iranians and AQ; he coordinated meetings with the IRGC's leaders and MOIS officials.

92. At all times relevant to this action, MOIS acted as an agent of Iran and performed certain acts within the scope of its agency within the meaning of 28 U.S.C. § 1603(b).

93. U.S. federal courts have consistently held that the IRGC and the MOIS are parts of the Iranian state itself.[18]

94. Defendant Iran authorized, ratified, and approved the acts of Defendant MOIS.

95. Accordingly, Defendant Iran is vicariously liable for the acts of Defendant MOIS.

**D. BANK MARKAZI JOMHOURI ISLAMI IRAN**

96. Bank Markazi Jomhouri Islami Iran is the Central Bank of Iran. The Central Bank of Iran ("CBI") was established in 1960, and, according to its website, CBI is responsible for the design and implementation of Iran's monetary and credit policies.[19]

97. CBI is headquartered in Tehran, Iran at Mirdamad Boulevard, No. 198, P.O. Box: 15875/7177.

98. CBI has provided millions of dollars to terrorist organizations via other Iranian-owned and controlled banks. For example, in a press release issued by the U.S. Treasury

---

[18] *See e.g., Rimkus v. Islamic Republic of Iran*, 575 F.Supp.2d 181, 198–200 (D.D.C. 2008) (Lamberth, C.J.); *Blais v. Islamic Republic of Iran*, 459 F.Supp.2d 40, 60–61 (D.D.C. 2006) (Lamberth, J.) (both MOIS and IRGC must be treated as the state of Iran itself for purposes of liability); and *Salazar v. Islamic Republic of Iran*, 370 F.Supp.2d 11, 105, 115–16 (D.D.C. 2005) (Bates, J.) (same).

[19] *Supra* note 16

Department in 2007 regarding the designation of the Iranian-owned Bank Saderat as an SDGT, the U.S. Government noted that:

> Bank Saderat, which has approximately 3200 branch offices, has been used by the Government of Iran to channel funds to terrorist organizations, including Hezbollah and EU-designated terrorist groups Hamas, PFLP-GC, and Palestinian Islamic Jihad. For example, from 2001 to 2006, Bank Saderat *transferred $50 million from the **Central Bank of Iran** through its subsidiary in London to its branch in Beirut for the benefit of Hezbollah fronts in Lebanon that support acts of violence*. (Emphasis added.)

99. According to the United States' Financial Crimes Enforcement Network ("FinCEN"):

> The Central Bank of Iran, which regulates Iranian banks, has assisted designated Iranian banks by transferring billions of dollars to these banks in 2011. In mid- 2011, the CBI transferred several billion dollars to designated banks, including Saderat, Mellat, EDBI and Melli, through a variety of payment schemes. In making these transfers, the CBI attempted to evade sanctions by minimizing the direct involvement of large international banks with both CBI and designated Iranian banks.

100. CBI is an alter-ego and "agent and instrumentality" of the Iranian government and its Supreme Leader as defined by 28 U.S.C. § 1603, and it has routinely used Iranian banks like the other Defendant Iranian banks as conduits for terror financing and weapons proliferation on behalf of the Iranian regime.

101. Defendant Iran authorized, ratified and approved the acts of Defendant CBI.

102. Accordingly, Defendant Iran is vicariously liable for the acts of Defendant CBI.

## E. BANK MELLI IRAN

103. Bank Melli Iran was established in 1927 by order of the Iranian Parliament. It is one of the largest banks in Iran.

104. Following the Iranian Revolution in 1979, all banks in Iran were nationalized, and, as discussed below, even now most are effectively controlled by the Iranian regime.

105. Bank Melli Iran is headquartered at Ferdowsi Avenue, Building 10, Tehran, Iran.

106. Bank Melli Iran maintains a branch office in Germany, located at Holzbrücke 2, 20459 Hamburg, Germany.

107. Bank Melli Iran is an "agency or instrumentality" of the government of Iran as defined by 28 U.S.C. § 1603(b).

108. As discussed in detail below, Bank Melli Iran is owned and controlled by Iran to such an extent that it rightfully can be considered an organ of the state as defined by 28 U.S.C. § 1603(b)(2).

109. Melli Bank Plc in London was established in January 2002 as a wholly-owned subsidiary of Bank Melli Iran.

110. Melli Bank Plc was headquartered at 98a Kensington High Street, London, W8 4SG, United Kingdom and, in 2016, moved its head office to Dubai.

111. The Chairman of Bank Melli Iran serves as the Chairman of the Board of Directors of Melli Bank Plc.

112. Bank Melli Iran appoints all members of the Board of Directors of Melli Bank Plc.

113. Melli Bank Plc is dominated and controlled by Iran to such an extent that it rightfully can be considered an organ of the state as defined by 28 U.S.C. § 1603, and its property is subject to and available to satisfy any final judgment in this matter pursuant to 28 U.S.C. § 1610.

114. According to the U.S. government, from 2004-2011, Bank Melli Iran and Melli Bank Plc in London transferred approximately $100 million USD to the IRGC-QF, which trained,

armed, and funded terrorist groups that targeted and killed and maimed American and Iraqi forces and civilians.

115. Specifically, according to the U.S. government:

> Islamic Revolutionary Guards Corps (IRGC) and IRGC-Qods Force, who channel funds to militant groups that target and kill Coalition and Iraqi forces and innocent Iraqi civilians, have used Bank Melli and other Iranian banks to move funds internationally. Bank Melli used deceptive banking practices to obscure its involvement from the international banking system by requesting that its name be removed from financial transactions when handling financial transactions on behalf of the IRGC.

116. In October 2007 and throughout the remainder of the relevant period, Bank Melli Iran and Melli Bank Plc were each designated as a SDN pursuant to Executive Order ("E.O.") 13382, and included on the Office of Foreign Assets Control's SDN list.[20] The U.S. Treasury Department press release announcing the designation stated:

> Bank Melli also provides banking services to the [Iranian Revolutionary Guard Corps] and the Qods Force. Entities owned or controlled by the IRGC or the Qods Force use Bank Melli for a variety of financial services. From 2002 to 2006, Bank Melli was used to send at least $100 million to the Qods Force. When handling financial transactions on behalf of the IRGC, Bank Melli has employed deceptive banking practices to obscure its involvement from the international banking system. For example, Bank Melli has requested that its name be removed from financial transactions.

117. A State Department diplomatic cable from March 2008 noted that:

> Bank Melli and the Central Bank of Iran also provide crucial banking services to the Qods Force, the IRGC's terrorist supporting arm that was headed by

---

[20] "The Office of Foreign Assets Control ("OFAC") of the U.S. Department of the Treasury administers and enforces economic and trade sanctions based on U.S. foreign policy and national security goals against targeted foreign countries and regimes, terrorists, international narcotics traffickers, those engaged in activities related to the proliferation of weapons of mass destruction, and other threats to the national security, foreign policy or economy of the United States." *See* U.S. Department of the Treasury, *Terrorism and Financial Intelligence*, https://www.treasury.gov/about/organizational-structure/offices/Pages/Office-of-Foreign-Assets-Control.aspx (last visited Sept. 26, 2018).

> UNSCR 1747 designee Commander Ghassem Soleimani. Soleimani's Qods Force leads Iranian support for the Taliban, Hezbollah [sic], Hamas [sic] and the Palestinian Islamic Jihad. Entities owned or controlled by the IRGC or the Qods Force use Bank Melli for a variety of financial services. From 2002 to 2006, Bank Melli was used to send at least $100 million to the Qods Force. Bank Melli use of Deceptive Banking Practices... When handling financial transactions on behalf of the IRGC, Bank Melli has employed deceptive banking practices to obscure its involvement from the international banking system. For example, Bank Melli has requested that its name be removed from payment instructions for US dollar denominated transactions.

118. According to the U.S. government, Bank Melli Iran provided banking services to the IRGC-QF which trained, armed, and funded terrorist groups that targeted, killed and maimed American and Iraqi forces and civilians.

119. Specifically, according to the U.S. government in a November 10, 2009 diplomatic cable:

> [The] Islamic Revolutionary Guards Corps (IRGC) and IRGC-Qods Force, who channel funds to militant groups that target and kill Coalition and Iraqi forces and innocent Iraqi civilians, have used Bank Melli and other Iranian banks to move funds internationally. Bank Melli used deceptive banking practices to obscure its involvement from the international banking system by requesting that its name be removed from financial transactions when handling financial transactions on behalf of the IRGC.

120. During the Relevant Time Period, Bank Melli Iran financed transactions that purposefully evaded U.S. sanctions on behalf of Mahan Air (an SDGT) and Iran's Ministry of Defense and Armed Forces Logistics.

121. For example, Bank Melli issued a Letter of Credit to Mahan Airlines (an Iranian airline) in August 2004 to help Mahan Airlines illegally acquire aircraft engines subject to the U.S. embargo.

122. Bank Melli's financial support and assistance to Mahan Airlines is particularly significant because on October 12, 2011, the United States designated Mahan Air as an SDGT for "providing financial, material and technological support to the Islamic Revolutionary Guard Corps-Qods Force (IRGC-QF). Based in Tehran, Mahan Airlines provides transportation, funds transfers and personnel travel services to the IRGC-QF."

123. The U.S. Treasury Department explained Mahan Airline's direct involvement with terrorist operations, personnel movements and logistics on the IRGC-QF's behalf:

> Mahan Air [has] facilitated the covert travel of suspected IRGC-QF officers into and out of Iraq by bypassing normal security procedures and not including information on flight manifests to eliminate records of the IRGC-QF travel.
>
> Mahan Air crews have facilitated IRGC-QF arms shipments. Funds were also transferred via Mahan Air for the procurement of controlled goods by the IRGC-QF.
>
> In addition to the reasons for which Mahan Air is being designated today, Mahan Air also provides transportation services to Hezbollah, a Lebanon-based designated Foreign Terrorist Organization. Mahan Air has transported personnel, weapons and goods on behalf of Hezbollah and omitted from Mahan Air cargo manifests secret weapons shipments bound for Hezbollah.

124. Mahan Airlines was also later identified as the conduit to Iran of thousands of radio frequency modules that were ultimately recovered by Coalition Forces in Iraq from IEDs and EFPs that were used to target Iraqi civilians, U.S. soldiers, and Coalition Forces, including some Plaintiffs herein.

125. In mid-2007, Bank Melli Iran's branch in Hamburg, Germany ("Bank Melli-Hamburg") transferred funds on behalf of Iran's Defense Industries Organization ("DIO").

126. As is further discussed below, DIO is an Iranian government-owned defense manufacturer whose name, logo, and/or product tracking information was stamped on munitions

found in weapons caches that were seized from terrorist organizations in Iraq, including large quantities of weapons produced by DIO in 2006 and 2007 (e.g. 107 and 122 millimeter artillery rockets, as well as rounds and fuses for 60 millimeter and 81 millimeter mortars).

127. Defendant Iran authorized, ratified, and approved the acts of Defendant Bank Melli Iran.

128. Accordingly, Defendant Iran is vicariously liable for the acts of Defendant Bank Melli Iran.

### F. NATIONAL IRANIAN OIL COMPANY

129. The National Iranian Oil Company ("NIOC"), owned and overseen by the Government of Iran through its Ministry of Petroleum, is responsible for the exploration, production, refining, and export of oil and petroleum products in Iran.

130. NIOC is headquartered at Roodsar Street No. 18, Tehran, Iran.

131. NIOC is an "agency or instrumentality" of the Government of Iran as defined by 28 U.S.C. § 1603(b).

132. In 2008, the Treasury Department identified NIOC (and other Iranian agencies) as "centrally involved in the sale of Iranian oil, as entities that are owned or controlled by the [Government of Iran]."

133. Pursuant to E.O. 13382, the U.S. Government designated NIOC as an SDN.

134. The U.S. Government has identified NIOC as an agent or affiliate of the IRGC.

135. In September 2012, the U.S. Treasury Department handed its report to Congress regarding its determination that NIOC is an agent or affiliate of the IRGC. The report provided that:

> Recently, the IRGC has been coordinating a campaign to sell Iranian oil in an effort to evade international sanctions, specifically those imposed by

> the European Union that prohibit the import, shipping, and purchase of Iranian oil, which went into full effect on July 1, 2012. NIOC, which is owned by the Government of Iran through the Ministry of Petroleum, is responsible for the exploration, production, refining, and export of oil and petroleum products in Iran.
>
> Under the current Iranian regime, the IRGC's influence has grown within National Iranian Oil Co. For example, on August 3, 2011, Iran's parliament approved the appointment of Rostam Qasemi, a Brigadier General in the IRGC, as Minister of Petroleum. Prior to his appointment, Qasemi was the commander of Khatam Al-Anbia, a construction and development wing of the IRGC that generates income and funds operations for the IRGC. Even in his new role as Minister of Petroleum, Qasemi has publicly stated his allegiance to the IRGC.

136. As the IRGC has become increasingly influential in Iran's energy sector, Khatam Al-Anbiya has obtained billions of dollars' worth of contracts with Iranian energy companies, including NIOC, often without participating in a competitive bidding process.

137. Under the Iran Threat Reduction and Syria Human Rights Act of 2012 ("ITRSHRA"), the U.S. government determined that that NIOC is an agent or affiliate of the IRGC under section 104(c)(2)(E)(i) of the Comprehensive Iran Sanctions, Accountability, and Divestment Act of 2010 ("CISADA") and section 302 of ITRSHRA. As part of that 2012 certification, NIOC was formally determined to be part of the Government of Iran.

138. In addition, the ITRSHRA provided that:

> It is the sense of Congress that the National Iranian Oil Company and the National Iranian Tanker Company are not only owned and controlled by the Government of Iran but that those companies provide significant support to Iran's Revolutionary Guard Corps and its affiliates.[21]

---

[21] U.S. Department of the Treasury, *Sanctions*, *See*, https://www.treasury.gov/resource-center/sanctions/Documents/hr_1905_pl_112_158.pdf (last visited Sept. 12, 2017).

139. After the events giving rise to the claims herein, the U.S. government withdrew this determination as of 2016.

140. NIOC used its oil and natural gas business to launder money for the IRGC, often using Defendant Central Bank of Iran for this purpose.

141. In 2009, West Point's Combating Terrorism Center published a report on the role of NIOC, particularly in the Maysan province in Iraq (Southeast border between Iran and Iraq), and its role in studying U.S. troops movements:

> The establishment of a new U.S. and Iraqi [Forward Operating Base] on the Iranian border has resulted in three waves of attacks in an area that was formerly devoid of incidents The incident occurred in the same district as the February 2007 EFP attack on a British aircraft at a Buzurgan dirt airstrip, itself a reaction by Special Groups to UK long-range patrolling of the Iranian border. This part of the border is increasingly the scene of U.S. and Iranian countermoves to support their proxies and patrol the frontier; Iranian intelligence gathering takes place using National Iranian Oil Company helicopters and border guards, while U.S.-Iraqi helicopter-borne joint patrols provide moral and material support to isolated Iraqi border posts and local communities.

142. Thus, NIOC served a critical function in funding and supporting the IRGC's activities.

143. NIOC also obtained letters of credit from western banks to provide financing and credit to the IRGC.[22]

144. Defendant Iran authorized, ratified, and approved the acts of Defendant NIOC.

145. Accordingly, Defendant Iran is vicariously liable for the acts of Defendant NIOC.

## V. FACTUAL ALLEGATIONS

---

[22] The Superseding Indictment filed in *U.S. v. Zarrab* (filed in the S.D.N.Y (1:15-cr-00867)) demonstrates that, as late as 2013, NIOC continued to illegally launder U.S. dollars through U.S. financial institutions.

146. International terrorism is a serious and deadly problem that threatens the vital interests of the United States.[23] It affects the interstate and foreign commerce of the United States by harming international trade and market stability, and limiting international travel by United States' citizens, as well as foreign visitors to the United States.[24]

147. The United States has a clear interest in combating terrorism, both within its borders and abroad, and in protecting its nationals at home and abroad.[25]

148. Iran committed and continues to commit violent attacks against U.S. nationals. Iran commits these attacks via proxy terrorist organizations.

149. According to the CIA, Iranian leaders view terrorism as an important instrument of foreign policy they use both to advance national goals and to export the regime's Islamic revolutionary ideals.[26]

150. Further, Iran supports and directs terrorist operations by Hezbollah and desires to keep the United States and U.S. nationals as primary terrorist targets.[27]

151. In June 2007, U.S. Department of State spokesman, Sean McCormack, delivered a press briefing on Iran and its ties to international terrorism. When asked what changes he was

---

[23] Justice Against Sponsors of Terrorism Act, § 2(a)(1), Pub. L. 114-222 (2016).

[24] *Id*. at § 2(a)(2).

[25] National Defense Guidance circa 2008. See:
https://archive.defense.gov/pubs/2008NationalDefenseStrategy.pdf

[26] Central Intelligence Agency, Directorate of Intelligence, *Iran: The Uses of Terror*, (Oct. 22, 1987 (approved for release June 1999)), https://www.cia.gov/library/readingroom/docs/DOC_0000259360.pdf.

[27] *Id*.

looking for concerning Iran and its ties to terrorism, he responded, "Well, for starters, stop supplying *money, technology, and training* for people who are trying to kill [U.S. nationals]... "[28]

### A. IRAN'S LONG HISTORY OF MATERIALLY SUPPORTING AND ENCOURAGING ACTS OF INTERNATIONAL TERRORISM

152. For decades Iran has made the funding of terrorist organizations (including the Special Groups and other terrorists that perpetrated the Terrorist Attacks) and the commodification of international acts of terrorism its business.

153. Iran has a history of financing, supporting and training terrorists and their affiliates in the perpetration of terrorist attacks against the United States, its citizens and its allies. For example, Hon. Judge John D. Bates found in a lawsuit brought by U.S. victims of the bombing of the U.S. embassies in Nairobi and Dar es Salaam that, "[s]upport from Iran and Hezbollah was critical to Al Qaeda's execution of the 1998 embassy bombings…Prior to its meetings with Iranian officials and agents, Al Qaeda did not possess the technical expertise required to carry out the embassy bombings."[29]

154. Similarly, Iran has been lavish with its support to all groups (including Sunni groups with ties to Al Qaeda) engaged in acts of international terrorism against Iraqi citizens, Coalition Forces and U.S. nationals, including Plaintiffs.

155. Since the Iranian Revolution in 1979, Iran has been a principal source of extremism and terrorism throughout the Middle East and the rest of the world, responsible for bombings, kidnappings, hostage-taking torture, extrajudicial killings, and assassinations across the globe.

---

[28] U.S. Department of State, *Sean Womack Daily Press Briefing* (June 27, 2007), http://site-894736.bcvp0rtal.com/detail/videos/archive/video/1807599216/daily-briefing---june-27-2007.
[29] *Wamai v. Republic of Sudan et. al.*, No. 1:08-cv-01349-JDB-JMF (D. D.C. Nov. 30, 2011), Memorandum Opinion at 13–14, ECF No. 55.

156. On January 19, 1984, the United States designated Iran a State Sponsor of Terrorism. That designation has remained in force throughout the Relevant Period to this Action.

157. Iran prefers not to be directly implicated in acts of international terrorism against U.S. nationals but instead acts through co-conspirators and/or agents and offers bounties for killing U.S. nationals, shooting down U.S. helicopters, and destroying American tanks.

158. Reports suggest that in fall 2003 "a senior Iranian cleric in Tehran set up a special 100-member army, known as al Saqar, which means eagle in Arabic, to... carry out [acts of international terrorism]."[30]

159. Countries determined by the Secretary of State to have repeatedly provided support for acts of international terrorism receive such a designation pursuant to three laws: (1) section 6(j) of the Export Administration Act; (2) section 40 of the Arms Export Control Act; and (3) section 620A of the Foreign Assistance Act.

160. Taken together, the main categories of sanctions resulting from designation under these authorities include: (1) restrictions on U.S. foreign assistance; (2) a ban on defense exports and sales; (3) certain controls over exports of dual use items; and (4) miscellaneous financial and other restrictions.

161. Designation under the above-referenced authorities also implicates other sanction laws that penalize persons and countries engaging in certain trade with state sponsors. Currently there are three recidivist countries designated under these authorities: Iran, Sudan, and Syria.[31]

---

[30] Edward T. Pound, *Special Report: The Iran Connection*, U.S. News and World Report, Nov. 14, 2004.

[31] U.S. Department of State, *State Sponsors of Terrorism*, https://www.state.gov/j/ct/list/c14151.htm (last visited Mar. 24, 2017).

162. In Iraq, the policies of Iran have been largely successful, "giving Iran an unprecedented degree of influence there at the expense of the United States…" An Iran-friendly Iraq "serves as an opportunity for Iran to evade the increasingly harsh international sanctions regime and to continue financing [FTOs]."[32]

163. Iranian diplomatic, political, and economic networks within Iraq are highly developed and closely linked both to Hezbollah and to the IRGC-QF.

164. Unclassified Iraqi government Harmony records, collated by the Combating Terrorism Center at West Point, as well as information provided to the Coalition Forces through interrogation of detainees of the Shiite militias, illustrate how Iran sponsored terrorist groups, directly and through Hezbollah (Iran's proxy for more than 30 years), operated in Iraq, including supporting and directing the terrorist groups responsible for the Terrorist Attacks which killed or injured Plaintiffs or their family members.

165. Planning and preparation by Iran and its agents, including Hezbollah, for their active involvement in supporting terrorist groups and encouraging sectarian violence in Iraq has been underway since at least 2002.

166. At least as early as the 2003 U.S. overthrow of Saddam Hussein's regime in Iraq, Iran has assiduously worked to expand its influence in Iraq and throughout the region in a variety of ways, including by fomenting violence and terrorism when such activities have served its diplomatic, political, and economic ambitions.

167. When Coalition Forces liberated Iraq in 2003, Iran's IRGC formed the counter-Coalition Ramazan Corps and ordered it to attack U.S. and Iraqi forces. Saddam Hussein's 24-year

---

[32] Frederick W. Kagan et. al., *Iranian Influence in the Levant, Egypt, Iraq, and Afghanistan*, at 6 (May 2012), http://www.aei.org/wp-content/uploads/2012/05/-iranian-influence-in-the-levant-egypt-iraq-and-afghanistan_171235465754.pdf.

rule ended on April 9, 2003. The U.S. Department of State reported that, shortly thereafter, individuals with ties to the IRGC may have attempted to infiltrate southern Iraq and elements of the Iranian regime helped members of AAI transit and find safe haven in Iran.

168. In a Friday prayers sermon in Tehran in May 2003, Secretary General of Iran's powerful Guardian Council Ayatollah Ahmad Jannati publicly encouraged Iraqis to stage and participate in suicide operations against U.S. nationals, including Plaintiffs and Coalition Forces.[33] He went on to encourage the so-called "holy fighters" to "maintain good relations with the coalition forces" but at the same time create "a secret group that would conduct attacks against American troops."[34]

169. In 2005, the Department of State reported that Iran was a safe haven in that known terrorists, extremists, and sympathizers are able to transit its territory and cross the long and porous border into Iraq. Iran also equips terrorists with technology and provides training in extremist ideology and militant techniques.[35]

170. In 2008, William Burns, U.S. Undersecretary of State for Political Affairs, testified before Congress that it is "Iran's… support for terrorist groups…its efforts to sow violence and

---

[33] U.S. *Department* of State, Office of the Coordinator for Counterterrorism, *Patterns of Global Terrorism* (Apr. 29, 2004) http://www.state.gov/j/ct/rls/crt/2003/31644.htm.

[34] Edward T. Pound, *Special Report: The Iran Connection*, U.S. News and World Report (Nov. 22, 2004), http://www.iranfocus.com/en/index.php?option=com_content&view=article&id=741:the-iran-connection&catid=33&Itemid=115.

[31] U.S. Department of State, Office of the Coordinator for Counterterrorism, *Country Reports on Terrorism 200,* at 212006), https://www.state.gov/documents/organization/65462.pdf.

[35] U.S. Department of State, Office of the Coordinator for Counterterrorism, *Country Reports on Terrorism 200,* at 212006), https://www.state.gov/documents/organization/65462.pdf.

undermine stability in Iraq and Afghanistan, including lethal support for groups that are directly responsible for hundreds of U.S. casualties."[36]

171. As recently as 2015, the State Department stated that "Iran's state sponsorship of terrorism worldwide remained undiminished through the … IRGC-QF, its Ministry of Intelligence and Security, and Tehran's ally Hezbollah, which remained a significant threat to the stability of Lebanon and the broader region."[37]

## B. IRAN'S SPONSORSHIP AND MATERIAL SUPPORT OF TERRORISM IN IRAQ

172. Iran is the world's foremost exporter of global terrorism, and uses various FTOs, Special Groups, and other agents or proxies to distribute and deliver this deadly product around the globe.

173. Iran utilizes Special Groups and other terrorists that coordinated with Hezbollah and the IRGC as front groups to perpetrate terrorist acts, including those that killed or injured Plaintiffs or members of Plaintiffs' families.

174. Iran's command and control over IRGC, FTOs and Special Groups that routinely perpetrate terrorist attacks, including the Terrorist Attacks at issue in this Action, is best illustrated by diagramming the command-and-control Iran exercises over those entities:

---

[36] *U.S. Policy Towards Iran: Hearing Before S. Comm. on Foreign Relations and H. Comm. on* Foreign *Affairs*, 110th Cong. (July 9, 2008) (testimony of William J. Burns, Undersecretary for Political Affairs, U.S. Department of State), https://2001-2009.state.gov/p/us/rm/2008/106817.htm.

[37] U.S. Department of State, Office of the Coordinator for Counterterrorism, *Country* Reports *on Terrorism 2015*, at 166 (June 2016), https://www.state.gov/documents/organization/258249.pdf.




175. Iran's support of terrorist groups in Iraq was described in the U.S. State Department's 2005 Country Reports on Terrorism, which observed:

> Iran has provided political and ideological support for several terrorist and militant groups active in Iraq. Attractive to terrorists in part because of the limited presence of the United States and other Western governments there, Iran is also a safe haven in that known terrorists, extremists, and sympathizers are able to transit its territory and cross the long and porous border into Iraq. Iran also equips terrorists with technology and provides training in extremist ideology and militant techniques.

176. Iran furthers its terrorism-based foreign policy through a number of key Iranian Proxies including Iran's Ministry of Defense and Armed Forces Logistics ("MODAFL"), the IRGC, the IRGC-QF, Hezbollah/Hizbollah, NIOC, KAA, Mahan Air, and Special Groups.

177. In 2008, Pentagon Press Secretary Geoff Morrell reported on the "smuggling system in which the Iranians are providing their allies within Iraq, these special groups, with the

munitions that are then used to take on us, whether it be EFPs or rockets or conventional arms. These are being used by these special groups and being provided by the Iranians."

178. On January 9, 2008, the U.S. Treasury Department designated four individuals and one entity under E.O. 13438 for threatening the peace and stability of Iraq and the government of Iraq. Three of the individuals, Ahmed Foruzandeh (a Brigadier General in the IRGC-QF), Abu Mustafa Al-Sheibani, and Isma'il Hafiz Al Lami (a/k/a "Abu Dura") were all based in Iran and/or received funding from Iran.

179. Regarding the designation of Abu Mustafa Al-Sheibani, the Treasury Department press release stated:

> Iran-based Abu Mustafa Al-Sheibani leads a network of Shia extremists that commit and provide logistical and material support for acts of violence that threaten the peace and stability of Iraq and the Government of Iraq. Al- Sheibani's Iran-sponsored network was created to affect the Iraqi political process in Iran's favor. The network's first objective is to fight U.S. forces, attacking convoys and killing soldiers. Its second objective is to eliminate Iraqi politicians opposed to Iran's influence. *Elements of the IRGC were also sending funds and weapons to Al-Sheibani's network.*
>
> Al-Sheibani's network – consisting of several hundred members – conducted IED attacks against Americans in the Baghdad region. As of March 2007, Al-Sheibani, known to transport Katyusha rockets to be used for attacks against Coalition Forces, launched rockets against Americans and made videos of the attacks to get money from Iran. *As of April 2007, a member of Al-Sheibani's network supervised the transport of money and explosives from Iran for eventual arrival in Baghdad*. In early May 2007, Al-Sheibani's network assisted members of a Shia militia group by transporting them to Iran for training and providing them with weapons for their activities in Iraq.
>
> Additionally, Al-Sheibani commands several pro-Iranian insurgent groups in southern Iraq that work to destabilize Iraq and sabotage Coalition efforts. These groups use a variety of weapons, to include mortars, Katyusha rockets, and anti-tank landmines. *Ordered by IRGC headquarters to create disorder, the task of these groups is to attack bases of Coalition Forces in southern Iraq, particularly British forces.*

180. To that end, Iran (with Hezbollah's aid) has armed, trained, and funded a variety of FTOs and Special Groups, and infiltrated and co-opted Iraqi security forces in an effort to kill or maim U.S. nationals, including Plaintiffs, and to coerce the United States into withdrawing those forces and to terrorize Iraq's civilian population in order to increase Iran's own influence.

181. According to a 2010 report by the Combatting Terrorism Center at West Point, Iran paid Iraqi "insurgent" groups "between $4,000 and $13,000 per rocket or roadside bomb, depending on the circumstances."

182. Iran did not just act on its own. As part of its strategy of sophisticated and clandestine use of terrorism, Iran preferred not to act directly against the Coalition Forces in Iraq. Rather, Iran relied on various other entities, including Defendants named herein to act on Iran's behalf and at Iran's discretion and guidance. Moreover, without the funding provided to these organizations by Iran, they would not be able to carry out the volume, consistency, frequency, scale, and lethality of the acts of international terrorism they currently, and in the past, routinely perpetrated, including the Terrorist Attacks that killed, maimed, or otherwise injured Plaintiffs or Plaintiffs' family members.

## C. ISLAMIC REVOLUTIONARY GUARD CORPS—QODS FORCE (IRGC-QF)

183. The highest echelons of the Iranian government and the highest echelons of Hezbollah have worked together to organize a violent, resistance movement in Iraq. The IRGC-QF, with direct assistance from Iran, has established and funded this movement.

184. Ayatollah Khomeini established the IRGC-QF in 1979 to protect Iran's Islamic Revolution and export it beyond Iran's borders. The commander of the IRGC-QF reports directly to Iran's Supreme Leader, Ayatollah Ali Khomeini.

185. The Qods Force is the IRGC unit tasked with extraterritorial operations. It trains and equips Islamic revolutionary groups around the Middle East. The IRGC-QF typically provides this paramilitary instruction in Iran and Sudan. At times, the IRGC-QF plays a more direct role in the military operations of the forces it trains, including pre-attack planning and other operation-specific military advice.

186. The Qods Force operates worldwide covertly, as part of a strategy which intends to conceal Iran's participation in terrorist activities.

187. Iran, through the Qods Force, gains access to countries and conceals its involvement in international terrorism therein by cloaking its operations with the appearance of legitimacy, mainly through civilian, charity, or religious oriented institutions or entities.[38]

188. Since 2003, Iran has been materially supporting acts of international terrorism by advising, organizing, training, funding, and equipping FTOs and Special Groups, and other terrorists to kill, maim, or otherwise injure U.S. nationals, among others. To do this, Iran enlisted (and continues to enlist) the IRGC-QF to provide such support to these FTOs and Special Groups.

189. This material support has made these FTOs, Special Groups and other terrorists more effective and lethal than they ever could have been without such assistance.

190. In October 2007, the United States designated the IRGC-QF a SDGT pursuant to E.O. 13324, explaining that:

> The Qods Force has had a long history of supporting Hizballah's military, paramilitary, and terrorist activities, providing it with guidance, funding, weapons, intelligence, and logistical support. The Qods Force

---

[38] As an example, the Qods Force used the Iranian Red Crescent to operate in the Balkans during the 1990s to provide assistance to the Bosnian Muslims against the Serb, and to Hizbollah during the 2006 Lebanon War. *See, e.g., U.S. Embassy Cables: Iran Abuses Iranian Red Crescent to Send Agents and Weapons Overseas,* THE GUARDIAN (Oct. 23, 2008), https://www.theguardian.com/world/us-embassy-cables-documents/174875.

> operates training camps for Hizballah in Lebanon's Bekaa Valley and has reportedly trained more than 3,000 Hizballah fighters at IRGC training facilities in Iran. The Qods Force provides roughly $100 to $200 million in funding a year to Hizballah and has assisted Hizballah in rearming in violation of UN Security Council Resolution 1701. *In addition, the Qods Force provides lethal support in the form of weapons, training, funding, and guidance to select groups of Iraqi Shi'a militants who target and kill Coalition and Iraqi forces and innocent Iraqi civilians.*

191. In 2004, the Qods Force began flooding Iraq with EFPs – lethal roadside bombs that fire a molten copper slug capable of piercing armor. These EFPs wreaked havoc on American troops, accounting for nearly twenty percent of U.S. service personnel deaths. EFPs require skilled assembly and rely on sophisticated sensors. According to General Stanley McChrystal, then head of Joint Special Operations Command, "[t]here was zero question where [the EFPs] were coming from. We knew where all the factories were in Iran. The EFPs killed hundreds of Americans."[39]

192. On October 25, 2007, when the U.S. Department of Treasury designated IRGC-QF as SDGT under E.O. 13224, the Department cited the IRGC-QF's material support to the Taliban, Lebanese Hezbollah, Hamas, Palestinian Islamic Jihad, and the Popular Front for the Liberation of Palestine-General Command as evidence of Iran seeking to inflict casualties on U.S. and NATO forces.[40]

193. IRGC-QF controls and commands Hezbollah, the Lebanese terrorist organization (described below). Pursuant to instructions from IRGC-QF, Hezbollah formed Unit 3800. Unit 3800 was tasked by the IRGC-QF with recruiting, radicalizing and training Iraqi militants and organizing several Iraqi terrorist/insurgency militias, called Special Groups.

---

[39] Dexter Filkins, *The Shadow Commander*, THE NEW YORKER (Sept. 30, 2013), http://www.newyorker.com/magazine/2013/09/30/the-shadow-commander.

[40] U.S. Department of The Treasury, *Fact Sheet: Designation of Iranian Entities and Individuals for Proliferation Activities and Support for Terrorism* (Oct. 25, 2007) https://www.treasury.gov/press-center/press-releases/Pages/hp644.aspx.

194. According to Brigadier Gen. Kevin J. Bergner, a U.S. military spokesman who previously served as the Deputy Commanding General for MNF-I in Mosul, Iraq, "the Qods Force has provided armor-piercing weapons to extremist groups in Iraq, funneling them up to $3 million a month and training Iraqi militiamen at three camps near Tehran." General Bergner added, "[t]he Iranian Qods Force is using Lebanese Hezbollah essentially as a proxy, as a surrogate in Iraq... Our intelligence reveals that senior leadership in Iran is aware of this activity."

195. The Qods Force methodology includes disguising operatives, and some who may appear to be retired officers, in civilian functions to facilitate operations.

196. The Qods Force provides financial aid to terrorist groups in Iraq by using the civilian or religious cover, specifically, entities known as The Headquarters for the Restoration of Holy Shrines (Setad-e Bazsazi-ye Atabat-e Ali-yat, hereinafter "HRHS"), and Khatam al-Ambiya AA (discussed in detail below).

### D. HEZBOLLAH

197. Iran has had a long, deep, strategic partnership with the Lebanese-based Foreign Terrorist Organization Hezbollah, which historically has served as Iran's proxy and agent, enabling Iran to project extremist violence and terror throughout the Middle East and around the globe.

198. Hezbollah is probably the most prominent and "successful" group developed with the assistance of the IRGC-QF.

199. From its inception, Hezbollah has enjoyed significant financial and material aid from Iran. The IRGC-QF, in particular, played a critical role in Hezbollah's foundation and its funding and training.

200. On June 25, 2016, the Secretary General of Hezbollah, Sheikh Hassan Nasrallah, claimed that, "We are open about the fact that Hezbollah's budget, its income, its expenses,

everything it eats and drinks, its weapons and rockets, come from the Islamic Republic of Iran." Nasrallah stated that, "[a]s long as Iran has money, we have money… Just as we receive the rockets that we use to threaten Israel, we are receiving our money. No law will prevent us from receiving it…"[41]

201. Through its proxy, agent, and strategic partner Hezbollah, Iran orchestrated a series of kidnappings of Westerners in Lebanon, including several Americans in the 1980s; killed more than two hundred U.S. Marines at their barracks in Beirut, Lebanon, in 1983; hijacked TWA flight 847 in 1985; and launched two major attacks in the 1990s on Jewish targets in Buenos Aires, Argentina, namely the 1992 bombing of the Israeli Embassy (killing twenty-nine people), and the 1994 bombing of a Jewish community center (killing eighty five people).

202. Hezbollah assisted Al Qaeda affiliated terrorists in the Khobar Tower bombings in Saudi Arabia on June 25, 1996 (which killed 19 U.S. service members) and in the bombing of the U.S. embassies in Nairobi and Dar es Salaam on August 7, 1998 (which killed 224 and injured approximately 5000 people).

203. Hezbollah is a Shi'a Islamist militant group based in Lebanon, funded by Iran, and formed in 1982. Its leaders are followers of Ayatollah Khomeini and Ayatollah Khamenei, and its forces are trained and organized by a contingent of 1,500 Revolutionary Guards.

204. Hezbollah's military strength has grown so significantly that its paramilitary wing, the Jihad Council, is considered more powerful than the Lebanese Army. Hezbollah relied almost exclusively on Iranian largesse, which funds at least $100 to $200 million a year or more.[42]

---

[41] Majid Rafizadeh, *In first, Hezbollah confirms all financial support comes from Iran*, Al Arabiya English (June 25, 2016), https://english.alarabiya.net/en/2016/06/25/In-first-Hezbollah-s-Nasrallah-confirms-all-financial-support-comes-from-Iran.html.

[42] U.S. Department of Defense, *CDA—Military Power of Iran, Unclassified Report on Military Power of Iran* (Apr. 2010), http://www.fas.org/man/eprint/dod_iran_2010.pdf.

205. The U.S. Department of State estimates that Hezbollah has tens of thousands of supporters and members worldwide. While Hezbollah is based in the southern suburbs of Beirut, the Bekaa Valley, and southern Lebanon, its activities make evident the group is capable of operating around the globe, particularly in Iraq.

206. Despite Shi'a ideologies, Iran and Hezbollah have supported and worked with Sunni and other terrorist organizations to effectuate their broader goal of exporting terror around the globe and destabilizing western involvement and influence in the Middle East. According to the New York Times:

> In an interview, Sheikh Naim Qassem, Hezbollah's deputy secretary general, proudly acknowledged his organization's efforts to pass its rich militant experience to other Iranian aligned forces. "Every group anywhere in the world that works as we work, with our ideas, is a win for the party," he said. "It is natural: All who are in accordance with us in any place in the world, that is a win for us because they are part of our axis and a win for everyone in our axis."[43]

207. Hezbollah received "massive material and technical support from the Iranian government"[44] in the planning and perpetrating the terrorist attack which killed 241 U.S. Service Members in Beirut in 1983.

208. The Iranian regime provides "extensive financial support for terrorists generally and in support for Al Qaeda and Hezbollah in particular."[45]

---

[43] Ben Hubbard, *Hezbollah: Iran's Middle East Agent, Emissary and Hammer,* N.Y. TIMES (Aug. 27, 2017).

[44] *Peterson v. Islamic Republic of Iran*, 264 F. Supp. 2d. 46, 58 (D. D.C. 2003).

[45] *Havlish v. Bin Laden (In re Terrorist Attacks on September 11, 2001),* 2011 U.S. Dist. LEXIS 155899, at 97-98 (S.D.N.Y. Dec. 22, 2011).

209. Iran "created Hizballah…[and] has been the sponsor of Hizballah since its inception, providing funding, training, leadership and advice via Hizballah's leadership councils…Hizballah has received from Iran $100 million to $500 million in direct financial support annually…Hizballah served as a terrorist proxy for Iran, created specifically for the purpose of serving as a front for Iranian terrorism, in effect, a cover name for terrorist operations run by Iran's IRGC around the world."[46]

210. As a result of its mission, conduct, and terrorist activities, on January 25, 1995, Hezbollah was designated a SDT by the United States. It has maintained that designation since that time.

211. Hezbollah was designated an FTO by the United States on October 8, 1997, and it has retained that designation since that time.

212. On October 31, 2001, pursuant to E.O. 13224, Hezbollah was designated SDGT by the United States. It has maintained that designation since that time.

213. According to a December 20, 2004 Washington Post article, "Western diplomats and political analysts in Beirut estimated that Hezbollah received $200 million a year from Iran."

214. Sometime after the 2003 U.S. invasion of Iraq, Hezbollah created "Unit 3800," an entity dedicated to supporting Iraqi Shi'a terrorist groups targeting Iraqi citizens, and Multi National Forces in Iraq ("MNF-I").

215. At Iran's request, Hezbollah leader Hassan Nasrallah established Unit 3800.

216. Unit 3800 has trained and advised various Shi'a militias in Iraq, later termed the Special Groups.

---

[46] *Id.*

217. By early 2005, the presence of Hezbollah operatives in Iraq became an open secret when Iraqi Interior Minister Falah al-Naquib announced the arrest of eighteen Lebanese Hezbollah members on terrorism charges.

218. According to U.S. intelligence estimates—and following the 2007 arrest and interrogation of Hezbollah's senior operative in Iraq—in 2007 the IRGC-QF provided Hezbollah and one of its local trainers, Ali Musa Daqduq (who is discussed in greater detail below), up to $3,000,000.00 in U.S. currency every month.

219. Hezbollah's terrorist attacks include the suicide truck bombings of the U.S. Embassy and U.S. Marine barracks in Beirut in 1983; the U.S. Embassy annex in Beirut in 1984; and the 1985 hijacking of TWA flight 847, during which U.S. Navy diver Robert Stethem was murdered. Elements of the group were responsible for the kidnapping, detention, and murder of Americans and other Westerners in Lebanon in the 1980s.

220. Hezbollah was implicated, along with Iran, in the 1992 attacks on the Israeli Embassy in Argentina and in the 1994 bombing of the Argentine-Israeli Mutual Association in Buenos Aires.

221. In 2000, Hezbollah operatives captured three Israeli soldiers in the Shebaa Farms area and, separately, kidnapped an Israeli non-combatant in Dubai. Although the non-combatant survived, on November 1, 2001, Israeli Army Rabbi Israel Weiss pronounced the soldiers dead. The surviving non-combatant and the bodies of the Israeli soldiers were returned to Israel in a prisoner exchange with Hezbollah in 2004.[47]

---

[47] U.S. Department of State, Office of the Coordinator for Counterterrorism, *Country Reports on Terrorism 2015*, at 369 (June 2016), https://www.state.gov/documents/organization/258249.pdf.

222. Hezbollah carried out two attacks against UN Interim Force Peacekeepers in Lebanon; an attack in late July 2011 that wounded six French citizens, and a second attack, days later, which injured three French soldiers. Also in 2011, four Hezbollah members were indicted by the UN-based Special Tribunal for Lebanon, an international tribunal investigating the 2005 assassination of Lebanese Prime Minister Rafik Hariri. A fifth Hezbollah member, Hassan Habib Merhi, was indicted in October 2013.

223. In January 2012, Thai police detained Hezbollah operative Hussein Atris on immigration charges as he was attempting to depart Thailand. Atris, a SDGT, was convicted of possessing bomb-making materials by a Thai court in September 2013 and sentenced to two years and eight months in prison. He was released in September 2014 and is believed to reside in Lebanon.

224. In July 2012, a suspected Hezbollah operative was detained by Cypriot authorities for allegedly helping plan an attack against Israeli tourists on the island.

225. On March 21, 2013, a Cyprus court found the operative guilty of charges based on his surveillance activities of Israeli tourists.

226. Hezbollah was also responsible for the July 2012 attack on a passenger bus carrying 42 Israeli tourists at the Sarafovo Airport in Bulgaria, near the city of Burgas. The explosion killed five Israelis and one Bulgarian, and injured 32 others.

227. In May 2013, Hezbollah publicly admitted to playing a significant role in the ongoing conflict in Syria, rallying support for Syrian President Bashar al-Assad. Hezbollah's support for the Assad regime continues in 2018.

228. In 2015, the group also continued its operations against Israel. In January, Hezbollah fired rockets on an Israeli convoy, killing two Israeli soldiers. In a speech in Tehran in

August, Hezbollah Deputy Secretary General Shaykh Na'im Qasim declared Israel, the United States, and Takfiri groups as enemies of Islam and urged Muslims to fight against these enemies. In December, Hezbollah leader Nasrallah threatened attacks in revenge for the death of senior Hezbollah militant Samir Kuntar. Nasrallah claimed orders had already been given and fighters on the ground were preparing for attacks.

229. In May 2015, Cypriot authorities arrested dual Lebanese-Canadian national Hussein Bassam Abdallah after finding 8.2 tons of liquid ammonium nitrate in the basement of a residence in Larnaca. Abdallah admitted to Cypriot authorities he was a member of Hezbollah. He was charged on five offenses, including participation in a terrorist organization and providing support to a terrorist organization, by the Republic of Cyprus and sentenced to six years in prison on June 29, 2015.

230. Iran continues to provide Hezbollah with funding, training, weapons, and explosives, as well as political, diplomatic, monetary, and organizational aid. Such support and material is crucial to Hezbollah's continued terrorist operations. Moreover, the support is substantial.

231. United States District Courts have found, in numerous lawsuits related to international acts of terrorism sponsored or directed by Iran, that Hezbollah is, in fact, an arm of the IRGC and a key component to Iran's modus operandi of sponsoring and/or directing international terrorism aimed primarily against the United States and its allies.[48]

---

[48] *See, e.g., Owens v. Republic of Sudan*, 826 F. Supp. 2d 128, 135–36 (D. D.C. 2011); *Kaplan v. Cent. Bank of the Islamic Republic of Iran*, 55 F. Supp. 3d 189, 197 (D. D.C. 2014).

232. Hezbollah training camps in southern Lebanon and Iran, and Hezbollah's expertise in the use of EFPs, kidnapping, communications and small-unit operations, were critical to the IRGC's operations in Iraq during the Relevant Period.

## E. IRAN'S MINISTRY OF DEFENSE AND ARMED FORCES LOGISTICS (MODAFL)

233. In October 2007, the United States designated Iran's Ministry of Defense and Armed Forces Logistics ("MODAFL") as a FTO stating it controls the Defense Industries Organization, an Iranian entity identified in the Annex to UN Security Council Resolution 1737 and designated by the United States under E.O. 13382 on March 30, 2007.

234. MODAFL is the principal procurement arm of Iran's military and terror apparatus.

235. MODAFL operates the [Iran] Aviation Industries Organization ("IAIO"), the Aerospace Industries Organization ("AIO"), and the Defense Industries Organization ("DIO"). MODAFL was designated by the United States on October 25, 2007.

236. The AIO was designated on June 28, 2005 for weapons proliferation.

237. The MAPNA group is also a key component of MODAFL and the IRGC's procurement chain. Abbas Aliaabadi, Chairman of MAPNA International FZE and President of the MAPNA Group, is a former member of the Iranian Ministry of Construction Jihad and of the Iranian Air Force.

238. Aliaabadi was also a key member of the Ministry of Culture & Islamic Guidance instrumental in the creation of Hezbollah and has close links to the IRGC.

239. Pursuant to the Arms Export Control Act and the Export Administration Act, MODAFL was sanctioned in November 2000 for its involvement in missile technology proliferation activities.

240. The U.S. government explained the basis for the designation as follows:

> The Ministry of Defense and Armed Forces Logistics (MODAFL) controls the Defense Industries Organization, an Iranian entity identified in the Annex to UN Security Council Resolution 1737 and designated by the United States under E.O. 13382 on March 30, 2007. MODAFL also was sanctioned, pursuant to the Arms Export Control Act and the Export Administration Act, in November 2000 for its involvement in missile technology proliferation activities.
>
> MODAFL has ultimate authority over Iran's Aerospace Industries Organization (AIO), which was designated under E.O. 13382 on June 28, 2005. The AIO is the Iranian organization responsible for ballistic missile research, development and production activities and organizations, including the Shahid Hemmat Industries Group and the Shahid Bakeri Industries Group, which were both listed under UN Security Council Resolution 1737 and designated under E.O. 13382. The head of MODAFL has publicly indicated Iran's willingness to continue to work on ballistic missiles. Defense Minister Brigadier General Mostafa Mohammad Najjar said that one of MODAFL's major projects is the manufacturing of Shahab- 3 missiles and that it will not be halted. MODAFL representatives have acted as facilitators for Iranian assistance to an E.O. 13382-designated entity and, over the past two years, have brokered a number of transactions involving materials and technologies with ballistic missile applications.

240. Formally, the IRGC is a subordinate directorate of MODAFL.

241. The IRGC uses MODAFL to both procure and develop weapons and equipment for its use.

242. The DIO, the AIO, and Defense Technology and Science Research Centre are all subordinate to MODAFL, giving it operational control over Iran's ballistic missile development program.[49]

243. MODAFL entities' illicit procurement activities have resulted in a series of ongoing U.S. sanctions.[50]

---

[49] Steven R. Ward, *Immortal: A Military History of Iran and Its Armed Forces* 320 (2009).

[50] The United States has sanctioned MODAFL pursuant to the Arms Export Control Act, the

244. Moreover, Iran continues to provide material support, including resources and guidance, to multiple terrorist organizations and Special Groups, including all of the terrorist groups that perpetrated the acts of international terrorism complained of herein, that undermine the stability of the Middle East and Central Asia.[51]

245. The Special Groups and FTOs that Iran provides material resources and support to include multiple Shi'a, and some Sunni, terror groups in Iraq, including but not limited to, Kata'ib Hizballah ("KH"); Asa'ib Ahl Al Haq ("AAH"); Jaysch al Mahdi ("JAM"); Badr Organization ("Badr") (all discussed below); and Ansar al Islam and Al Qaeda in Iraq.

246. Tellingly, Hamas, Lebanese Hezbollah, and the Palestinian Islamic Jihad maintain representative offices in Tehran, in part to help coordinate Iranian financing and training.[52]

### F. ANSAR AL ISLAM

247. From its beginning, Iran did not confine its support of anti-U.S. national fighters to Shi'a groups. Iran also supported Ansar al Islam (a/k/a Ansar al Sunna, "AAI"), a radical terrorist group with close ties to Al Qaeda.

248. In the 1990s, Al Qaeda developed a close relationship with Iran and the IRGC. Usama bin Laden and Ayman al Zawahiri held clandestine meetings with Imad Mughniyah and Ahmad Vahidi (then commander of IRGC Qods Force) which "lead to an informal agreement to cooperate in providing support for actions carried out primarily against Israel and the United States…"

---

Export Administration Act (in November 2000), and Executive Order 13382 (in October 2007).

[51] U. S. Department of State, *2016 International Narcotics Control Strategy Report*, https://www.state.gov/j/inl/rls/nrcrpt/2016/vol2/253407.htm (last visited Sept. 12, 2017).

[52] *Id.*

249. Thereafter, senior Al Qaeda operatives and trainers traveled to Iran to receive training in explosives. Usama bin Laden also sent senior aides to Iran for training with the IRGC and to Lebanon for training with Hizballah."[53]

250. AAI is a Kurdish Sunni Muslim insurgent group and separatist movement in Iraq with well-established ties to Al Qaeda and Iran. Although the group's initial membership was primarily Kurdish, it grew to comprise a large number of Sunni Arabs, including Iraqis, Saudis, and Yeminis.

251. Mullah Krekar, aka Faraj Ahmad Najmuddin, reportedly founded Ansar al Islam in December 2001 (at that time, with funding and logistical support from Al Qaeda and Usama bin Laden). However, the group has significant, life-sustaining ties to Iran.

252. AAI seeks to transform Iraq into an Islamic state. AAI operates primarily in northern Iraq, but maintains a presence in western and central Iraq. AAI expanded its operations into Syria in 2011.

253. AAI has a number of aliases, including Ansar al-Sunna; Ansar al-Sunna Army; Devotees of Islam; Followers of Islam in Kurdistan; Helpers of Islam; Jaish Ansar al-Sunna; Jund al-Islam; Kurdish Taliban; Kurdistan Supporters of Islam; Partisans of Islam; Soldiers of God; Soldiers of Islam; and Supporters of Islam in Kurdistan. AAI was established in 2001 in Iraqi Kurdistan with the merger of two violent Kurdish extremist factions that traced their roots to the Islamic Movement of Kurdistan. AAI seeks to expel western interests from Iraq and establish an independent Iraqi state based on its interpretation of Sharia law. AAI has been mostly active in the northern party of Iraq, western Iraq-Anbar province, and in the areas surrounding

---

[53] *Havlish v. Bin Laden (In re Terrorist Attacks on September 11, 2001),* 2011 U.S. Dist. LEXIS 155899, at 110-111 (S.D.N.Y. Dec. 22, 2011).

and including Mosul and Kirkuk since 2003.

254. In 2001, AAI seized control of several villages near the town of Halabja and established an administration ruled by Shari'a Law. As part of Operation Iraqi Freedom, Coalition and Kurdish forces routed AAI from northern Iraq.

255. Coalition airstrikes destroyed AAI's base in northern Iraq (Iraqi Kurdistan) in late March 2003, and the majority of AAI members fled across the border and regrouped in Iran with the assistance of the IRGC and the Iranian regime. Counterterrorist operations suggest many of those fighters reentered Iraq and took active part in anti-Coalition activities. From Iran, the group continued to operate under leader Abu Abdullah Shafi's leadership and was temporarily renamed Ansar al-Sunna (although it officially re-adopted the name Ansar al-Islam in 2007).

256. During the summer of 2004, the jihadists began migrating back into Iraq. A large number of the returning jihadists chose to settle in Mosul. In October 2004, coalition forces in Mosul captured a senior Ansar leader, Aso Hawleri. A week later, Lt. Gen. Norton Schwartz, who at the time was Director, the Joint Staff, Pentagon (and from 2008-2012 was Chief of Staff of the Air Force), warned that Ansar al Islam had reemerged as the coalition's "principal organized terrorist adversary in Iraq."

257. From 2003-2007, AAI continued to target Coalition Forces and U.S. Nationals, including Plaintiffs. Its deadliest attack during this period occurred on February 1, 2004, when it launched multiple simultaneous suicide car bombings at PUK offices in Erbil, killing over 100 civilians and injuring over 130 more.

258. By February 2007, AAI had claimed responsibility for over 1,600 attacks in Iraq, including against American nationals. AAI openly cooperated with AQ; however, it adamantly refused to formally join the Islamic State of Iraq, which was an umbrella organization established

by AQ.

259. Instead, in May 2007, AAI joined with the Mujahideen Army, the Islamic Army in Iraq, and Ansar al-Sunna Shariah (a splinter group that had broken from AAI in early 2007 because its members wished to take a harder line against AQ) to form an anti-Coalition umbrella organization called the Reformation and Jihad Front ("RJF"). The RJF was a pan-Islamist organization that challenged AQ for leadership of the Iraqi Sunni Islamist movement.

260. AAI claimed responsibility for the beheading of 12 Nepalese hostages and the kidnapping and beheading of an Iraqi who was employed as a mechanic for the American forces at the Mosul airport. AAI targeted Iraqi Kurds for alleged collaboration with the U.S. In September 2003, members of the Jaysch Ansar al-Sunna beheaded three Iraqi Kurdish militiamen in retaliation for the cooperation by Kurdish political parties with the U.S. in Iraq.

261. U.S. and British intelligence reports in 2004 "concluded that [AAI] was working closely with Iran, and also Al Qaeda, in its terrorist attacks against coalition forces." One British defense report noted "Intelligence indicates that elements of Iran's [IRGC-QF] 'are providing safe haven and basic training to Iran-based [AAI] cadres.'" (brackets in original).[54]

262. On December 21, 2004, AAI subgroup Jamaat Ansar al-Sunna launched a suicide bomb attack on Forward Operating Base Marez in Mosul, Iraq. AAI insurgent Abu Museli, disguised as an Iraqi Security Services officer, entered the base mess tent and detonated the explosive vest he was wearing. The blast killed fourteen U.S. soldiers, four U.S. citizen Halliburton employees, and four Iraqi soldiers allied with the U.S. military. An additional fifty-one U.S soldiers and twenty-one others sustained non-fatal injuries. AAI, through Jamaat Ansar

[54] Pound, *supra* note 27.

al-Sunna, claimed credit for the attack.

263. Another British intelligence source "said that Iranian government agencies were also secretly helping [AAI] members cross into Iraq from Iran, as part of a plan to mount sniper attacks against coalition forces."[55]American sources confirmed this information, adding that "an Iranian was aiding [AAI] 'on how to build and set up' IEDs.[56]

264. In February 2004, Kurdish intelligence officials uncovered a cache of Syrian, Yemeni, and Saudi passports—all bearing Iranian entry stamps—in an Ansar al Islam safe-house on the Iranian side of the border. The fact the passports found had Iranian stamps on them indicated the terrorists did not secretly infiltrate into Iran, but that they entered with the cognizance and full knowledge of the Iranian authorities. According to Iraqi intelligence officers, captured Ansar al-Sunna militants have admitted to receiving assistance from Iranian officials.

265. Iran played a significant role in supporting AAI. Iran openly allowed the group to operate along its borders despite the group's alleged affiliation with the AQ network. AAI was tasked with conducting checks on cars leaving their stronghold and going into Iran, indicating coordination with the Islamic Republic.

266. According to a document from Iraqi intelligence dated June 13, 2002 and seized by U.S. forces in Iraq, it was reported from a trust-worthy source that Mullah Kraykar (Krekar), the head of the AAI organization arrived in Iran for negotiations with several Iranian officials. The information indicated that the purpose of the visit was to confirm a unified strategy and to guarantee continuous Iranian support to that group.

---

[55] *Id.*

[56] *Id.*

267. According to other sources Mullah Krekar spent many years in Iran and was arrested in Amsterdam after a flight from Tehran.

268. AAI operations decreased substantially by 2006, but the group continued to maintain an extensive support and financial infrastructure in Europe that it used to recruit and send jihadis to Iraq.

269. Over the course of 2007-2008, AAI moved increasingly away from the RJF and strengthened its ties to AQ. It coordinated with AQ on several attacks against U.S. and PUK troops and began to adopt AQ's hardline attitude against Sunni Iraqis who worked for the U.S. or Iraqi governments.

270. On May 4, 2010, AAI's leader Abu Abdullah al-Shafi was captured by U.S. forces in Baghdad and remains in prison. On December 15, 2011, AAI announced a new leader: Abu Hashim Muhammad bin Abdul Rahman al Ibrahim.

271. In March 2012, a Norwegian court convicted Iraqi citizen and AAI founder Mullah Krekar (aka Najmuddin Faraj Ahmad) of issuing threats and inciting terrorism, and sentenced him to six years in prison. Living in Norway on a long-term resident permit, Krekar appealed, and in December 2012, an appeals court affirmed his convictions for issuing threats and intimidating witnesses, but reversed his conviction for inciting terrorism. The appeals court reduced his prison sentence to two years and 10 months. He was released from prison in late January 2015, but was arrested again shortly after for praising the January 2015 Charlie Hebdo attacks in Paris in a TV interview.

272. AAI has conducted attacks against a wide range of targets including Iraqi government and security forces, as well as U.S. and Coalition Forces and U.S. nationals, including Plaintiffs. AAI has conducted numerous kidnappings, executions, and assassinations of Iraqi

citizens and politicians. The group has either claimed responsibility or is believed to be responsible for attacks in 2011 that resulted in 24 deaths and wounded 147.

273. In 2012, the group claimed responsibility for the bombing of the Sons of Martyrs School in Damascus, which was occupied by Syrian security forces and pro-government militias; seven people were wounded in the attack.

274. In 2014, AAI claimed responsibility for attacks near Kirkuk, Tikrit, and Mosul, Iraq; primarily directed against Iraqi police and security forces and, in one instance, an oil field.

275. The U.S. Department of Treasury designated AAI a Specially Designated Terrorist Group under E.O 13224 on February 20, 2003.

276. The U.S. Department of State designated AAI a FTO on March 22, 2004.

277. Australia, New Zealand, Canada, and the European Union have designated AAI as a terrorist organization.

278. The U.S. Treasury Department designated Mullah Krekar an individual providing assistance to terrorism and thus subject to having all international assets frozen in December 2006.

## G. AL QAEDA NETWORK

279. Al Qaeda (a/k/a al-Qaeda, a/k/a al-Qa'ida, "AQ") is a designated international terrorist organization, widely recognized as such by all civilized nations and the United Nations, and is neither a legitimate "military force" nor a recognized sovereign state.

280. The United States has designated AQ, including its branches, subsidiaries and "franchisees" (Including al-Qa'ida in Iraq ("AQI")) as a foreign terrorist organization and a specially designated global terrorist.

281. Commencing in the early 1990s and continuing until at least 2011, the Islamic Republic of Iran provided significant, indispensable, funding, weapons, safe haven, training,

intelligence, centers for command and control, undocumented transport between Afghanistan, Iraq and Pakistan across its borders and other significant material support.

282. Iran was an indispensable accomplice and provided significant financial and material support in AQ's terrorist attacks against American, European and Iraqi civilians and soldiers from at least 1991 until 2011.

283. On June 30, 1989, General Omar Hassan al-Bashir led a coup d'état toppling the exiting regime in Sudan. The radical Salafi cleric, Hassan Abd Allah al-Turabi served as the "intellectual architect" or "the power behind the throne", sometimes officially as leader of the National Islamic Front and sometimes as speaker of the parliamentary assembly.

284. In 1990-1991, Turabi founded the Popular Arab and Islamic Congress, which included representatives from the Palestine Liberation Organization, Hamas, Egyptian Islamic Jihad, Al Qaeda, Algerian Islamic Jihad, Hezbollah, Abu Nidal Group, and the Islamic Revolutionary Guard Corps.

285. In 1991, the Kingdom of Saudi Arabia expelled AQ leader Usama bin Laden ("UBL") and UBL moved his base of operations to Sudan.

286. The Sudanese army protected Bin Laden's home in Khartoum and his terrorist training bases within the country as well as providing AQ with access to the international and United States financial networks. In addition, Sudan provided AQ with 200 Sudanese passports, allowing AQ operatives to travel under fictitious identities.

287. Turabi brought together UBL and leaders of the IRGC Qods Force and leaders of Hezbollah. Commencing in April 1991, Turabi hosted meetings bringing together leaders from AQ, Hezbollah, and Iranian and Sudanese officials. According to AQ shura council member Abu Hajer al-Iraqi, the purpose of these meetings was to focus on common enemies, the West and the

United States.

288. In 1991, Hezbollah opened a base of operations in Khartoum, Sudan.

289. On December 13, 1991, Iranian President Ali Akbar Hashemi Rafsanjani arrived in Khartoum, Sudan for a six-day visit, by a delegation of 157 members, including Mohsen Rezai then Commander of the IRGC, Iranian Intelligence Minister Ali Fallahian and Iranian Defense Minister Ali Akbar Torkan. Various agreements were signed between Iran and Sudan, pursuant to which, inter alia, Iran delivered $300 million of Chinese weapons and 2000 IRGC operatives were sent to train Sudan's Popular Defense Forces.

290. According to the 9-11 Commission Report, in late 1991 or 1992, discussions in Sudan between AQ and Iranian operatives led to an agreement to cooperate in providing support - specifically, training - for actions carried out primarily against Israel and the United States. Not long afterward, senior AQ operatives and trainers traveled to Iran to receive training in explosives.

291. The 9-11 Commission reported that "“[t]he relationship between Al Qaeda and Iran demonstrated that Sunni-Shia divisions did not necessarily pose an insurmountable barrier to cooperation in terrorist operations."[57]

292. Iran was a valuable connection for UBL and AQ, and AQ was highly beneficial to Iran, given AQ's extreme and violent position against America and its animosity against the Kingdom of Saudi Arabia. Iran and Hezbollah played significant roles in the buildup of AQ's terrorist capabilities.

293. As a result of the creation of this terrorist alliance, AQ leader Ayman al Zawahiri repeatedly visited Tehran during the 1990s and met with Minister Ali Fallahian, other officers of

---

[57] The 9/11 Comm. Rpt. (2004) at p. 61.

Iran Ministry of Intelligence and Security ("MOIS"), and Qods Force Commander Ahmad Vahidi.

294. Throughout the 1990s, the Al Qaeda-Iran-Hezbollah terrorist training arrangement continued. Hezbollah leader Imad Mughniyah coordinated these training activities, including training of AQ personnel, with Iranian government officials in Iran and with IRGC officers working undercover at the Iranian embassy in Beirut, Lebanon.AQ operative Ali Mohammed provided security for one prominent meeting between Hezbollah's chief external operations officer, Imad Mughniyah, and Bin Laden in Sudan.

295. Mohammed testified at this plea hearing that "Hezbollah provided explosives training for AQ and a1 Jihad. Iran supplied Egyptian Jihad with weapons. Iran also used Hezbollah to supply explosives that were disguised to look like rocks."

296. Iran trained Saif al-Adel, head of AQ security, and other AQ members, including shura council members, at Hezbollah training camps in the mid-1990s. AQ leader Mustafa Hamid was one of AQ's primary points of contact with IRGC. He negotiated the agreement between AQ and Iran, which secured safe transit between Iran and Afghanistan and to Iraq for AQ members.

297. This facility was used by AQ in planning and perpetrating the terrorist attacks conducted against U.S. civilians, diplomats and servicemen and women, such as: the suicide bombing of U.S. Air force personnel and their families in Khobar, Saudi Arabia; the U.S. embassies in Nairobi and Dar es Salaam; and the World Trade Center on September 11, 2001.

298. On June 25, 1996, Iranian-backed Hezbollah terrorists, with the support of AQ, bombed the Khobar Towers housing complex in Dhahran, Saudi Arabia, killing 19 U.S. servicemen and wounding approximately 500 others. FBI investigators concluded: the operation

was undertaken on direct orders from senior Iranian government leaders; the bombers had been trained and funded by the IRGC in Lebanon's Bekaa Valley; and senior members of the Iranian government, including Ministry of Defense, Ministry of Intelligence and Security and the Supreme Leader's office, had selected Khobar as the target and commissioned Hezbollah to carry out the operation.

299. AQ was involved in the planning and preparations for the Khobar Towers bombing. UBL tried to facilitate a shipment of explosives to Saudi Arabia, and, on the day of the operation, bin Laden was, according to NSA intercepts, congratulated on the telephone.[58]

300. The 9/11 Commission examined classified CIA documents establishing that IRGC- Qods Force commander Ahmad Vahidi planned the Khobar Towers attack with Ahmad al Mugassil, a Saudi-born AQ-operative.

301. Two months later, in August 1996, UBL would cite the Khobar Towers bombing in his first fatwa, a "Declaration of War Against the Americans Occupying the Land of the Two Holy Places": "The crusader army became dust when we detonated al Khobar…"

302. Iran aided, abetted and conspired with Hezbollah, UBL, and AQ to launch the large-scale bombing attacks against the United States embassies in Nairobi and Dar es Salaam on August 7, 1998. Prior to their meetings with Iranian officials and agents, Bin Laden and AQ did not possess the technical expertise required to carry out the embassy bombings. Iran, through Hezbollah, provided explosives training to Bin Laden and AQ and rendered direct assistance to AQ operatives.[59]

---

[58] The 9/11 Comm. Rpt. (2004) at p. 60.
[59] *Owens v. Republic of Sudan*, 826 F. Supp. 2d 128, 139 (D.D.C. Nov. 28, 2011).

303. As stated in the 9/11 Report, "Iran made a concerted effort to strengthen relations with Al Qaeda after the October 2000 attack on the USS Cole…" For example, Iranian officials facilitated the travel of AQ members – including at least 8 of the 9/11 hijackers – through Iran on their way to and from Afghanistan, where the hijackers trained at AQ's terrorist training camps.[60]

304. U.S., Saudi, and Egyptian political pressure on the Sudanese eventually forced them to expel Usama bin Laden in May 1996. Radical Afghan Sunni warlord Gulbuddin Hekmatyar, a strong Iranian ally, invited bin Laden to join him in Afghanistan. UBL then relocated to Afghanistan with the assistance of the Iranian intelligence services.[61]

305. Iran provided material support to AQ after the 9/11 attacks in several ways, most significantly by providing safe haven to AQ leaders and operatives, keeping them safe from retaliation by U.S. forces that had invaded Afghanistan. According to the U.S. Treasury Department press release, January 16, 2009, in late 2001, while in Tehran, AQ senior operative Mustafa Hamid negotiated with the Iranians to relocate Al Qaeda families to Iran after the 9/11 attacks.

306. In the fall of 2001, Iran facilitated the exit from Afghanistan, into Iran, of numerous AQ leaders, operatives, and their families. The Iran-Afghanistan safe passageway, established earlier to get AQ recruits into and out of the training camps in Afghanistan, was utilized to evacuate hundreds of AQ fighters and their families from Afghanistan into Iran for safe haven there. The IRGC knew of, and facilitated, the border crossings of these AQ fighters and their families entering Iran.

---

[60] The 9/11 Comm. Rpt. (2004) at pp. 240-241.

[61] *Id*. at 65.

307. Among the high-level AQ officials who arrived in Iran from Afghanistan at this time were Sa'ad bin Laden and the man who would soon lead "Al Qaeda in Iraq," Abu Musab al Zarqawi.

308. In late 2001, Sa'ad bin Laden facilitated the travel of UBL's family members from Afghanistan to Iran. Thereafter, Sa'ad bin Laden made key decisions for AQ and was part of a small group of AQ members involved in managing AQ from Iran.

309. By 2002, AQ had established in Iran its 'management council,' a body that Usama bin Laden reportedly tasked with providing strategic support to the organization's leaders in Pakistan. Key members of the council included Saif al-Adel, Sulayman Abu Ghayth, Abu al-Khayr al-Masri, Abu Muhammad al-Masri, and Mahfouz Ould al-Walid (a.k.a. Abu Hafs al-Mauritani). All five senior operators remained influential over the next several years and retained close ties to bin Laden. Adel organized groups of fighters to overthrow Hamid Karzai's regime in Afghanistan and provided support for the May 12, 2003 terrorist attacks in Riyadh.

310. The Iranian regime offered AQ this safe haven in order to advance its own interests. Having AQ operatives in the country gave Iran a bargaining chip and important leverage with the U.S. and Saudi Arabia. In addition, it enabled Iran to protect itself from a possible attack against targets in Iran. The deal enabled Iran to cause chaos in Iraq and thus preventing it from becoming a Muslim democratic regime, which would endanger the security of the Iranian regime by the example and influence it would pose to the tens of thousands of Iranian pilgrims who visit the Shiite shrines in Iraq each year.

311. The agreement was reached between IRGC Qods Force commander Qassem Soleimani and AQ senior commander Abu Hafs al-Mauritani at Iran's Zahedan (near the Pakistani and Afghanistan border) during December 2001.

312. In testimony before the U.S. Senate in February 2003, CIA Director George Tenet said, "we see disturbing signs that Al Qaeda has established a presence in both Iran and Iraq."[62]

313. Senior AQ members continued to conduct terrorist operations from inside Iran. For example, the U.S. intercepted communications from Saif al Adel, then in Mashad, Iran, to AQ assassination teams in Saudi Arabia just before their May 12, 2003 assault on three housing compounds in Riyadh. AQ leaders in Iran planned and ordered the Riyadh bombing.

314. CIA Director General Michael Hayden noted that Usama Bin Laden understood that Iran was providing safe harbor to AQ.

315. For example – he quoted communications between senior AQ commanders and bin Laden, found on bin Laden's computer: "everybody is threatened – as long as he moves – by a missile…There is an idea preferred by some of the brothers to avoid attrition [loss of staff, leaders, and the organization's old elites] the idea is that some brothers will travel to 'safe' areas with their families, just for protection." The author offers some ideas for safe havens: Sind, Baluchistan, Iran. Two months later bin Laden agrees they should be taking refuge in safer areas."[63]

316. After the September 19, 2008 attack on the American embassy in Sana'a, Yemen, which killed 19 people, Ayman al Zawahiri sent a letter to IRGC (which was intercepted) which stated: "Al-Qaeda's leadership pays tribute to Iran's generosity, stating that without its 'monetary

---

[62] David Johnston, *Threats and Responses: Washington; Top U.S. Officials Press Case Linking Iraq to Al Qaeda,* N.Y. TIMES (Feb. 12, 2003), http://www.nytimes.com/2003/02/12/world/threats-responses-washington-top-us-officials-press-case-linking-iraq-al-qaeda.html.

[63] Michael W. Hayden, AMERICAN INTELLIGENCE IN THE AGE OF TERROR – PLAYING TO THE EDGE 339-340 (2016).

and infrastructure assistance' it would have not been possible for the group to carry out the terror attacks.[64] (Emphasis added).

317. Testifying before the Senate Foreign Relations Committee on March 16, 2010, then commander of U.S. Central Command General David Petraeus stated that: AQ "[c]ontinues to use Iran as a key facilitation hub, where facilitators connect AQ's senior leadership to regional affiliates..."[65]

### 1. ABU MUSAB ZARQAWI AND THE RISE OF AL QA'EDA IN IRAQ ("AQI")

318. In 1999, Abu Musab Zarqawi founded and was the operational leader of Al Tawhid al Jihad (a/k/a Jund al-Islam), an organization with close personal and organizational links to the AQ network. UBL provided Zarqawi $200,000 to set up a training camp in Afghanistan near the border with Iran. In 2000, a Jordanian court sentenced him in absentia to fifteen years of hard labor for his role in the AQ millennial terror plot targeting Western interests in Jordan.

319. On September 23, 2001, Tawhid (together with Iranian-sponsored AAI) took hostage, tortured and murdered (the majority of whom were beheaded) 42 Peshmerga security officers in the Iraqi Kurd border town (on the border with Iran).

320. In early 2002, Zarqawi escaped from U.S. forces in Afghanistan to Iran with other AQ leaders and operatives. While staying in Iran, Zarqawi operated under the control of the

---

[64] Con Coughlin, *Iran receives al Qaeda praise for role in terrorist attacks*, THE TELEGRAPH (Nov. 23, 2008, http://www.telegraph.co.uk/news/worldnews/middleeast/iran/3506544/Iran-receives-al-Qaeda-praise-for-role-in-terrorist-attacks.html).

[65] U.S. Military Academy, *Combating Terrorism at West Point* (Apr. 2017), https://ctc.usma.edu/v2/wp-content/uploads/2017/04/CTC-Sentinel_Vol10Iss4.pdf.

IRGC and the Qods Force. Intelligence officials claimed that the time Zarqawi spent in Iran was crucial for rebuilding his network before relocating to Iraq to establish AQI.

321. Several months later, Zarqawi returned to the AAI camp in northern Iraq, run by his Jund al-Islam/Tawhid lieutenants.

322. On September 24, 2003, the U.S. Treasury designated Zarqawi and several of his associates as Specially Designated Global Terrorists, stating that Zarqawi not only has "ties" to Hezbollah, but that plans were in place for his deputies to meet with both Hezbollah and Asbat al Ansar (a Lebanese Sunni terrorist group tied to AQ).[66]

323. In 2004, Zarqawi changed the name of his group from Al Tawhid to AQI.

324. US Department of Treasury designed Tawhid al Jihad as an FTO and SDGT on October 15, 2004.[67] The OFAC SDN designation was updated on December 1, 2004 to the other known names of AQI.[68]

325. MOIS and IRGC-QF are under the general command of Section 101, also called the Leader's Intelligence and Security office. They cooperate and share intelligence in "exporting the revolution" (which is a euphemism for fomenting violence and destabilizing other regimes, primarily via acts of international terrorism).[69]

326. Department 15 of MOIS handles liaison responsibilities with foreign terror groups

---

[66] *Supra* note 37.

[67] U.S. Department of the Treasury, *Recent OFAC Actions* (Oct. 15, 2004), https://www.treasury.gov/resource-center/sanctions/OFAC-Enforcement/Pages/20041015.aspx.

[68] U.S. Department of the Treasury, *Recent OFAC Actions* (Dec. 1, 2004), https://www.treasury.gov/resource-center/sanctions/OFAC-Enforcement/pages/20041201.aspx.

[69] Stratfor, Iranian Intelligence and Regime Preservation (June 22, 2010), https://worldview.stratfor.com/article/special-series-iranian-intelligence-and-regime-preservation.

while the IRGC relies on its Qods Force for many of the same functions.[70]

327. On June 10, 2003, American intelligence officials asserted that MOIS and the IRGC Qods Force are deeply involved in supporting AQ.[71]

328. In December 2006, two Qods force agents were arrested in Baghdad, possessing "weapons lists, documents pertaining to shipments of weapons into Iraq, organizational charts, telephone records and maps, among other sensitive intelligence information… [and] information about importing modern specially shaped explosive charges into Iraq. Officials were particularly concerned by the fact that the Iranians had information about importing modern, specially shaped explosive charges into Iraq, weapons that have been used in roadside bombs to target U.S. military armored vehicles."[72] An American intelligence official said these documents "show how the Qods Force … is working with individuals affiliated with Al Qaeda in Iraq and Ansar Al Sunna."[73] One of the IRGC Qods Force detainees was, according to General Stanley McChrystal, Mohsen Chizari, commander of Qods Force's Operations and Training staff.[74]

---

[70] William Tucker, *A Reported Shift in Iran's IRGC*, IN HOMELAND SECURITY (Sept. 29, 2015),http://inhomelandsecurity.com/a-reported-shift-in-irans-irgc/; Stratfor Report, *Iranian Intelligence and Regime Preservation* (June 22,2010), https://worldview.stratfor.com/article/special-series-iranian-intelligence-and-regime-preservation.

[71] *U.S. says Iran harbors al Qaeda 'associate'*, WASHINGTON TIMES (June 10, 2003, http://www.washingtontimes.com/news/2003/jun/10/20030610-125659-6237r/).

[72] *Iraq Expels 2 Iranians Detained by U.S.*, WASHINGTON POST (Dec. 30 2006, http://www.washingtonpost.com/wp-dyn/content/article/2006/12/29/AR2006122901510.html).

[73] *Iran's Secret Plan For Mayhem,* NEW YORK SUN, (Jan. 3 2007, http://www.nysun.com/foreign/irans-secret-plan-for-mayhem/46032/).

[74] Michael Weiss and Hassan Hassan, ISIS: INSIDE THE ARMY OF TERROR 53 (2015).

329. Iranian involvement in Iraq with the Sunni terrorists was known in military and intelligence circles since the Fallujah uprising in March of 2004.

330. Iranian mines and weapons were funneled to Zarqawi's terrorists in Fallujah, Ramadi and elsewhere throughout "Sunni Triangle" dominating Anbar province.

331. On February 16, 2012, the U.S. Department of Treasury designated MOIS, indicating that it has facilitated AQ operatives in Iran and provided them with documents, identification cards, and passports. The Treasury also stated that MOIS provided money and weapons to AQI (a terrorist group designated under E.O. 13224), and negotiated prisoner releases of AQ operatives.[75]

332. Under Secretary for Terrorism and Financial Intelligence, David S. Cohen, stated on July 28, 2011 "that Iran is the leading state sponsor of terrorism in the world today. By exposing Iran's secret deal with al-Qa'ida, allowing it to funnel funds and operatives through its territory, we are illuminating yet another aspect of Iran's unmatched support for terrorism. Today's action [designating the following AQ terrorists and others] also seeks to disrupt this key network and deny al-Qa'ida's senior leadership much-needed support…Iran is a critical transit point for funding to support al-Qa'ida's activities in Afghanistan and Pakistan."[76] Among terrorists designated were the following:

a. Ezedin Abdel Aziz Khalil, a prominent AQ facilitator, who has been operating under a secret agreement between AQ and the Iranian

---

[75] U.S. Department of the Treasury, *Treasury Designates Iranian Ministry of Intelligence and Security for Human Rights Abuses and Support for Terrorism* (Feb. 16 2012), https://www.treasury.gov/press-center/press-releases/Pages/tg1424.aspx.

[76] U.S. Department of the Treasury, *Treasury Targets Key Al-Qa'ida Funding and Support Network Using Iran as a Critical Transit Point* (Jul. 28, 2011), https://www.treasury.gov/press-center/press-releases/Pages/tg1261.aspx

government. The Iranian regime has permitted Khalil to operate within its borders since 2005 and maintain a relationship with him. Khalil moved money and recruits from across the Middle East into Iran, then on to Pakistan for the benefit of AQ senior leaders. He was responsible for moving significant amounts of money via Iran for onward passage to AQ leadership in Iraq and Afghanistan.

b. Muhsin al-Fadhli, who was considered then an AQ leader in the Gulf countries. Al-Fadhli is so trusted within AQ that he was one of the few terrorists with foreknowledge of the 9/11 attacks. When he was first designated in 2005, al- Fadhli was considered an al Qaeda leader in the Gulf who provided support to Iraq-based fighters for attacks against the U.S.-led Coalition. Al-Fadhli was also a major facilitator for deceased AQI leader Abu Musab al Zarqawi. Al- Fadhli began working with AQ's Iran-based facilitation network in 2009 and was later arrested by the Iranians. He was subsequently released by the Iranians in 2011 and went on to assume the leadership of the facilitation network from AQ leader Yasin al-Suri later that year.

c. AQ leader Yasin al Suri, along with five other terrorist operatives who use Iranian soil to move funds and recruits from Iran's neighboring Gulf countries to South Asia and elsewhere. Al Suri's network assists senior AQ operatives in Iraq and Pakistan.

333. On February 6, 2014, the U.S. Treasury Department designated senior AQ member Jafar al-Uzbeki, part of an AQ network which operates in Iran "with the knowledge of Iranian authorities."[77]

334. The U.S. Treasury added that this network "uses Iran as a transit point for moving funding and foreign fighters through Turkey to support Al Qaeda-affiliated elements inside Syria."[78]

## H. THE SPECIAL GROUPS

335. Iran opposes U.S. peacekeeping efforts and initiated acts of international terrorism against U.S. nationals, Coalition Forces, and Iraqi citizens with the goals of destabilizing Iraq and increasing Iranian influence in that country.

336. Iran, through its proxies and/or agents acting within the scope of their employment, agency, and direction from Iran, provided substantial material support and/or resources that facilitated acts of torture, extrajudicial killing and hostage taking that caused personal injury or death to more than one thousand Americans in Iraq.

337. Iran's support for the Special Groups is now well established. The IRGC-QF attempted to develop the Special Groups into a network similar to Hezbollah – a highly-lethal network that relied upon the Iranian regime to survive. The purpose of the IRGC-QF in developing these Special Groups was to create highly lethal networks that relied upon the Iranian regime to survive, and thus, were controlled, either directly or indirectly, by Iran.

---

[77] U.S. Department of the Treasury, *Treasury Targets Networks Linked to Iran* (Feb. 6, 2014), https://www.treasury.gov/press-center/press-releases/Pages/jl2287.aspx.

[78] *Id.*

338. Iran leveraged (and continues to do so) its control and dominion over the IRGC, the IRGC-QF, and Hezbollah, and through those entities, provided the Special Groups with training (in Iran), weapons, safe harbor, U.S. currency, and intelligence, including those Special Groups responsible for the Terrorist Attacks which killed, maimed, or otherwise injured Plaintiffs.[79] The training provided to the Special Groups while they were in Iran included tactics and technology to conduct kidnappings, small unit tactical operations, and employ sophisticated IEDs.[80]

339. These Special Groups returned to Iraq after receiving their Iran-supported training, maintaining their group's organization. Thus, each Special Group consisted of Iraqi civilians who trained together in Iran on how to use IEDs, EFPs, mortars, rockets, as well as intelligence, sniper, and kidnapping operations.

340. The Special Groups operate throughout Iraq and, at all relevant times, remained under the control of Iran, through its proxies and/or agents, MOIS, IRGC, IRGC-QF, and Hezbollah.

341. During the Relevant Period, the IRGC-QF supplied the Special Groups with an estimated funding stream of at least $750,000 to $3 million (U.S. Dollars) a month.

342. Utilizing the training, weapons and funding provided by Defendants, either directly or indirectly, the Special Groups planned and executed a string of bombings, kidnappings, sectarian murders, and more against Iraqi civilians, Coalition Forces and U.S.

[79] U.S. Department of Defense, *CDA—Military Power of Iran, Unclassified Report on Military Power of Iran*, at 3 (Apr. 2010), http://www.fas.org/man/eprint/dod_iran_2010.pdf.

[80] U.S. Department of Defense, *Iranian Government Behind Shipping Weapons to Iraq*, http://archive.defense.gov/news/newsarticle.aspx?id=1289 (last visited Sept. 13, 2017).

nationals, including Plaintiffs.

343. Although U.S. policy (supported by U.N. Security Council resolutions) was to establish peace and stability in Iraq in the hopes of establishing a democratic government, Iran viewed the U.S. and international peacekeeping efforts in Iraq as a potential threat to its regime.

344. Rather than cooperate with the U. S. and Coalition Forces authorized by the U.N. to bring peace, democracy and stability to Iran, or alternatively to openly and directly engage in armed conflict with the U.S. or other Coalition Forces, Iran chose to undermine U.S. and U.N. peacekeeping efforts by unleashing massive waves of terrorism and sectarian violence in Iraq, in part, by targeting U.S. Nationals, including Plaintiffs, through the Special Groups that Iran controlled.

345. President Bush declared on May 1, 2003, that "major combat operations in Iraq have ended."

346. On May 23, 2003, the Coalition Provisional Authority established as the interim government for Iraq disbanded the Iraqi military forces.

347. The U.N. Security Council authorized the post-conflict occupation of Iraq by Coalition Forces in October 2003 to maintain "security and stability."[81]

348. After 2003, the IRGC inserted hundreds of its Iranian-trained operatives into Iraq's state security organs (notably the Ministry of Interior intelligence structure) in part through its influence within the Badr Organization (discussed further below).

349. In addition to its coordination with the Badr Organization, Iran, through its agent the IRGC-QF, formed the Ramezan Corps intended to operate specifically in Iraq. The Ramezan

[81] S.C. Res. 1511, ¶ 13, U.N. Doc. S/RES/1511 (Oct. 16, 2003).

Corps cultivated, armed, trained and supported several Shi'a terror groups in Iraq that the U.S. military later termed "Special Groups."

350. Although a June 7, 2004 U.N. Security Council Resolution expressly assigned Coalition Forces in Iraq the task of helping Iraq "by preventing and deterring terrorism," Iran set out to target Coalition Forces and U.S. nationals, including Plaintiffs, and force them out of Iraq.[82] (emphasis added).

351. After Coalition Forces invaded, Iranian intelligence services penetrated Iraq rapidly and thoroughly. The goal of their collection efforts was finding out what weapons U.S. troops were carrying and what kind of body armor they were wearing.

352. Iranian agents also sought information on the location of U.S. Army and intelligence bases; on the routes traveled by U.S. convoys; on the operations of the Special Forces' elite Delta Force; and on the plans of the U.S. military and intelligence inside Iraq.

353. The Iranians preferred not to be directly implicated in attacks on U.S. forces, but instead offered bounties to Iraqis for killing Americans, shooting down U.S. helicopters, and destroying American tanks.[83]

354. The number and sophistication of Special Groups increased in 2005, as the Iranian regime deployed Hezbollah to train Iraqi civilians in Iran.

355. In 2007, the Special Groups further escalated the number of mortar and rocket attacks against U.S. national targets, including Plaintiffs, in the Baghdad International Zone. The accuracy of this indirect fire improved because of the training and weapons these Special Groups received from Iran.

---

[82] S.C. Res. 1546, U.N. Doc. S/RES/1546.

[83] Pound, *supra* note 27.

356. In sum, from October 16, 2003 onward, even though U.S. military personnel in Iraq were present at the request of the sovereign government of Iraq and participants in an internationally sanctioned peace keeping mission pursuant to the U.N. Security Council Resolution acting under Chapter VII of the U.N Charter, Iran embarked on a policy of terrorism, extrajudicial killings and murder, kidnapping and torture to thwart those efforts.

357. During the Relevant Period, the conduct of MOIS IRGC, IRGC-QF, Hezbollah, AAI, AQ, the Special Groups, and other Iranian supported terrorists in the extrajudicial killing, injuring, and kidnapping and hostage taking of U.S. nationals, Coalition Forces, and civilians were conducted by operatives who did not carry fixed distinctive signs recognizable at a distance, carry arms openly, conduct their operations in accordance with the laws and customs of war, or enjoy any form of combatant immunity for their acts. In fact, Hezbollah, the IRGC, IRGC-QF, AAI, AQ, the Special Groups and other Iranian supported terrorists acted in flagrant violation of, inter alia, the Geneva Convention Articles 48, 51(2) and 52(2)[84] of Additional Protocol I; Article 4(2)(d) of Additional Protocol II[85] and Article 147 of the Geneva Convention on the Protection of Civilian Persons in Time of War (Fourth Geneva Convention 1949), as well as United Nations Security Council Resolution 1373.[86]

---

[84] Article 51(2) of Additional Protocol I prohibits acts or threats of violence where the primary purpose is to spread terror among the civilian population.

[85] The prohibition of acts or threats of violence aimed at terrorizing the civilian population is further supported by the wider prohibition of acts of terrorism in Article 4(2)(d) of Additional Protocol II. The UN Secretary-General noted that violations of Article 4 of Additional Protocol II have long been considered violations of customary international law. UN Secretary-General, *Report on the establishment of a Special Court for Sierra Leone*; ICTR Statute, Article 4(d) (cited in Vol. II, Ch. 1, § 545).

[86] United Nations Security Council, *Prevention and Suppression of Financing Terrorist Acts*, (Sept. 28, 2001), http://www.un.org/en/sc/ctc/specialmeetings/2012/docs/United%20Nations%20Security%20Cou

358. Iran facilitated and enabled the terrorist attacks launched against U.S. Nationals, including the Plaintiffs and others, on a massive scale which would not have been possible without Iran's provision of hundreds of thousands of munitions, advanced technologies, training, funding, intelligence, safe harbor and other material support detailed herein.

359. Without the massive funding and material support from Iran, Special Groups and other Iranian proxies would not have been able to conduct the thousands of acts of international terrorism on the scale and with the lethality they achieved, including the Terrorist Attacks which resulted in the deaths, maiming, or otherwise injuring of Plaintiffs and Plaintiffs' family members.

**1. THE BADR CORPS/BADR ORGANIZATION**

360. The Badr Corps was established in 1982 in Iran as the military wing of the Supreme Council for Islamic Revolution in Iraq.

361. From its headquarters in Iran, the Badr Corps operated extensive networks throughout Iraq in the 1990s. The group smuggled men and weapons into Iraq to conduct attacks against the Iraqi regime of Saddam Hussein.

362. Like Hezbollah, the Badr Corps established clandestine offices in businesses and social organizations in Iraq.

363. The Badr Corps also used Iraqi front companies to recruit operatives, collect intelligence, and circulate propaganda materials in Shi'a populated areas.

364. Before 2003, the Badr Corps served as Iran and Hezbollah's most important surrogate inside Iraq, acting as a de facto arm of the IRGC-QF.

---

ncil%20Resolution%201373%20(2001).pdf (passing unanimously to reaffirm various UN resolutions).

365. The Badr Corps received training and weapons from Iraq through the IRGC and Hezbollah.

366. After Saddam Hussein's overthrow in 2003, the Badr Corps renamed itself the Badr Organization, and many of its operatives joined the newly formed Iraqi security forces.

367. Published reports indicate that thousands of members of the Badr Organization remained on the IRGC-QF payroll after 2004.

368. Several senior Badr Corps operatives later emerged as key conduits for funneling weapons to Iranian Proxies in Iraq from 2004 through at least 2011, including Abu Mustafa al-Sheibani, a key smuggler of deadly Iranian IEDs, and Jamal Ja'far Muhammad, a/k/a Abu Mahdi al-Muhandis (a/k/a "The Engineer"), who later led Kata'ib Hizballah (discussed below).[87]

369. "Department 1000" of the IRGC-QF, known as the Ramezan Corps, is in charge of Iraqi operations and remains the largest Qods Force command outside of Iran. It coordinated, armed, and influenced the Badr Organization.

370. Although the Badr Organization evolved into a major political organization with seats in the new Iraqi parliament, it also played a significant role in facilitating Special Groups' operations in Iraq. A number of Special Groups commanders such as Al-Muhandis are, or were, Badr Corps agents and operatives.

371. It was through the Badr Corps that the IRGC inserted hundreds of its Iranian-trained operatives into Iraq's state security organs (e.g. the Iraqi Ministry of Interior Intelligence structure) during the Relevant Period.

---

[87] Abu Mahdi al-Muhandis was killed on January 3, 2020 with Major General *Qassem Soleimani by a U.S. drone strike in Baghdad. See: https://ctc.usma.edu/cyber-threat-iran-death-soleimani/*

### 2. KATA'IB HIZBALLAH

372. Kata'ib Hizballah ("KH") has functioned as Iran's go-to terror group in Iraq and received support from Lebanese Hezbollah, including training in weapons use; IED construction and operation; and sniper, rocket, and mortar attacks. KH is a radical Shi'a Islamist group, an Iraqi terrorist organization, and an anti-Western establishment responsible for numerous terrorist acts against Iraqi, U.S., and other targets in Iraq since at least 2007. KH has ideological ties to Lebanese Hezbollah and may have received support from that group.

373. KH has a number of aliases, including Hezbollah Brigades; Hezbollah Brigades in Iraq; Hezbollah Brigades-Iraq; KH; Kata'ib Hezbollah; Kheta'ib Hezbollah; Khattab Hezballah; Hezbollah Brigades-Iraq of the Islamic Resistance in Iraq; Islamic Resistance in Iraq; Kata'ib Hizbollah Fi al-Iraq; Katibat Abu Fathel al-A'abas; Katibat Zayd Ebin Ali; and Katibut Karbalah.

374. KH was formed in 2006 and came to prominence in 2007 for attacks against Coalition Forces and U.S. nationals, including Plaintiffs, and its online propagandizing of those attacks. The IRGC-QF established it as a vehicle to deploy its most experienced operators and its most sensitive equipment. Historically, KH operated mainly in Shi'a areas of Baghdad, such as Sadr City and throughout the south.

375. The IRGC-QF positioned one of its own, Abu Mahdi al-Muhandis (aka Jamal al-Ibrahimi), as the leader of KH. Under al-Muhandis, KH developed as a compact movement of less than 400 personnel that was firmly under IRGC Qods Force control and maintains relatively good operational security.

376. In June 2011, five U.S. soldiers were killed in a rocket attack in Baghdad when KH assailants fired between three and five rockets at U.S. military base Camp Victory.

377. In 2015, Iran continued to be deeply involved in the conflict in Syria, working closely with the Assad regime to counter the Syrian opposition, and also in Iraq where Iran continued to provide support to militia groups, including the FTO KH. Iranian-backed groups, including KH, continued to operate in Iraq during 2015, which exacerbated sectarian tensions in Iraq and contributed to human rights abuses against primarily Sunni civilians. KH and other Iraqi Shi'a militias associated with the IRGC have been brought into the Iraqi government's Popular Mobilization Forces. The inclusion of KH, a designated FTO, in the Popular Mobilization Forces enlisted by the Iraqi Government in the effort against the Islamic State of Iraq and the Levant ("ISIL," aka "ISIS" or "Daesh"), threatens to undermine counterterrorism objectives.

378. On June 24, 2009, the United States designated KH an FTO.

379. The State Department's notice of KH's FTO designation stated that:

> The organization has been responsible for numerous violent terrorist attacks since 2007, including improvised explosive device bombings, rocket propelled grenade attacks, and sniper operations. Kata'ib Hizbollah [sic] also targeted the International Zone in Baghdad in a November 29, 2008 rocket attack that killed two UN workers. In addition, KH has threatened the lives of Iraqi politicians and civilians that support the legitimate political process in Iraq.[88]

380. KH was simultaneously designated an SDGT under E.O. 13224, because it was "responsible for numerous terrorist acts against Iraqi, U.S., and other targets in Iraq since 2007.[89]

381. The U.S. Treasury Department also designated KH pursuant to E.O. 13438.

382. The U.S. Treasury Department's 2009 press release announcing KH's designation

---

[88] U.S. Department of State, Office of the Coordinator for Counterterrorism, *Designation of Kata'ib Hizbollah*, (June 26, 2009), https://www.state.gov/j/ct/rls/other/des/143209.htm.

[89] Exec. Order 13,224.

explained that KH had "committed, directed, supported, or posed a significant risk of committing acts of violence against Coalition and Iraqi Security Forces."[90]

383. The press release also quoted then-Under Secretary for Terrorism and Financial Intelligence, Stuart Levey, as stating "[t]hese designations play a critical role in our efforts to protect Coalition troops, Iraqi security forces, and civilians from those who use violence against innocents to intimidate and to undermine a free and prosperous Iraq."[91]

384. The U.S Treasury press release also stated: "[f]urther, the IRGC-Qods Force provides lethal support to KH and other Iraqi Shia militia groups who target and kill Coalition and Iraqi Security Forces."[92]

385. The 2009 press release further reported that between March 2007 and June 2008, KH led a number of attacks against U.S. forces in Iraq, advising:

> As of 2008, Kata'ib Hizballah was funded by the IRGC-Qods Force and received weapons training and support from Lebanon-based Hizballah. In one instance, Hizballah provided training--to include building and planting IEDs and training in coordinating small and medium arms attacks, sniper attacks, mortar attacks, and rocket attacks--to Kata'ib Hizballah members in Iran.[93]

386. Furthermore, the 2009 U.S. Treasury Department press release noted:

> Recordings made by Kata'ib Hizballah for release to the public as propaganda videos further demonstrate that Kata'ib Hizballah conducted attacks against Coalition Forces. In mid-August 2008, Coalition Forces seized four hard drives from a storage facility associated with a Kata'ib Hizballah media facilitator. The four hard drives included approximately 1,200 videos showing Kata'ib Hizballah's sophisticated planning and

---

[90] *Supra* note 83.

[91] *Id.*

[92] *Id.*

[93] *Id.*

> attack tactics, techniques, and procedures, and Kata'ib Hizballah's use of the most lethal weapons--including RPG-29s, IRAMs, and EFPs--against Coalition Forces in Iraq.[94]

387. One of the hard drives contained 35 attack videos edited with the KH logo in the top right corner. Additionally, between February and September 2008, Al-Manar in Beirut, Lebanon broadcast several videos showing KH conducting multiple attacks against U.S. nationals and Coalition Forces in Iraq.

388. Immediately preceding the government of Iraq's approval of the United States-Iraq security agreement in late November 2008, KH posted a statement that the group would continue fighting Coalition Forces and threatened to conduct attacks against the government of Iraq if it signed the security agreement with the United States.

389. In 2008, the U.S. Department of Defense described the linkages it found between KH, Iran, and multiple terrorist attacks against U.S. nationals in Iraq—including KH's use of EFPs:

> [A]lso known as Hezbollah Brigades, is a terrorist group believed to receive funding, training, logistics and material support from Iran to attack Iraqi and coalition forces using what the military calls 'explosively formed penetrators' – roadside bombs designed to pierce armor-hulled vehicles – and other weapons such as rocket-assisted mortars.

390. As noted above—and as stated by the U.S. Treasury Department in its July 2009 press release—throughout 2008, Al-Manar, Lebanon Hezbollah's official television outlet in Lebanon (and itself a designated SDGT since May 2006), played numerous videos of KH launching rocket and IED attacks against U.S. troops in Iraq. In this manner, Hezbollah helped publicize KH's activities and increase its profile among leading Shi'a terrorist groups.

391. Although KH's leadership remains in flux, one individual reportedly associated

---

[94] *Id.*

with the group is Abu Mahdi al-Muhandis. According to an inquiry published by Kuwaiti daily al-Rai on June 4, 2016, during the 1980's, Abu Mahdi al-Muhandis received an Iranian citizenship from the Iranian regime as part of his prominent role in the Badr Corps.[95]

392. KH's leader, Abu Mahdi al-Muhandis, is wanted in Kuwait for his alleged role in the 1983 bombings of the American and French embassies in Kuwait City, as well as for his alleged involvement in the assassination attempt on the Kuwaiti Emir in 1985. In an interview with Hezbollah-affiliated media on January 3, 2017, Abu Mahdi al-Muhandi admitted that he cooperated with Hezbollah top commanders Imad Moughniyeh and Mustafa Badreddine from the early 80's. According to him, this cooperation included training opposition Iraqi Shiite groups to fight Saddam Hussein regime and the U.S. troops in Iraq from 2003 onward.[96]

393. The U.S. Treasury Department designated al-Muhandis an SDGT in July 2009 and announced the designation in the same press release announcing KH's designation. That press release stated:

> As of early 2007, al-Muhandis formed a Shia militia group employing instructors from Hizballah to prepare this group and certain Jaysh al-Mahdi (JAM) Special Groups for attacks against Coalition Forces. The groups received training in guerilla warfare, handling bombs and explosives, and employing weapons--to include missiles, mortars, and sniper rifles.
>
> In another instance as of September 2007, al-Muhandis led networks that moved ammunition and weapons--to include explosively formed penetrators (EFPs)--from Iran to Iraq, distributing them to certain JAM militias to target Coalition Forces.
>
> As of mid-February 2007, al-Muhandis also ran a weapons smuggling

[95] *See* http://www.alraimedia.com/ar/article/special-reports/2016/06/04/684698/nr/nc (last visited Sept. 13, 2017) (Arabic translation available).

[96] Middle East Media Research Institute TV Monitor Project, *Clip #5829*, https://www.memri.org/tv/abu-mahdi-al-muhandis-deputy-commander-popular-mobilization-units-optimism-over-liberation-mosul (last visited Sept. 12, 2017).

> network that moved sniper rifles through the Iran-Iraq border to Shia militias that targeted Coalition Forces. Al- Muhandis also provided logistical support for attacks against Iraqi Security Forces and Coalition Forces conducted by JAM Special Groups and certain Shia militias.
>
> In one instance, in April 2008, al-Muhandis facilitated the entry of trucks--containing mortars, Katyusha rockets, EFPs, and other explosive devices--from Iran to Iraq that were then delivered to JAM Special Groups in Sadr City, Baghdad. Additionally, al-Muhandis organized numerous weapons shipments to supply JAM Special Groups who were fighting Iraqi Security Forces in the Basrah and Maysan provinces during late March-early April 2008.
>
> In addition to facilitating weapons shipments to JAM Special Groups and certain Shia militias, al-Muhandis facilitated the movement and training of Iraq-based Shia militia members to prepare them to attack Coalition Forces.
>
> In one instance in November 2007, al-Muhandis sent JAM Special Groups members to Iran to undergo a training course in using sniper rifles. Upon completion of the training course, the JAM Special Groups members had planned to return to Iraq and carry out special operations against Coalition Forces.
>
> Additionally, in early March 2007, al-Muhandis sent certain Shia militia members to Iran for training in guerilla warfare, light arms, marksmanship, improvised explosive devices (IED) and anti-aircraft missiles to increase the combat ability of the militias to fight Coalition Forces.
>
> In addition to the reasons for which he is being designated today, al-Muhandis participated in the bombing of Western embassies in Kuwait and the attempted assassination of the Emir of Kuwait in the early 1980s. Al- Muhandis was subsequently convicted in absentia by the Kuwaiti government for his role in the bombing and attempted assassination.[97]

394. In a July 2010 press briefing, U.S. General Ray Odierno identified KH as the group behind increased threats to U.S. bases in Iraq. General Odierno confirmed that KH operatives had

---

[97] U.S. Department of the Treasury, *Treasury Designates Individual, Entity Posing Threat to Stability in Iraq* (July 2, 2009), https://www.treasury.gov/press-center/press-releases/Pages/tg195.aspx.

gone to Iran for special training and then returned to Iraq. General Odierno stated, "[T]hey are clearly connected to Iranian IRGC."[98]

395. In June 2011, it was estimated that KH membership exceeded 1,000 people in Iraq.

396. Senior Iraqi Intelligence officials have stated that KH receives unlimited funding from Iran, allowing KH operatives to be paid $300-$500 per month.

### 3. JAYSCH AL MAHDI & THE PROMISED DAY BRIGADES

397. Jaysh al Mahdi ("JAM" or the "Mahdi Army") was established by radical Shi'a cleric Muqtada al-Sadr in June 2003. On April 18, 2004, it led the first major armed confrontation by Shi'a militia against U.S.-led forces in Iraq.

398. JAM was co-founded by Imad Mughniyah, once the terrorism chief of Hezbollah and "an agent of Iran and a direct role in Iran's sponsorship of terrorist activities."[99] Prior to September 11, 2001, Mughniyah was ranked number one on the FBI's Most Wanted list for leading the attacks which killed 183 Marines in the bombing of the Holiday Inn in Beirut, the hijacking of a TWA plane and murder of a U.S. Navy diver, and the bombing of the U.S. Embassy in Beirut (replaced as number one most wanted by Usama bin Laden).

399. JAM expanded its territorial control of mixed or predominantly Shi'a

---

[98] Jim Loney, *Iran-backed force threatens U.S. Iraq bases - general*, REUTERS, July 13, 2010, https://in.reuters.com/article/idINIndia-50093520100713.

[99] "Imad Fayez Mughniyah (a/k/a Hajj Radwan) was, for decades prior to his death in February 2008, the terrorist operations chief of Hizballah. Mughniyah played a critical role in a series of imaginative high-profile terrorist attacks across the globe, and his abilities as a terrorist coordinator, director, and operative was an order of magnitude beyond anything comparable on the scene between 1980-2008. Mughniyah was, since the early 1980s, an agent of the Islamic Republic of Iran, where he lived for many years. Imad Mughniyah had a direct reporting relationship to Iranian intelligence and a direct role in Iran's sponsorship of terrorist activities." *Havlish v. Bin Laden (In re Terrorist Attacks on September 11, 2001),* 2011 U.S. Dist. LEXIS 155899, at 106-107 (S.D.N.Y. Dec. 22, 2011).

neighborhoods and displaced or killed the local Sunni population.

400. JAM was able to gain initial control in many of the neighborhoods in and around Baghdad (such as Sadr City) by offering the Shi'a population protection and social services.

401. In a Department of Defense news briefing on August 24, 2007, General Rick Lynch confirmed that on August 7, 2006, the 3rd Brigade Combat Team "conducted a raid on a militant house... about 20 miles east of Baghdad... They arrested one of our division's most valued targets,... [who] acted as a link between Iran and the [JAM]. He was the main Shia conduit in that region for getting Iranian EFPs and rockets into Baghdad,..."[100]

402. Al-Sadr dissolved part of his militia after 2007, but maintained a small group of Iranian-supported militants called the Promised Day Brigades ("PDB") to carry out terrorist attacks against Coalition Forces and U.S. nationals, including certain Plaintiffs.

403. The PDB has received funding, training, and weapons from the IRGC and is one of the Special Groups. It is estimated that the PDB had approximately 5,000 active members in June 2011.

404. The PDB actively targeted U.S. nationals, including Plaintiffs and U.S. forces, in an attempt to disrupt security operations and further destabilize Iraq.

405. For example, in June 2011, the PBD claimed responsibility for 52 attacks on U.S. Forces.

406. On June 28, 2011, the PDB issued a statement claiming responsibility for ten (10) mortar and Katyusha rocket attacks against U.S. Military convoys in which U.S. officials confirmed that three U.S. service members were killed.

---

[100] Kimberly Kagan, THE SURGE: A MILITARY HISTORY (ENCOUNTER BROADSIDES) 50 (2010).

407. PDB's headquarters is located in Sadr City, Baghdad, and the groups' main areas of operation include southern Iraq, and Baghdad.

**4. ASA'IB AHL AL HAQ**

408. Group supported by Hezbollah and the IRGC-QF that conducted assassinations and operations in Iraq against Coalition Forces and various individuals and U.S. nationals.

409. AAH was originally established by Senior Sadrist and MDF-I detainee Qais al-Khazali. His brother, Laith Khazali, also helped lead the organization.

410. AAH split from al-Sadr's JAM in 2006. Since that time, AAH has conducted: thousands of IED attacks against U.S. and Iraqi forces; targeted kidnappings of Westerners and Iraqis; rocket and mortar attacks on the U.S. Embassy; murders of American and British soldiers; and assassinations of Iraqi officials.

411. AAH fought alongside Hezbollah in the 2006 Lebanon-Israeli War.

412. During the Relevant Period, AAH received significant funding from Iran, and had links to Iran's IRGC-QF and Hezbollah.

413. Senior Lebanese Hezbollah operative Ali Musa Daqduq provided training to AAH terrorists.

414. Daqduq reported to Youssef Hashim, the head of Lebanese Hezbollah Special Operations, and the latter reported to Abdul Reza Shahlai, the director of the IRGC-QF External Operations.

415. In October 2006, AAH used mortars to attack Coalition Forces at Forward Operating Base Falcon.

416. In May of 2007, AAH operatives attacked the Iraqi Finance Ministry, kidnapping British contractor, Peter Moore, and his four bodyguards. AAH released Moore in December 2009

in exchange for the Iraqi government's release of its leader Qais al-Khazali, but not before murdering Moore's four bodyguards.

417. In October 2009, AAH used mortars to attack the U.S. Consulate in Al Hillah, Babil, Iraq.

418. In October 2011, AAH claimed responsibility for a roadside bomb that killed the last American to die before the U.S. withdrawal in Iraq in November 2011.

419. Hezbollah and the IRGC-QF provided JAM, PDB, KH, AAH, and other Shi'a groups with a variety of weapons and training used to target U.S. nationals, including Plaintiffs, and Coalition Forces engaged in their post-2003 peacekeeping mission.

420. These weapons included signature Iranian munitions such as EFPs and Improvised Rocket Assisted Munitions ("IRAMs"), as well as 107 mm rockets (often used as part of IRAMs), 120 mm and 60 mm mortars, Rocket Propelled Grenade ("RPG") launchers and other small arms.

421. The training and weapons provided by Iran and its agents resulted in an increased lethality and effectiveness of the Terrorist Attacks, and included sophisticated tell-tale tactics that had not previously been seen in Iraq prior to infusion of Iranian agents, Hezbollah and the IRGC-QF in 2003.

## I. IRANIAN SIGNATURE WEAPONS USED IN THE TERRORIST ATTACKS

422. In addition to conventional former Soviet-block weapons, a variety of Iranian weapons flowed into Iraq through direct purchases, smuggling, and dual-purpose component exportation to Iraq by Iran.

### 1. EXPLOSIVELY FORMED PENETRATORS

423. One of Iran's primary forms of material support and/or resources that facilitated extrajudicial killings of U.S. citizens in Iraq was the financing, manufacturing and deployment of EFPs and IEDs.

424. IED is a term commonly used by the U.S. military as shorthand for a roadside bomb. The Terrorist Groups consistently sought to attempt to improve IED effectiveness and sophistication.[101]

425. EFPs, IEDs, and other WMDs were typically smuggled from Iran to Iraq, and the IRGC-QF played a vital role in that process.

426. Additionally, in Iraq, the IRGC and Hezbollah supplied and trained various Special Groups, Al Qaeda, and Ansar al Islam to deploy EFPs and IEDs. Iran, through Hezbollah, the IRGC-QF, and MOIS provided EFP and IED component to Iraqi insurgents and paid them up to $200 U.S. to use these weapons against U.S. soldiers in Iraq.

427. The number of EFPs used against Coalition Forces and U.S. nationals rose at a rate of 150% between January 2006 and December 2006, and increased every month between November 2006 and January 2007.

428. EFPs are a particularly effective form of manufactured IED and are sometimes known as a "shaped charge," usually made with a manufactured concave copper disk and a high explosive packed behind the liner.

---

[101] Pound, *supra* note 27.




429. The EFPs deployed by the IRGC and Hezbollah in Iraq were not truly "improvised" explosive devices but professionally manufactured and specifically designed to target U.S. nationals, including Plaintiffs, and Coalition Forces' armor. These EFPs cannot be made without specific machinery, access to which Iran controls, and without which Special Groups and other terrorist organizations could not obtain or use these munitions. EFPs constitute "weapons of mass destruction" as that term is defined in 18 U.S.C. § 2332a(2)(A).

430. In Iraq, EFPs were often triggered by various technologies, including passive infra-red sensors (tripped by the engine heat of passing vehicles) and radio frequency modules (triggering the weapon when high-powered radio waves were generated by Coalition Forces' jamming devices), ultimately setting off an explosion within the steel casing of the EFP, forcing the copper disk forward, and turning it into a high-velocity molten slug, traveling at over a mile per second, that could pierce the military-grade armor of most U.S. vehicles deployed in Iraq even up to 300 feet away.

431. Metallurgic analysis by U.S. technicians helped confirm the high-purity copper EFP liners were not generally produced in Iraq.

432. Differences in the liners indicated the kind of press that was required to fabricate them—a heavy (hydraulic) press not commonly seen in Iraq.

433. To produce these weapons, copper sheets are often loaded onto a punch press to yield copper discs. These discs are annealed in a furnace to soften the copper. The discs are then loaded into a large hydraulic press and formed into the disk-like final shape.

434. The hydraulic press machinery was transported to Iran by Iran's national maritime carrier, Islamic Republic of Iran Shipping Line ("IRISL").

435. This munitions manufacturing process is critical to the design and concomitant lethality of the weapon and is controlled by Iran.

436. EFPs are far more sophisticated than homemade explosive devices such as traditional improvised explosive devices, and they are designed specifically to target vehicles such as armored patrols and supply convoys, though Hezbollah and the Special Groups have deployed them against U.S. and Iraqi civilians as well.

437. One of the ways in which the IRGC provided "militants with the capability to assemble improvised explosive devices (IEDs) with explosively formed penetrators (EFPs) that were specially designed to defeat armored vehicles" included providing them with manufacturing supplies such as copper and steel, as well as machinery—including hydraulic presses used to form copper into the shape of disks used in EFPs.

438. Iran propagated its specialized weapons knowledge up and down its network of terror proxies in Iraq. As documented by the U.S. State Department in its 2006 Country Reports on Terrorism regarding Iran's specific efforts to provide terrorists with lethal EFPs to ambush and murder U.S. nationals, including Plaintiffs, and other Coalition Forces, "Iran provided guidance and training to select Iraqi Shia political groups, and weapons and training to Shia militant groups

to enable anti-Coalition attacks.[102]

439. As reported by the New York Times on March 26, 2007, U.S. Army officials believe that terrorists first began using EFPs in Iraq in August 2003.

440. In December 2003, Coalition Forces recovered radio equipment that was most likely intended for use with EFPs in Iraq.

441. In December 2004, Coalition Forces recovered passive infrared sensors modified for use with EFPs.

442. Although Iran's use of EFPs was publicly disclosed by U.S. and British officials in 2005 when the two countries issued diplomatic protests, the official identification of specific attacks as EFP attacks was not first publicly disclosed until 2010.

443. In 2006, the U.S. State Department's Country Reports on Terrorism further documented Iran's specific efforts to provide terrorists with lethal EFPs to ambush and murder U.S. nationals, including Plaintiffs, and other Coalition Forces:

> Iranian government forces have been responsible for at least some of the increasing lethality of anti-Coalition attacks by providing Shia militants with the capability to build IEDs with explosively formed projectiles similar to those developed by Iran and Lebanese Hezbollah [sic]. The Iranian Revolutionary Guard was linked to armor-piercing explosives that resulted in the deaths of Coalition Forces. The Revolutionary Guard, along with Lebanese Hezbollah [sic], implemented training programs for Iraqi militants in the construction and use of sophisticated lED technology. These individuals then passed on this training to additional militants in Iraq. (emphasis added).[103]

---

[102] U.S. Department of State, Office of the Coordinator for Counterterrorism, *Country Reports on Terrorism 2006*, at 369 (April 2007), https://www.state.gov/j/ct/rls/crt/2006/.

[103] *Id.*

444. Also in 2006, Brigadier Gen. Michael Barbero, Deputy Chief of Staff for Strategic Operations of the Multi-National Force-Iraq stated, "Iran is definitely a destabilizing force in Iraq. I think it's irrefutable that Iran is responsible for training, funding and equipping some of these Shi'a extremist groups and also providing advanced IED technology to them, and there's clear evidence of that."[104]

445. Brigadier Gen. Kevin Bergner commented on Iran funding of Hezbollah operatives in Iraq:

> Actions against these Iraqi groups have allowed coalition intelligence officials to piece together the Iranian connection to terrorism in Iraq [...] Iran's Qods Force, a special branch of Iran's Revolutionary Guards, is training, funding and arming the Iraqi groups. [...] It shows how Iranian operatives are using Lebanese surrogates to create Hezbollah-like capabilities. And it paints a picture of the level of effort in funding and arming extremist groups in Iraq.... The groups operate throughout Iraq. They planned and executed a string of bombings, kidnappings, sectarian murders and more against Iraqi citizens, Iraqi forces and coalition personnel. They receive arms – including explosively formed penetrators, the most deadly form of improvised explosive device – and funding from Iran. They also have received planning help and orders from Iran.

446. In May 2007, the Commander of the Multinational Division-Center, U.S. Army Major General Richard Lynch, confirmed that "[m]ost of our casualties have come from improvised explosive devices. That's still the primary threat to our soldiers—IEDs. And we have an aggressive campaign to counter those IEDs, but they still are taking a toll on our soldiers: 13 killed, 39 soldiers wounded. *What we're finding is that the technology and the financing and the training of the explosively formed penetrators are coming from Iran.* The EFPs are killing our soldiers, and we can trace that back to Iran." (Emphasis added.)

447. That same year, the Deputy Chief of Staff for Intelligence with the MNF-I, U.S.

[104] John Hendron and Alex Chadwick, *Pentagon: Iran Training Shiite Militias in Iraq*, NPR, August 24, 2006, https://www.npr.org/templates/story/story.php?storyId=5703572.

Army Major General Richard Zahner, declared that:

> Labels on weapons stocks seized inside and outside Iraq point to Iranian government complicity in arming Shiite militias in Iraq […] Iran is funneling millions of dollars for military goods into Iraq […] You'll find a red label on the C-4 [explosive] printed in English and will tell you the lot number and name of the manufacturer.

Major General Zahner further added:

> [T]he control of military-grade explosives in Iran is controlled through the state apparatus and is not committed through rogue elements right there. It is a deliberate decision on the part of elements associated with the Iranian government to affect this type of activities.

448. According to the U.S. State Department's 2007 Country Reports on Terrorism:

> Despite its pledge to support the stabilization of Iraq, Iranian authorities continued to provide lethal support, including weapons, training, funding, and guidance, to some Iraqi militant groups that target Coalition and Iraqi security forces and Iraqi civilians. In this way, Iranian government forces have been responsible for attacks on Coalition forces. The Islamic Revolutionary Guard Corps (IRGC) -Qods Force, continued to provide Iraqi militants with Iranian-produced advanced rockets, sniper rifles, automatic weapons, mortars that have killed thousands of Coalition and Iraqi Forces, and explosively formed projectiles (EFPs) that have a higher lethality rate than other types of improvised explosive devices (IEDs), and are specially designed to defeat armored vehicles used by Coalition Forces. The Qods Force, in concert with Lebanese Hezbollah, provided training outside Iraq for Iraqi militants in the construction and use of sophisticated IED technology and other advanced weaponry. These individuals then passed on this training to additional militants inside Iraq, a "train-the-trainer" program. In addition, the Qods Force and Hezbollah have also provided training inside Iraq. In fact, Coalition Forces captured a Lebanese Hezbollah operative in Iraq in 2007.

449. Other U.S. Government reports, such as the Department of Defense's December 2007 "Measuring Stability and Security in Iraq" quarterly report to Congress, similarly concluded that:

> Iranian Islamic Revolutionary Guard Corps-Qods Force (IRGC-QF) efforts to train, equip, and fund Shi'a extremists also continue despite reported assurances to Prime Minister Maliki that Iran will cease lethal aid.

450. These observations continued in 2008. According to the U.S. State Department's 2008 Country Reports on Terrorism:

> The Qods Force, an elite branch of the Islamic Revolutionary Guard Corps (IRGC), is the regime's primary mechanism for cultivating and supporting terrorists abroad. The Qods Force provided aid in the form of weapons, training, and funding to HAMAS and other Palestinian terrorist groups, Lebanese Hezbollah, Iraq-based militants, and Taliban fighters in Afghanistan...
>
> Despite its pledge to support the stabilization of Iraq, Iranian authorities continued to provide lethal support, including weapons, training, funding, and guidance, to Iraqi militant groups that targeted Coalition and Iraqi forces and killed innocent Iraqi civilians. Iran's Qods Force continued to provide Iraqi militants with Iranian- produced advanced rockets, sniper rifles, automatic weapons, and mortars that have killed Iraqi and Coalition Forces as well as civilians. Tehran was responsible for some of the lethality of anti-Coalition attacks by providing militants with the capability to assemble improvised explosive devices (IEDs) with explosively formed projectiles (EFPs) that were specially designed to defeat armored vehicles. The Qods Force, in concert with Lebanese Hezbollah, provided training both inside and outside of Iraq for Iraqi militants in the construction and use of sophisticated IED technology and other advanced weaponry.

451. Similarly, in 2011, the U.S. Ambassador to Iraq, James F. Jeffrey, was quoted as saying "[F]resh forensic testing on weapons used in the latest deadly attacks in the country bolsters assertions by U.S. officials that Iran is supporting Iraqi insurgents with new weapons and training. […] We're not talking about a smoking pistol. There is no doubt this is Iranian." Further, the State Department's 2011 Country Reports on Terrorism reported:

> Despite its pledge to support the stabilization of Iraq, Iran continued to provide lethal support, including weapons, training, funding, and guidance, to Iraqi Shia militant groups targeting U.S. and Iraqi forces, as well as civilians. Iran was responsible for the increase of lethal attacks on U.S. forces and provided militants with the capability to assemble explosives designed to defeat armored vehicles. The IRGC-QF [Islamic Revolutionary Guard Corps-Qods Force], in concert with Lebanese Hezbollah, provided training outside of Iraq as well as advisors inside Iraq for Shia militants in the construction and use of sophisticated improvised explosive device technology and other advanced weaponry.

452. Iran also introduced other weapons into Iraq for the purpose of supporting terrorist attacks on U.S. nationals and coalition personnel, including Plaintiffs. These included 81 mm mortars (the remainder of the region uses 82 mm mortars), repainted 107 and 122mm rockets imported into Iran from China and marked for sale in the open markets, 60 mm canisters filled with Iranian-manufactured mortar rounds, 240 mm rockets, IRAMs, RPG-7s, RPG-29s, and RG-3 armor penetrating anti-tank grenades deployed by the Terrorist Groups in various acts of international terrorism, including the Terrorist Attacks wherein Plaintiffs and/or Plaintiffs' family members were killed, maimed, or otherwise injured.

453. The presence of these weapons shows a high level of sophistication of the Iranian arms flow into Iraq as the purchases are made by the Iranian regime.

### 2. IMPROVISED ROCKET ASSISTED MUNITIONS

454. In addition to EFPs, Iran also provided material support to the Terrorist Groups by providing them with IRAMs.

455. Along with EFPs, Improvised Rocket Assisted Munitions were a signature weapon of terrorists in Iraq that were supplied by the IRGC.

456. An IRAM is a rocket-fired improvised explosive device made from a large metal canister—such as a propane gas tank—filled with explosives, scrap metal, ball bearings, and propelled by rockets, most commonly 107 and 122mm rockets launched from fixed or mobile sites by remote control. They are designed to cause catastrophic damage and inflict mass casualties.




457. According to The Joint Improvised Explosive Device Defeat Organization of the U.S. Department of Defense, IRAMs were first introduced by Iran in November 2007 against U.S. personnel in Iraq.

458. Although Iran's use of IRAMs was publicly disclosed by U.S. officials after their introduction in 2007, systematic identification of specific attacks as IRAM attacks was not publicly disclosed until 2010.

459. IRAM attacks occurred primarily in Baghdad and in the Shi'a dominated areas in southern Iraq, where Iranian-backed militias primarily operate.

460. All of the foregoing material support provided to Terrorist Groups, including those Special Groups that perpetrated the Terrorist Attacks that resulted in the death, maiming, or otherwise injuring of Plaintiffs and Plaintiffs' family members, was provided by Iran for attacks on Coalition Forces and U.S. nationals, including Plaintiffs, or was financed and facilitated in substantial part by Iran.

Vehicle Overview




Team concluded that Special Group criminals utilized 14 IRAMs, fired from a cargo truck, with 14 improvised rocket tubes setup in the bed with remote initiation to attack FOB Loyalty on April 28. [105]

**J. IRAN EVADES SANCTIONS & COMMITS ACTS OF TERRORISM THROUGH ITS AGENTS/PROXIES**

461. Because Iran is under numerous sanctions issued by other countries, it continues to evade those sanctions by operating clandestinely through agents of Iran, including the Islamic Republic of Iran Shipping Lines, Mahan Air, and the National Iranian Oil Company.

462. Iran obtains and provides weapons and other material support to Terrorist Groups and other terrorist organizations through agents and proxies that are nothing more than extensions of the Iranian regime.

---

[105] Bill Roggio, "Mahdi Army Uses 'Flying IEDs' In Baghdad," The Long War Journal, June 28, 2008, available at: https://www.longwarjournal.org/archives/2008/06/mahdi_army_uses_flyi.php (last accessed July 4, 2018).

463. Congress and successive Administrations have enacted several laws and executive orders that imposed sanctions on countries and firms that sell WMD technology and military equipment to Iran. Despite these efforts, Iran continued to evade sanctions.

464. In order to thwart U.S. sanctions efforts, Iran cultivated close relationships with foreign arms suppliers, including Russia, China, and North Korea. In addition, Iran sought to clandestinely acquire dual-use technologies from European manufacturers, and certain export-controlled defense products, aircraft parts, dual-use technologies and materials from the United States.

465. Iran used proxies and agents as tools to circumvent sanctions, including IRISL, NIOC, KAA, and Mahan Air.

466. IRISL, NIOC, KAA, Mahan Air, and other Iranian government and IRGC fronts serve as financial, physical, and logistical conduits for Iran and its terroristic goals. At all relevant times, these agents and proxies of Iran acted in concert with Defendants.

### 1. ISLAMIC REPUBLIC OF IRAN SHIPPING LINES

467. As Iran's national maritime carrier, IRISL[106] is an agent and instrumentality of Iran.

468. IRISL has a long history of facilitating arms shipments on behalf of the IRGC and the Iranian military, including copper discs that are a key component in EFPs (discussed below) used to kill and maim many of the Plaintiffs herein.

469. For example, a November 2007 State Department cable noted:

> Washington remains concerned about on-going conventional arms transfers from China to Iran, particularly given Iran's clear policy of providing arms and other support to Iraqi insurgents and terrorist groups

[106] IRISL is Iran's national maritime carrier: a global operator of merchant vessels with a worldwide network of subsidiaries, branch offices and agent relationships. It provides a variety of maritime transport services, including bulk, break-bulk, cargo and containerized shipping.

> like the Taliban and Hezbollah….
> We have specific information that Chinese weapons and components for weapons transferred to Iran are being used against U.S. and Coalition Forces in Iraq, which is a grave U.S. concern.

470. The diplomatic cable went on to note that an IRISL-flagged vessel was loaded at a Chinese port with multiple containers of cargo bound for delivery at the port of Bandar Abbas, Iran.

471. The cargo included DIO[107] manufactured ammunition cartridges (7.62 x 39 rounds for AK-47 assault rifles).

472. DIO is an Iranian government-owned weapons manufacturer controlled by MODAFL.

473. An April 2008 State Department cable warned of an IRISL shipment of chemical weapons precursors from China aboard the IRISL-leased, Iranian flagged merchant vessel ("M/V") Iran Teyfouri.

474. In September 2008, the U.S. Treasury Department designated IRISL a SDN, stating:

> "Not only does IRISL facilitate the transport of cargo for U.N. designated proliferators, it also falsifies documents and uses deceptive schemes to shroud its involvement in illicit commerce."

475. The Treasury Department further noted that:

> [i]n order to ensure the successful delivery of military-related goods, IRISL has deliberately misled maritime authorities through the use of deception techniques. These techniques were adopted to conceal the true nature of shipments ultimately destined for MODAFL [Iran's Ministry of Defense and Armed Forces Logistics].

---

[107] DIO was designated an SDN by the U.S. on March 30, 2007. IRGC Brigadier-General Seyyed Mahdi Farahi was the Managing Director of DIO and has been sanctioned by the European Union since 2008. He was later sanctioned by the U.S. on January 17, 2016. *See*, http://eur-lex.europa.eu/legal-content/EN/TXT/?uri=celex%3A32010D0644 (last visited Sept. 13, 2017).

476. In January 2009, a former Russian merchant ship chartered by IRISL—named the M/V Monchegorsk and flying a Cypriot flag—was spotted leaving the Iranian port of Bandar Abbas and heading for the Suez Canal.

477. Egyptian authorities were alerted by the U.S. Navy and the M/V Monchegorsk was forced into an Egyptian port to be searched. Iran's DIO was later determined to be the shipper of the military-related cargo.

478. Munitions, believed to be headed for Gaza, were found hidden in the cargo, including components for mortars and thousands of cases of powder, propellant, and shell casings for 125mm and 130mm guns.

479. In October 2009, U.S. troops boarded a German-owned freighter, the M/V Hansa India, in the Gulf of Suez and found eight containers full of ammunition that were headed to Syria from Iran.

480. The vessel carried seven containers of small arms ammunition (including 12 million bullet casings), as well as one container containing copper discs of the type used in EFPs to kill and maim Coalition Forces and U.S. nationals, including Plaintiffs.

481. The acronym "IRISL" was painted in large block letters on the exterior side walls of each shipping container, and the barrels of munition parts discovered inside the containers were marked with the inscription "SAEZMANE SANAYE DEFA," a common transliteration from Farsi to English of the name for Iran's Defense Industries Organization.

482. The M/V Hansa India was registered to the Hamburg-based shipping company Leonhardt & Blumberg but had been under charter to IRISL for several years.

483. In November 2009, the Government of Israel intercepted an IRISL-flagged ship, the M/V Francop, headed for Beirut, Lebanon and then Latakia, Syria. The vessel was loaded with

munitions crates that were either stamped "IRISL" or included documentation marked with the IRGC-QF logo.

484. The munitions found onboard included over two thousand 107mm "Katyusha" rockets, more than six hundred 122mm "Grad 20" rockets, and also various rocket fuses, mortar shells, rifle cartridges, fragment grenades and 7.62mm bullets.

485. The M/V Francop, owned by the Cypriot shipping company UFS, was carrying shipping containers clearly marked IRISL.

486. Because the DIO, as discussed infra, was one of MODAFL's three main weapons systems manufacturers, it was required to use IRISL for most of its illicit shipments of military-related raw-materials, parts and finished products for, and from, foreign suppliers, Iranian arms dealers and terrorist organizations.

487. Iran's DIO was listed as an entity of concern for military procurement activities in an early warning document distributed by the German government to industry in July 2005.

488. The DIO was also designated by the United Nations in 2006 for its involvement in Iran's WMD program.

489. During 2006 and 2007, weapons caches seized by Coalition Forces from the Special Groups in Iraq contained large quantities of weapons produced by Iran; including many 107-millimeter artillery rockets with closely clustered DIO lot numbers and production dates between 2005 and 2007, as well as rounds and fuses for 60 millimeter and 81-millimeter mortars with DIO lot markings and 2006 production dates.

490. There can be no question that IRISL facilitated shipments of military cargo to FTOs and Special Groups, including those responsible for carrying out the Terrorist Attacks that killed, maimed, and/or injured Plaintiffs or Plaintiffs' family members.

491. IRISL did, in fact, facilitate shipments of military cargo to Hezbollah, one of the organizations controlled and/or otherwise substantially and materially supported by Iran and responsible for acts of international terrorism that killed and injured American citizens in Iraq, including the Plaintiffs. However, IRISL was not Iran's only means of passing weapons on to the Terrorist Groups, weapons used to commit acts of international terrorism, including the Terrorist Attacks carried out against Plaintiffs and/or Plaintiffs' family members.

**2. MAHAN AIR**

492. Mahan Airlines was founded in 1991 and began passenger air travel services in June 1992 as the first Iranian "private" airline. Since 1997, Mahan Airlines has also provided air cargo operations.

493. Mahan Airlines operates under the name "Mahan Air" and uses the Tehran Imam Khomeini International Airport and Mehrabad International Airport as its main business hubs.

494. As of November 2016, Mahan Air owned at least 60-passenger and cargo aircraft, and, in addition to domestic flights, flew to 52 destinations in Europe, Asia and the Middle East.

495. Mahan Air publicly acknowledges that it is wholly owned by Mol-Al-Movahedin Charity.

496. The Mol-A-Movahedin Charity is managed and controlled by the IRGC.

497. Mahan Air is an "agency or instrumentality" of the government of Iran as defined by 28 U.S.C. § 1603(b).

498. On October 12, 2011, the United States designated Mahan Air as an SDGT for "providing financial, material and technological support to the Islamic Revolutionary Guard Corps-Qods Force."

499. According to the U.S. government, Mahan Air (1) "facilitated the covert travel of

suspected IRGC-QF officers into and out of Iraq;" (2) "facilitated IRGC-QF arms shipments"; and transported personnel, weapons and goods on behalf of Hezbollah [sic]." (Brackets in original).

500. The Treasury Department explained Mahan Air's direct involvement with terrorist operations, personnel movements and logistics on behalf of the IRGC-QF:

> Mahan Air also facilitated the covert travel of suspected IRGC-QF officers into and out of Iraq by bypassing normal security procedures and not including information on flight manifests to eliminate records of the IRGC- QF travel.
>
> Mahan Air crews have facilitated IRGC-QF arms shipments. Funds were also transferred via Mahan Air for the procurement of controlled goods by the IRGCQF.
>
> In addition to the reasons for which Mahan Air is being designated today, Mahan Air also provides transportation services to Hezbollah [sic], a Lebanon-based designated Foreign Terrorist Organization. Mahan Air has transported personnel, weapons and goods on behalf of Hezbollah [sic] and omitted from Mahan Air cargo manifests secret weapons shipments bound for Hezbollah [sic].

501. Under-Secretary of Commerce Eric L. Hirschhorn described this supply chain as "egregious conduct by… foreign companies and individuals who have endangered the lives of U.S. and coalition forces in Iraq."

502. During a press conference, Under-Secretary for Terrorism and Financial Intelligence David S. Cohen said that "Mahan Air's close coordination with the Qods Force – secretly ferrying operatives, weapons and funds on its flights – reveals yet another facet of the IRGC's extensive infiltration of Iran's commercial sector to facilitate its support for terrorism."

503. The U.S. Department of Treasury further highlighted that Mahan Air provided travel services to Qods Force personnel to fly to and from Iran and for military training.

504. The airline facilitated arms shipments and "covert travels" to Iraq of suspected Qods Force members who were responsible for targeting Coalition Forces.

505. Mahan Air was also later identified as the conduit to Iran of thousands of radio

frequency modules recovered by Coalition Forces in Iraq from IEDs that were used to target U.S. nationals, including Plaintiffs, and Coalition Forces.[108]

506. Coalition Forces recovered these modules from IED devices in Iraq that were used to target U.S. nationals, including Plaintiffs, and Coalition Forces.

507. The modules had encryption capabilities and a particularly long range that allowed Special Groups operatives to operate them across significant distances.

508. In 2008, Mahan Air transported the IED components from Singapore and Thailand to Tehran, Iran.

509. In short, at the direction of Iran, Mahan Air transported weapons, personnel, and technology into Iraq on behalf of the IRGC-QF and Hezbollah, and did, in fact, transport modules used to control and activate IEDs and EFPs deployed against Coalition Forces in Iraq.

510. Mahan Air, in its supporting, albeit crucial, role of exporting terrorism, and the materials and instruments thereof for Iran, is an agent and instrumentality of Iran.

511. Due to the role played by Mahan Air, Iran was able to effectuate global jihad and commit acts of terrorism much more effectively and conveniently during the Relevant Period, including the time in which the Terrorist Attacks at issue were committed.

512. Since 2012, Mahan Air has multiple daily flights from Tehran, Mashhad, Isfahan, Shiraz and Abadan to Damascus. These flights use Iraqi air space and carry weapons, equipment and Revolutionary Guard personnel to be used on the ground in Syria in support of Iranian-backed operations.

---

[108] *See* Superseding Indictment in *United States v. Larijani*, *available at:* https://www.justice.gov/opa/file/837996/download (last visited Sept. 13, 2017).

513. Since fighting began in Syria, the Iraqi Special Groups linked to the Qods Force have been sent by bus through Basra to Abadan and from there are transferred to Damascus with Mahan aircraft. According to reports obtained from the IRGC, these groups include the Special Groups: Badr Corps., KH, AAH, as well as the FTO Hezbollah. As they were in Iraq, these terrorist groups, now operating in Syria, are commanded by the IRGC and have been directly linked to the massacres of Aleppo and killings of Syrian civilians.

### 3. NATIONAL IRANIAN OIL COMPANY (NIOC)

514. Defendant NIOC is not a state agency, operation, or program of the Iranian Government. Rather, it is a front-company for the IRGC, and therefore an agent and instrumentality of Iran.

515. At all relevant times, the NIOC was controlled by Iran through the IRGC.

516. NIOC is an "agency or instrumentality" of the government of Iran as defined by 28 U.S.C. § 1603(b).

517. In 2008, the Treasury Department identified NIOC (and other Iranian agencies) as "centrally involved in the sale of Iranian oil, as entities that are owned or controlled by the [government of Iran]."

518. Pursuant to E.O. 13382, the United States designated NIOC as an SDN.

519. The United States has identified NIOC as an agent or affiliate of the IRGC.

520. Under the ITRSHRA, the U.S. government determined that that NIOC is an agent or affiliate of the IRGC under section 104(c)(2)(E)(i) of the CISADA and section 302 of the ITRSHRA. As part of that 2012 certification, NIOC was formally determined to be part of the Government of Iran.

521. During the Relevant Period, the NIOC not only was under IRGC control, but it also

served a critical function in supporting the IRGC's activities.

522. The Iranian Helicopter Aviation Company, Ahwaz Pipe Mill Co., and Kala Naft[109] are all subsidiaries of the NIOC.

523. As early as February 1998, Kala Naft was identified by the UK government "as having procured goods and/or technology for weapons of mass destruction programs."

524. Kala Naft was also publicly identified as a NIOC subsidiary in a 2003 Commerce Department action that further stated that Kala Naft was a recipient of illegally exported U.S. origin oil field equipment from the U.S.

### 4. KHATAM AL-ANBIYA CONSTRUCTION COMPANY & THE HEADQUARTERS FOR THE RESTORATION OF HOLY SHRINES

525. Iran also logistically and financially supports terrorist groups through proxies of Iran, including, but not limited to Khatam al-Anbiya Construction Company (a/k/a Khatam al-Anbiya Construction Headquarters, Qaragah-e Sazandegi-ye Khatam al- Anbiya, or "Seal of the Prophets," hereinafter referred to as "KAA"), and The Headquarters for the Restoration of the Holy Shrines ("HRHS"), both Qods Force front entities, as well as their agents and subsidiaries.

526. KAA serves to help the IRGC disguise its funding and operations, including IRGC- Qods Force terror activities.

527. KAA is a large Iranian corporation, controlled by the IRGC, and serves to help the IRGC funnel money, material, and personnel to its operations.

528. KAA was originally founded by the IRGC as an engineering wing to assist in the

---

[109] Kala Naft was designated as a Specially Designated National (SDN) by the United States Treasury on June 16, 2010. U.S. Department of the Treasury, *Recent OFAC Actions* (June 16, 2010), https://www.treasury.gov/resource-center/sanctions/OFAC-Enforcement/Pages/20100616.aspx.

building of fortifications during the Iran-Iraq War (1980-1989) and to rebuild after the conflict. Since then it has diversified into mechanical engineering, energy, mining, and defense.

529. KAA is an "agency or instrumentality" of the government of Iran as defined by 28 U.S.C. § 1603(b), and, as a designated IRGC entity, is owned and controlled by the government of Iran.

530. IRGC Commander-in-Chief, Major General Mohammad Ali Jafari, serves as KAA's council chairman.

531. KAA functions as the IRGC's engineering and logistical arm, conducting a range of civil engineering activities, such as road and dam construction, the manufacturing of pipelines to transport water, oil, gas (within and outside Iran's borders), mining operations, agriculture, and telecommunications.

532. On October 25, 2007, KAA was designated by the U.S. Treasury Department under E.O. 13382 for extensively assisting IRGC to gain financial support for IRGC activities.

533. The U.S. Treasury designated nine IRGC-affiliated entities, including KAA, and five IRGC-affiliated individuals as derivative designations of the IRGC.

534. On June 23, 2008, the European Union also designated IRGC-affiliated companies, including KAA, for their support to Iranian ballistic missile and nuclear programs.

535. On June 9, 2010, the U.N. Security Council designated KAA in the 1929 Resolution for its involvement with Iranian military and nuclear activities.[110]

536. On February 10, 2010, The U.S. Department of the Treasury took further action to

---

[110] United Nations, *Security Council Imposes Additional Sanctions on Iran, Voting 12 in Favour to 2 Against, with 1 Abstention,* (June 9 2010), https://www.un.org/press/en/2010/sc9948.doc.htm.

implement then-existing U.S. sanctions against the IRGC by designating an individual and four companies affiliated with the IRGC pursuant to Executive Order (E.O.) 13382, which freezes the assets of designated proliferators of weapons of mass destruction (WMD) and their supporters. This action focused in particular on KAA, considered an arm of the IRGC designated pursuant to

537. E.O. 13382 in 2007. At the time, Treasury stated:

> Today's designations include IRGC General Rostam Qasemi, who is also the commander of Khatam al-Anbiya Construction Headquarters, the engineering arm of the IRGC that serves to help the IRGC generate income and fund its operations. Khatam al-Anbiya is owned or controlled by the IRGC and is involved in the construction of streets, highways, tunnels, water conveyance projects, agricultural restoration projects, and pipelines. Treasury also today designated four companies that are owned or controlled by, or that act on behalf of, Khatam al-Anbiya.
>
> As the IRGC consolidates control over broad swaths of the Iranian economy, displacing ordinary Iranian businessmen in favor of a select group of insiders, it is hiding behind companies like Khatam al-Anbiya and its affiliates to maintain vital ties to the outside world," said Under Secretary for Terrorism and Financial Intelligence Stuart Levey. "Today's action exposing Khatam al-Anbiya subsidiaries will help firms worldwide avoid business that ultimately benefits the IRGC and its dangerous activities.

538. In 2011, the British and Japanese governments both listed KAA as an entity of concern due to its involvement in the proliferation of WMDs, missiles, and biological, chemical, and nuclear weapons.

539. KAA also owns and controls Ghorb Karbala (a/k/a Gharargah Karbala, Gharargah Sazandegi Karbala-Moasseseh Taha, or Ghorb-e Karbala), an entity also listed in an annex to U.N. Security Council Resolution 1929 of June 9, 2010, as an entity of Iran's IRGC, with a role "in Iran's proliferation-sensitive nuclear activities and the development of nuclear weapon delivery systems.

540. Companies that are owned or controlled by KAA, or that act on its behalf, and

directly support its efforts include: Fater Engineering Institute, Imensazen Consultant Engineers Institute (ICEI), Makin Institute, and Rahab Institute.

541. By 2010, KAA had become a massive holding firm with control of more than 812 registered companies inside and outside of Iran and the recipient of over 1,700 Iranian-government contracts, many awarded on a no-bid basis.

542. KAA has undertaken infrastructure development projects in Iraq, Syria, and Lebanon, extending its services as a tool of the IRGC and Iran.

543. KAA was operating on the ground in Iraq during the entire Relevant Time period.

544. No later than October 2006, western media outlets were reporting that KAA was involved in hidden and unlawful economic activities beyond the borders of Iran.

545. On May 7, 2008, Mohammad Reza Pourzeyai, then KAA deputy head, announced that KAA had built a railway line connecting Iraq's Basra and Iran's Khorramshar.

546. KAA also performed due diligence and planned a project for building a water pipeline from the Iraqi border to the middle of Syria, a distance of approximately 256 kilometers, and also designed a project for building an oil pipeline from Iran's Abadan refinery to Basra, Iraq.

547. KAA also undertook efforts to renovate the Mosul Dam in Iraq. KAA's work on Dam projects around the globe is a known conduit through which the IRGC moves its operatives into foreign countries.

548. On December 13, 2011, then commander of KAA, Abu al-Qassem Mozaffari, confirmed that KAA operates in Iraq, Syria and Lebanon.

549. From 2002 through 2007, Defendant Banks sent and received payments totaling nearly USD $100 million for KAA, and supplied financial services and other material support to many KAA subsidiaries.

550. KAA, under the guise of various construction development projects in Iraq, in concert with other agents of Iran, provided the means by which Iran and other Defendants were able to supply raw materials, currency, weapons, and munitions used by the Special Groups and other terrorist organizations to effectuate Iran's campaign of terror in Iraq.

551. A critical IRGC agent, subsidiary and Iranian-proxy is the HRHS.

552. HRHS was established in 2003, purportedly to renovate the Shiite shrines in Iran and in Iraq. In order to do so, HRHS enlisted the assistance of KAA.

553. According to its charter, as listed on its website, HRHS was authorized by the Islamic regime to, among other things, renovate Shiite shrines in Iraq and to coordinate between the Iranian regime and Iraqi government organizations and NGOs.

554. HRHS does not hide its links to the Qods Force; a provincial official in the HRHS told Iranian media that the organization is affiliated with the Qods Force.

555. The commander of the Qods Force, Qassem Soleimani, and the Supreme Leader's representative to the Qods Force both sat on HRHS's Board of Trustees. The four other board members include HRHS head Hassan Pelarak, and three senior clerics who are members of the Supreme Leader's office. Thus, the Supreme Leader and his top general responsible for external operations control HRHS.[111]

556. Hassan Pelarak is a former mining executive and former IRGC commander, and, according to Iranian media, has served in the Qods Force.

557. All HRHS heads have served as Qods Force officers. Pelarak's predecessors,

---

[111] Major General Qassem Soleimani was killed in Baghdad, Iraq on January 3, 2020 by a U.S. drone strike. See: https://www.aljazeera.com/news/2020/01/qassem-soleimani-iran-elite-quds-force-leader-200103033905377.html

Hassan Danaeifar, who was Iran's ambassador to Iraq from 2010 to 2017, and Mansour Haghighatpour, who is now a former parliamentarian, have been Qods Force officers. In 2008, Soleimani touted Danaeifar's Qods Force credentials in a famous message passed along to General David Patraeus, commander of U.S. forces in Iraq.

558. It is no coincidence that Qassem Soleimani sat on HRHS's Board of Trustees and that the organization's Directors have been Qods Force officers; the unit uses the infrastructure of the HRHS to funnel weapons, manpower, money, equipment, and supplies into Iraq.

559. HRHS publishes on its website that it renovates Shiite shrines in Najaf, Karbala, Kadhimiya, Samarra, and other places.

560. HRHS claims to have spent millions of dollars on more than 200 projects in Iraq and further plans to develop projects valued at approximately $1.6 billion.

561. HRHS also claims that its finances are charitable donations from citizens, as well as government, private, and quasi-government entities.

562. HRHS embraces and supports the Special Groups. The direct link between HRHS and the Special Groups is concretely reflected on its official website of the HRHS Samarra office.[112]

563. HRHS considers the Special Groups to be "Defenders of the Shiite Holy Shrines in Iraq," as stated on websites controlled by the IRGC-QF.[113]

564. HRHS is nothing more than a front for the IRGC-QF, whose mission is to support

---

[112] *See* http://setadsamarra.ir/ (last visited Sept. 13, 2017) (translation available).

[113] *Introduction with the Brigades of the Defenders of the Shiite Holy Shrines Operating in Iraq*, OWEIS, Iran (January 12, 2015), http://oweis.ir/ (Farsi web address and translation available). *Marking the Fourth Anniversary of the [Assassination of] Martyr Hassan Shateri*, Tasnim News, Tehran (February 16, 2007), https://www.tasnimnews.com/fa/news/ (Farsi web address and translation available).

the Iranian-backed terror groups in Iraq, disrupt the stability of free and democratic Iraq, and expand Iranian influence in the country.

565. HRHS and KAA worked closely together in Iraq.

566. HRHS worked in cooperation with the IRGC-QF-affiliated KAA to perform construction work on the Zahra Shrine in Najaf, Iraq. This project involved the HRHS subsidiary, Kowsar Engineering.

567. Under the guise of serving the faithful, KAA and HRHS act as a pipeline for the Qods Force, whose mission is to support the Iranian-backed Iraqi network and expand Iranian influence in the country.

568. KAA and HRHS, much like its IRGC affiliates, work closely with the well-known FTO, Hezbollah. This relationship was highlighted following the assassination of IRGC-QF senior commander Hassan Shateri (a/k/a Hesam Khoshnevis) in February 2013.

569. Shateri was deployed to Lebanon by KAA to lead its Lebanese branch, while at the same time serving as senior IRGC-QF commander.

570. Shateri's role in the Lebanese branch of KAA extended far beyond construction projects into extensive terror activities. On August 3, 2010, the U.S. Department of Treasury designated Hassan Shateri "for providing technical support to Hizballah's reconstruction efforts in Lebanon and to the expansion of the terrorist group's private communications network. Khoshnevis [Shateri] also operates as President Ahmadinejad's personal representative in Lebanon."

571. Shateri arrived in Lebanon after the Lebanon War of 2006 in order to: (1) rehabilitate Hezbollah's operational infrastructure damaged during the conflict; (2) to replace Hezbollah's lost arsenal; and (3) to rebuild its missile sites close to the demarcation line with Israel.

Shateri served as a Special Representative of the IRGC, sitting on Hezbollah's Central Command where he helped shape Hezbollah's policies with advice from Secretary-General Hassan Nasrallah.

Prior to working in Lebanon, Shateri operated in Afghanistan, where his mission was to renovate regions that were damaged during fighting with Coalition Forces in Afghanistan.[114]

572. Between his services in Afghanistan and Lebanon, Shateri was operating in Iraq.[115]

573. Though his detailed activities in Iraq were concealed, the Supreme Leader's Representative to the Qods Force, Ali Shirazi, mentioned Shateri's time there, saying he was dispatched to Iraq as part of his extensive service for the Islamic Revolution.[116]

574. In or around February 2013, after Shateri's assassination, Hezbollah published details that showed that KAA functioned as a cover for Qods Force insurgent activities.

575. Bank Melli and Bank Mellat were headed by UNSCR 1737 designee and former IRGC Commander Rahim Safavi.

576. Defendant Bank Melli and Bank Mellat also provided material support to KAA and its subsidiaries by handling their letters of credit. These letters of credit are primarily used to finance KAA's purchase of equipment and services from overseas suppliers.

577. KAA subsidiaries serviced by Defendant Bank Melli and Bank Mellat include the designated entities Ghorb Nooh, Sepasad, Sahel Consultant Engineers and Gharargah Sazandegi

---

[114] *Where and How Volunteers for Fighting ISIS are Trained*, Masregh News, Tehran (June 23, 2014), https://www.mashreghnews.ir/news/ (Farsi web address and translation available).

[115] Dexter Filkins, *The Shadow Commander,* THE NEW YORKER (Sept. 30, 2013), http://www.newyorker.com/magazine/2013/09/30/the-shadow-commander.

[116] Will Fulton, *The Assassination of Iran Quds Force General Hassan Shateri in Syria* (Feb. 28, 2013), https://www.criticalthreats.org/analysis/the-assassination-of-iranian-quds-force-general-hassan-shateri-in-syria#_edn77efea9b2d5a1d9d20e5cb794c934c9632.

Ghaem.

578. KAA and HRHS' activities in Iraq, from 2003 until the present, provided the perfect vehicle through which Iran smuggled and disguised raw materials, currency, weapons, and munitions used by the Terrorist Groups to effectuate Iran's campaign of terror in Iraq.

## VI. THE PLAINTIFFS & THE TERRORIST ATTACKS

579. At issue in this case are terrorist attacks perpetrated by AQ, AAI, the Special Groups, other terrorist organizations, including the FTOs, SDGTs, SDTs, SDNs and other terrorists with known links to Iran which killed or injured Plaintiffs (the "Terrorist Attacks").

580. During the Relevant Period, the injuries and deaths caused by Defendants to Plaintiffs were the result of acts of international terrorism committed, planned, or authorized by organizations designated as foreign terrorist organizations pursuant to Section 219 of the Immigration and Nationality Act (8 U.S.C. § 1189), as of the date on which such acts of international terrorism were committed, planned, and/or authorized. Iran funded, aided and abetted such foreign terrorist organizations by, at least, knowingly providing funding and other substantial and material support to the Terrorist Groups who committed such acts of international terrorism.

581. Further, none of the Terrorist Attacks occurred in the course of (1) a declared war; (2) an armed conflict, whether or not war had been declared between two or more nations; or (3) an armed conflict between military forces of any origin.

582. All Plaintiffs physically injured or killed in Iraq were, at the time of their injury or extrajudicial killing, participating in a peacekeeping mission intended to contribute to the security of the United Nations Assistance Mission for Iraq, the Governing Council of Iraq and other institutions of the Iraqi interim administration, and key humanitarian and economic infrastructure.

583. Without Iran's conduct, support, control and authority described herein, the

Terrorist Groups, including the FTOs, SDGTs, SDTs, and/or SDNs responsible for the Terrorist Attacks would not have had the funding or material support necessary to carry out these Terrorist Attacks.

584. Plaintiffs are individuals who were injured or killed in the Terrorist Attacks that occurred in Iraq, and who, as a result, experienced physical and mental pain and suffering and emotional distress. Some Plaintiffs are decedents, whose anticipated personal representatives and Estates,[117] bring claims for the named individuals who were killed in those attacks, as well as all heirs thereof. Other Plaintiffs are family members of the victims of the Terrorist Attacks and have experienced injuries including anxiety, severe mental anguish, extreme emotional distress, and loss of companionship as a result of their relatives' injuries or death.

585. Iran goes to great lengths to hide the fact that it funds terrorism, including funding the Special Groups and terrorists that perpetrated the terrorist attacks that resulted in the death or injury of Plaintiffs.

586. Additionally, even utilizing the utmost diligence, it can take months, or even years, before the terrorist group who perpetrated an act of international terrorism, or the type of weapon/explosive used by a terrorist group in a terrorist attack, can be identified.

587. Here, Plaintiffs did not know and did not have reason to know of their potential claims against Defendants until recently and have worked diligently to adequately investigate and pursue their claims.

588. As it concerns Plaintiffs' claims, and as outlined above, Iran has fraudulently concealed its involvement with any of the Terrorist Groups and terrorists responsible for

[117] In some instances, families are in the process of establishing estates and the identified family members, as the Anticipated Personal Representatives, bring these actions, individually, and on behalf of the anticipated estates of their deceased family members and all heirs thereof.

perpetrating the Terrorist Attacks. Iran has further denied the fact it provided material support and resources to the Terrorist Groups responsible for perpetrating the Terrorist Attacks. As such, the doctrine of equitable tolling applies to this Action and all Plaintiffs.

589. On June 13, 2016, a Class Action Complaint was filed in the District of Columbia captioned *Alan Burks, et al. v. Islamic Republic of Iran*, et al., Case. No. 1:16-cv-01102, "bring[ing] this class action pursuant to 28 U.S.C. § 1605A of the Foreign Sovereign Immunities Act ("FSIA") for wrongful death, personal injury, and related torts on behalf of a class consisting of all United States nationals, members of the United States armed forces, or employees of the United States Government acting within the scope of their employment, injured or killed by an EFP, and no other form of improvised explosive device, after June 1, 2005, their estates, and immediate family members[.]" Should Defendants appear in this case and raise affirmative defenses, the doctrine of American Pipe tolling should apply to the claims of possible class members.

590. Pursuant to the Service Members Civil Relief Act (SCRA). "[t]he period of a service member's military service may not be included in computing any period limited by law, regulation, or order for the bringing of any action or proceeding in a court, or in any board, bureau, commission, department, or other agency of a State (or political subdivision of a State) or the United States by or against the service member or the service member's heirs, executors, administrators, or assigns." 50 U.S.C.A. § 3936.

591. The following Plaintiffs are United States' nationals, members of the U.S. armed forces, or government contractors injured or killed in the acts of international terrorism complained of herein, and estates and/or family members of such U.S. nationals, members of the U.S. armed forces, or contractors.

### 1. THE SEPTEMBER 19, 2003 ATTACK – MOSUL

#### A. MICHAEL MATTHEWS

592. Plaintiff Michael Matthews is a citizen of the United States and is domiciled in the State of Texas.

593. On September 19, 2003, Michael Matthews, age 23, was serving in the U.S. Army, assigned to C Battery, 1st Battalion, 27th Field Artillery Regiment (C/1-27 FA), based in Babenhausen, Germany. At the time, Matthews held the rank of E-4.

594. At approximately 10:32 a.m. on Sunday, September 19, 2003, Matthews was serving as the gunner in an up-armored HMMWV, part of a 12-man team escorting field artillery ordnance to a site near Mosul, Iraq to be destroyed, when his element was attacked. Matthews was shot by a sniper before an improvised explosive device (IED) was remote-detonated.

595. As a result of the September 19, 2003 Terrorist Attack, Matthews sustained significant injuries including traumatic brain injury (TBI); gunshot wounds to the neck and head; shrapnel wounds to the left leg/groin, right shoulder blade, right arm, and right shoulder/neck area; nerve damage to the right side of his body; a broken jaw; and two broken fingers.

596. Matthews was MEDEVAC'd from the scene. He was unconscious during evacuation and does not have independent recollection of the route — he believes he was taken to Baghdad first. He has undergone 23 surgeries related to his injuries, including procedures to his right arm, neck, and right leg, with implanted hardware including metal rods in his right arm and metal plates in his jaw and head. He received the Purple Heart for wounds received at the hands of the enemy and the Combat Action Badge for actively engaging or being engaged by the enemy. He will require further continuous treatment and care.

597. As a result of the September 19, 2003 Terrorist Attack, and the injuries suffered,

Michael Matthews has experienced and will continue to experience, severe physical and mental anguish and extreme emotional pain and suffering.

598. Matthews has received a combined disability rating of 90–100% from the Department of Veterans Affairs, with a finding of individual unemployability.

**2. THE OCTOBER 6, 2003 ATTACK – RAMADI**

**B. MICHAEL J. DIEHN AND FAMILY**

599. Plaintiff Michael J. Diehn is a citizen of the United States and is domiciled in the State of Mississippi.

600. On October 6, 2003, Michael Diehn, age 21, was serving in the United States Army with Echo Company, 51st Infantry Regiment, Long Range Surveillance (LRS), 3rd Armored Cavalry Regiment (3rd ACR). At the time, Mr. Diehn held the rank of Specialist and was performing his assigned military duties as an Infantryman in Ramadi, Iraq.

601. On that date, Mr. Diehn was en route to conduct surveillance from a fixed position. He was serving as a passenger in a HMMWV when the vehicle was struck by an improvised explosive device (IED) consisting of two stacked anti-tank mines. The explosion was devastating and resulted in the death of Specialist Spencer Karl.

602. As a direct result of the October 6, 2003, terrorist attack, Mr. Diehn sustained significant injuries, including substantial scarring and a traumatic brain injury (TBI). In recognition of the wounds he received as a result of enemy action, Mr. Diehn was awarded the Purple Heart. His injuries have required, and will continue to require, medical treatment and care.

603. As a result of the October 6, 2003, terrorist attack and the injuries he sustained, Mr. Diehn has experienced and will continue to experience severe physical pain, mental anguish, emotional distress, and suffering. The lasting effects of his injuries have significantly impacted his

life and continue to require ongoing treatment and care.

604. Plaintiff David Diehn is a citizen of the United States and is domiciled in the State of Minnesota. David Diehn is the parent of Michael J. Diehn.

605. Plaintiff Barbra Diehn is a citizen of the United States and is domiciled in the State of Minnesota. Barbra Diehn is the parent of Michael J. Diehn.

606. As a result of the October 6, 2003 Terrorist Attack and the injuries suffered by Michael J. Diehn, his immediate family listed above experienced and continue to experience severe mental anguish, extreme emotional pain and suffering and diminished capacity for companionship, comfort, advice and counsel.

### 3. THE MARCH 16, 2004 ATTACK – FALLUJAH

#### C. WILLIAM BRENNAN

607. Plaintiff William Brennan is a citizen of the United States and is domiciled in the State of Alaska.

608. On March 16, 2004, William Brennan, age 30, was serving in the United States Army with Attack Company, 1st Battalion, 16th Infantry Regiment, 1st Infantry Division. At the time, Mr. Brennan held the rank of Sergeant and was performing his assigned military duties as a Petroleum Supply Specialist in Fallujah, Al Anbar, Iraq.

609. On that date, Mr. Brennan was participating in convoy operations to relocate from Fallujah, specifically FOB Mercury, to Habbinyia, Camp Manhattan. During the convoy, the vehicle in which Mr. Brennan was traveling struck an improvised explosive device (IED). The explosion was severe and resulted in the deaths of multiple Iraqi civilians.

610. As a direct result of the March 16, 2004, terrorist attack, Mr. Brennan sustained significant injuries, including a traumatic brain injury (TBI). The incident exposed Mr. Brennan to

a violent and traumatic event while he was carrying out his military duties in a combat environment.

611. As a result of the attack and the injuries he sustained, Mr. Brennan has experienced and will continue to experience significant physical and mental anguish, emotional distress, and pain and suffering. The effects of the traumatic event and resulting TBI have had a lasting impact on Mr. Brennan's life and continue to require attention and care.

**4. THE MARCH 21, 2004 ATTACK – ISKANDARIYAH**

**D. ADAM PETTIT AND FAMILY**

612. Plaintiff Adam Pettit is a citizen of the United States and is domiciled in the State of Missouri.

613. Adam M. Pettit was a 28-year-old E-4 infantryman with the 1st Armored Division, 26th Infantry, when he was attacked near Iskandariya, Iraq, on March 21, 2004. In the early afternoon, his platoon of approximately 40 soldiers was traveling to mark ordnance and tag bombs when a VBIED struck one of the Bradley vehicles at an intersection. Pettit was mounted in a HUMVEE as the gunner.

614. The attack involved a VBIED suicide bombing using home-made explosives and was not identified as a complex attack. Jeremy Horton, the Bradley commander, was killed.

615. Pettit sustained a traumatic brain injury, received the Combat Action Badge, and has a 100% VA disability rating, including a 70% combined rating for TBI and PTSD. He honorably retired from the military on June 1, 2022, at Fort Bragg.

616. As a result of the March 21, 2004 Terrorist Attack and the injuries suffered, Adam Pettit has experienced and will continue to experience severe physical and mental anguish and extreme emotional pain and suffering.

617. Plaintiff Brenna Pettit is a citizen of the United States and is domiciled in the State of Missouri. Brenna Pettit is the child of Adam Pettit.

618. Plaintiff Crystal Pettit is a citizen of the United States and is domiciled in the State of Missouri. Crystal Pettit is the spouse of Adam Pettit.

619. As a result of the March 21, 2004 Terrorist Attack and the injuries suffered by Adam Pettit, his immediate family listed above experienced and continue to experience severe mental anguish, extreme emotional pain and suffering and diminished capacity for companionship, comfort, advice and counsel.

## 5. THE APRIL 8, 2004 ATTACK – AL ANBAR PROVINCE

### E. LUIS M. VEGA MIRANDA AND FAMILY

620. Plaintiff Luis M. Vega Miranda is a citizen of the United States and is domiciled in the State of Florida.

621. On April 8, 2004, Luis M. Vega Miranda, age 18, was serving in the U.S. Marine Corps, assigned to 3rd Battalion, 7th Marine Regiment, Lima Company, based at Twentynine Palms, California, and deployed to the Al Qaim/Husaybah area of operations, Al Anbar Province, Iraq. At the time, Mr. Vega Miranda held the rank of Private First Class (E-2).

622. Mr. Vega Miranda was conducting a security patrol with his squad element in Husaybah, Al Anbar Province, Iraq, when his unit was attacked.

623. As a result of the April 8, 2004 Terrorist Attack, Lance Cpl. Christopher B. Wasser was killed, and Mr. Vega Miranda sustained significant injuries including shrapnel wounds to the right side of his body and right eye, amputation of a severed finger, and a right leg injury requiring reconstruction.

624. Mr. Vega Miranda was MEDEVAC'd from the scene and evacuated through Al

Anbar Province to Baghdad for further medical treatment.

625. He underwent multiple surgeries related to his injuries, including hip surgery, eye surgery, right leg reconstruction, and a bone graft. He received the Purple Heart for wounds received at the hands of the enemy and the Combat Action Ribbon for actively engaging or being engaged by the enemy. He will require further continuous treatment and care.

626. As a result of the April 8, 2004 Terrorist Attack, and the injuries suffered, Luis M. Vega Miranda has experienced and will continue to experience severe physical and mental anguish and extreme emotional pain and suffering.

627. Mr. Vega Miranda has received a combined disability rating of 100% from the Department of Veterans Affairs, including a 40% rating for TBI.

628. Plaintiff Norka Vega Miranda is a citizen of the United States and is domiciled in the State of Florida. Norka Vega Miranda is the mother of Luis M. Vega Miranda.

629. Plaintiff Luis Vega is a citizen of the United States and is domiciled in the State of Florida. Luis Vega is the father of Luis M. Vega Miranda.

630. As a result of the April 8, 2004 Terrorist Attack and the injuries suffered by Luis M. Vega Miranda, his immediate family listed above experienced and continue to experience severe mental anguish, extreme emotional pain and suffering and diminished capacity for companionship, comfort, advice and counsel.

### F. JAMIE BROWN AND FAMILY

631. Plaintiff Jamie Brown is a citizen of the United States and is domiciled in the State of Arizona.

632. On April 8, 2004, Jamie Brown, age 22, was serving in the U.S. Marine Corps, assigned to 3rd Battalion, 7th Marines, Lima Company, 3rd Platoon. At the time, Brown held the

rank of Lance Corporal (E-3).

633. Brown was performing his duties on a security patrol with his squad element — approximately 12 to 13 Marines — near a cemetery south of Market Street in Husaybah, Iraq, when his unit was attacked in a complex attack involving three improvised explosive devices (IEDs). Lance Cpl. Christopher B. Wasser was killed during the attack.

634. As a result of the April 8, 2004 Terrorist Attack, Brown sustained significant injuries including traumatic brain injury (TBI), post-traumatic stress disorder (PTSD), and tinnitus.

635. Brown was not CASEVAC'd or MEDEVAC'd from the scene; his injuries were diagnosed following the attack. Brown received the Combat Action Ribbon for actively engaging or being engaged by the enemy. He will require further continuous treatment and care.

636. As a result of the April 8, 2004 Terrorist Attack, and the injuries suffered, Jamie Brown has experienced and will continue to experience, severe physical and mental anguish and extreme emotional pain and suffering.

637. Brown has received a combined disability rating of 100% (Permanent & Total) from the Department of Veterans Affairs, including a 70% rating for PTSD and a 10% rating for TBI.

638. Plaintiff Alicia Lyn Brown is a citizen of the United States and is domiciled in the State of Arizona. Alicia Lyn Brown is the spouse of Jamie Brown.

639. As a result of the April 8, 2004 Terrorist Attack and the injuries suffered by Jamie Brown, his immediate family listed above experienced and continue to experience severe mental anguish, extreme emotional pain and suffering and diminished capacity for companionship, comfort, advice and counsel.

**6. THE APRIL 9, 2004 ATTACK – BAYJI**

**G. ANTHONY JOHNSON AND FAMILY**

640. Plaintiff Anthony Johnson is a citizen of the United States and is domiciled in the State of Georgia.

641. Anthony Johnson was an E-4 Specialist assigned to the 109th Quartermaster Brigade when his unit came under attack in Bayji, Iraq on April 9, 2004. Johnson's squad was part of a platoon-sized patrol securing the Bayji Police Station and was sent to investigate a group near the Iraqi Police Chief's residence.

642. As the squad moved toward the location, it was attacked with RPG fire and became engaged with enemy forces. Specialist Peter Enos, Staff Sergeant Toby Mallet, and Staff Sergeant Raymond Jones were killed during the attack.

643. Johnson sustained a traumatic brain injury as a result of the attack.

644. As a result of the April 9, 2004 Terrorist Attack, and the injuries suffered, Anthony Johnson has experienced and will continue to experience, severe physical and mental anguish and extreme emotional pain and suffering.

645. Plaintiff Willie Earl Kirksey is a citizen of the United States and is domiciled in the State of Mississippi. Willie Earl Kirksey is the stepbrother of Anthony Johnson.

646. As a result of the April 9, 2004 Terrorist Attack and the injuries suffered by Anthony Johnson, his immediate family listed above experienced and continue to experience severe mental anguish, extreme emotional pain and suffering and diminished capacity for companionship, comfort, advice and counsel.

**7. THE JUNE 22, 2004 ATTACK – TAL AFAR**

**H. JOHN F. DETRO AND FAMILY**

647. Plaintiff John F. Detro is a citizen of the United States and is domiciled in the State of Florida.

648. Mr. Detro was in Iraq on June 22, 2004, age 42, serving as a Physician Assistant in the U.S. Army. Mr. Detro was a passenger in a Humvee that was transporting a patient to Baghdad's main hospital when they were hit by an Improvised explosive device (IED).

649. As a result of the terrorist attack, Mr. Detro suffered an L4-L5 spinal fracture, scarring and post-traumatic stress disorder (PTSD).

650. Mr. Detro's recovery is ongoing, and he continues to struggle daily with PTSD, tinnitus, hearing loss, scarring, overuse injuries and academic obstacles.

651. As a result of the June 22, 2004 Terrorist Attack and the injuries suffered, John F. Detro has experienced and will continue to experience severe physical and mental anguish and extreme emotional pain and suffering.

652. Plaintiff Anthony Lee Detro is a citizen of the United States and is domiciled in the State of New York. Anthony Lee Detro is the son of John F. Detro.

653. As a result of the June 22, 2004 Terrorist Attack and the injuries suffered by John F. Detro, his immediate family listed above experienced and continue to experience severe mental anguish, extreme emotional pain and suffering and diminished capacity for companionship, comfort, advice and counsel.

**8. THE JUNE 24, 2004 ATTACK – BAGHDAD**

**I.JEROME YOUNG AND FAMILY**

654. Plaintiff Jerome Young is a citizen of the United States and is presently domiciled

in the State of New York.

655. On June 24, 2004, Jerome Young, age 26, was serving as a peacekeeping service member with the U.S. Army with the 282-field artillery 1st cavalry. At the time, Mr. Young held the rank of specialist.

656. Mr. Young was performing his duties as a food service crewmember while in Baghdad, Iraq.

657. While at a checkpoint at the greenzone, Mr. Young was attacked by a suicide vehicle improvised explosive device (SVIED). Mr. Young sustained injuries to include a traumatic brain injury (TBI).

658. As a result of the June 24, 2004, terrorist attack and the injuries suffered, Jerome Young has experienced and will continue to experience, severe physical and mental anguish and extreme emotional pain and suffering.

659. Plaintiff Jenifer Young is a citizen of the United States and is domiciled in the State of New York. Jenifer Young is the mother of Jerome Young.

660. Plaintiff Latoya Tracy Young is a citizen of the United States and is domiciled in the State of New York. Latoya Tracy Young is the sister of Jerome Young.

661. As a result of the June 24, 2004 Terrorist Attack and the injuries suffered by Jerome Young, his immediate family listed above experienced and continue to experience severe mental anguish, extreme emotional pain and suffering and diminished capacity for companionship, comfort, advice and counsel.

### 9. THE JULY 30, 2004 ATTACK – FALLUJAH

#### J. ALEXANDER MUNOZ AND FAMILY

662. Plaintiff Alexander Munoz is a citizen of the United States and is domiciled in the

State of Florida.

663. On July 30, 2004, Alexander Munoz was serving as a peacekeeping service member in the U.S. Marine Corps with Kilo Company, 3rd Battalion, 1st Marine Regiment, 1st Marine Division, 2nd Platoon, as 2nd Squad Leader. At the time, Mr. Munoz held the rank of Sergeant (E-5). Mr. Munoz was performing his duties as an Infantry Rifleman in Fallujah, Iraq. While returning to base after foot patrol, he got hit by mortars used as Improvised Explosive Devices (IEDs).

664. As a result of the July 30, 2004 Terrorist Attack, Mr. Munoz suffered from metal stuck in chest, ear damage, tinnitus, back surgery, spine surgery, and a Traumatic Brain Injury (TBI).

665. Mr. Munoz was awarded the Combat Action Badge and Purple Heart for engaging in fire with the enemy. He will require further continuous treatment and care.

666. As a result of the July 30, 2004 Terrorist Attack and the injuries suffered, Alexander Munoz has experienced and will continue to experience severe physical and mental anguish and extreme emotional pain and suffering.

667. Plaintiff Bianka N. Munoz is a citizen of the United States and is domiciled in the State of Florida. Bianka N. Munoz is the daughter of Alexander Munoz.

668. Plaintiff Gabriella Munoz is a citizen of the United States and is domiciled in the State of Florida. Gabriella Munoz is the daughter of Alexander Munoz.

669. Plaintiff Marlene Colon Soler is a citizen of the United States and is domiciled in the State of Florida. Marlene Colon Soler is the spouse of Alexander Munoz.

670. As a result of the July 30, 2004 Terrorist Attack and the injuries suffered by Alexander Munoz, his immediate family listed above experienced and continue to experience severe mental anguish, extreme emotional pain and suffering and diminished capacity for

companionship, comfort, advice and counsel.

## 10. THE AUGUST 1, 2004 ATTACK – SAMADA

### K. CHARLES KAUFFMAN

671. Plaintiff Charles Kauffman is a citizen of the United States and is domiciled in the State of Texas.

672. On August 1, 2004, Mr. Charles Kauffman, age 43, was serving as a peacekeeping service member in the United States Army and assigned to the 961st Quartermaster Company. At the time, Mr. Kauffman held the rank of E-8.

673. Mr. Kauffman was performing his duties as the vehicle commander of a Humvee during a mounted patrol and convoy-escort mission in the vicinity of Samada, Iraq.

674. At approximately midday, Mr. Kauffman and his unit were subjected to a complex enemy attack involving an improvised explosive device and small-arms fire. The explosive blast and enemy fire struck the convoy during the mission.

675. Mr. Kauffman sustained significant injuries during the attack, including shrapnel wounds, severe soft-tissue injuries, scarring, and a traumatic brain injury. His injuries required surgery, and he was evacuated out of Iraq for further medical treatment and care.

676. Mr. Kauffman was subsequently awarded the Purple Heart for wounds received in action. He continued serving in the United States Army until his honorable discharge in 2006.

677. As a result of the August 1, 2004 Terrorist Attack and the injuries he suffered, Mr. Kauffman has experienced and will continue to experience physical pain, mental anguish, emotional distress, and other lasting effects. Mr. Kauffman has received a total disability rating of 100% from the Department of Veterans Affairs.

### 11. THE AUGUST 26, 2004 ATTACK – NAJAF

#### L. ESTATE OF NICHOLAS SKINNER AND FAMILY

678. On the morning of August 26, 2004, PFC Nicholas Skinner was shot in the chest by an enemy sniper while standing security in the platoon's defense in Najaf, Iraq. Private First Class Skinner later succumbed to his wound after being evacuated to the battalion's casualty collection point.

679. Plaintiff Laura Paulsen is a citizen of the United States and is domiciled in the State of Florida. Laura Paulsen is the mother of Nicholas Skinner, and brings this action individually, and on behalf of the Estate of Nicholas Skinner, and all heirs thereof, as its anticipated legal representative.

680. Plaintiff Dexter Hamann is a citizen of the United States and is domiciled in the State of Iowa. Dexter Hamann is the brother of Nicholas Skinner.

681. Plaintiff Randy Skinner is a citizen of the United States and is domiciled in the State of Iowa. Randy Skinner is the father of Nicholas Skinner.

682. Plaintiff Elizabeth Lynn Ibarra is a citizen of the United States and is domiciled in the State of Illinois. Elizabeth Lynn Ibarra is the sister of Nicholas Skinner.

683. Plaintiff Linda Skinner is a citizen of the United States and is domiciled in the State of Iowa. Linda Skinner is the sister of Nicholas Skinner.

684. Plaintiff Stephanie Skinner is a citizen of the United States and is domiciled in the State of Iowa. Stephanie Skinner is the sister of Nicholas Skinner.

685. As a result of the August 26, 2004 Terrorist Attack and the fatal injuries suffered by Nicholas Skinner, his immediate family listed above experienced and continue to experience severe mental anguish, extreme emotional pain and loss of companionship, comfort, advice and

counsel.

### 12. THE NOVEMBER 4, 2004 ATTACK – LSA ANACONDA

#### M. NORMAN J. VALDEZ, JR.

686. Plaintiff Norman J. Valdez, Jr. is a citizen of the United States and is domiciled in the State of California.

687. On November 4, 2004, Norman J. Valdez, Jr., age 41, was serving as a peacekeeping serviceman in the U.S. Army, with the 579th Engineer Battalion, 81st Engineer Brigade. At the time, Mr. Valdez held the rank of Sergeant First Class.

688. Mr. Valdez was performing his duties as a Platoon Sergeant in Balad, Iraq when he was attacked. While conducting a mounted security mission, Mr. Valdez's vehicle was hit by an IED leaving Mr. Valdez in the vehicle severely injured.

689. As a result of the November 4, 2004 Terrorist Attack, Mr. Valdez sustained significant injuries due to the concussive blast of the explosion to his head and neck. He also suffered fragmentation injuries to the left arm and leg and required nerve reconstructive surgery.

690. Mr. Valdez was treated locally in Balad, Iraq and MEDEVAC to Germany and Walter Reed Army Hospital in the United States. Mr. Valdez was awarded the Purple Heart Medal for wounds received at the hands of the enemy. He will require further continuous treatment and care for mental and physical issues.

691. As a result of the November 4, 2004 Terrorist Attack, and the injuries he suffered, Norman J. Valdez, Jr. has experienced, and will continue to experience, severe physical and mental anguish and extreme emotional pain and suffering.

692. Mr. Valdez has been rated by the Veteran's Administration as 80% disabled.

### 13. THE DECEMBER 11, 2004 ATTACK – FALLUJAH

#### N. ROBERT SPADONI

693. Plaintiff Robert Spadoni is a citizen of the United States and is domiciled in the State of California.

694. On December 11, 2004, Robert Spadoni, age 21, was serving as a peacekeeping service member in the U.S. Marines with the 3rd Battalion, 5th Marine Regiment, Weapons Company. At the time, Mr. Spadoni held the rank of Lance Corporal.

695. Mr. Spadoni was performing his duties as an infantry assault man in Fallujah, Iraq.

696. While responding to an ambush that was underway, Mr. Spadoni was attacked by an improvised explosive device (IED), grenade and small arms fire. Mr. Spadoni sustained significant injuries to include a traumatic brain injury (TBI) and shrapnel to his left bicep.

697. Mr. Spadoni received treatment for his injuries in country. He was awarded the Purple Heart for his wounds received at the hands of the enemy and will require further continuous treatment and care.

698. As a result of the December 11, 2004, terrorist attack and the injuries suffered, Robert Spadoni has experienced and will continue to experience, severe physical and mental anguish and extreme emotional pain and suffering.

### 14. THE JANUARY 6, 2005 ATTACK – TAJI

#### O. ESTATE OF KENNETH G. VONRONN AND FAMILY

699. On January 6, 2005, Kenneth G. VonRonn, age 20, was a peacekeeping member of the U.S. Army with Headquarters and Headquarters company, 1st Battalion, 69th Infantry Regiment, 42nd Infantry Division. At the time, he held the rank of Sergeant.

700. Mr. VonRonn was a passenger in a Bradley Fighting Vehicle in the vicinity of Taji,

Iraq, when it was attacked by an IED and Killed Mr. VonRonn and 6 other service members.

701. Plaintiff Debra A. VonRonn is a citizen of the United States and is domiciled in the State of New York. Debra A. VonRonn is the mother of Kenneth G. VonRonn, and brings this action individually, and on behalf of the Estate of Kenneth G. VonRonn, and all heirs thereof, as its anticipated legal representative.

702. Plaintiff Samantha Borman is a citizen of the United States and is domiciled in the State of New York. Samantha Borman is the sister of Kenneth G. VonRonn.

703. Plaintiff Courtney VonRonn is a citizen of the United States and is domiciled in the State of Virginia. Courtney VonRonn is the sister of Kenneth G. VonRonn.

704. Plaintiff Gina Howard is a citizen of the United States and is domiciled in the State of New York. Gina Howard is the sister of Kenneth G. VonRonn.

705. As a result of the January 6, 2005 Terrorist Attack and the fatal injuries suffered by Kenneth G. VonRonn, his immediate family listed above experienced and continue to experience severe mental anguish, extreme emotional pain and loss of companionship, comfort, advice and counsel.

## 15. THE JANUARY 11, 2005 ATTACK – RAMADI

### P. ESTATE OF MICHAEL JAMES SMITH AND FAMILY

706. On January 11, 2005, Michael James Smith, age 24, was serving as a peacekeeping service member with Company C, 1st Battalion, 503rd Infantry, 2nd Infantry Division in Ramadi, Iraq.

707. Mr. Smith was performing his duties as the driver of his Humvee when his unit became engaged in a Complex Attack involving RPG and Small Arms Fire. He was killed when an RPG was fired into the driver's side window of his Humvee.

708. Plaintiff Oxana Smith is a citizen of the United States and is domiciled in the State of Colorado. Oxana Smith is the wife of Michael James Smith, and brings this action individually, and on behalf of the Estate of Michael James Smith, and all heirs thereof, as its anticipated legal representative.

709. As a result of the January 11, 2005 Terrorist Attack and the fatal injuries suffered by Michael James Smith, his immediate family listed above experienced and continue to experience severe mental anguish, extreme emotional pain and loss of companionship, comfort, advice and counsel.

## 16. THE APRIL 23, 2005 ATTACK – BAGHDAD

### Q. CODY STAGNER AND FAMILY

710. Plaintiff Cody Stagner is a citizen of the United States and is domiciled in the State of Kentucky.

711. On April 23, 2005, Cody Stagner, age 23, was serving as a peacekeeping service member in the U.S. Army with the 1st Battalion, 623rd Field Artillery, Bravo Battery. At the time, Mr. Stagner held the rank of Staff Sergeant.

712. Mr. Stagner was performing his duties as an Artillery Rocket System crewmember on Route Vernon in Baghdad, Iraq.

713. While returning from Anaconda performing convoy security, Mr. Stagner was attacked by a vehicle born improvised explosive device (VBIED). Mr. Stagner sustained significant injuries to include burns, scarring and shrapnel wounds.

714. Mr. Stagner received treatment in the Greenzone. He was awarded the Purple Heart for his wounds received at the hands of the enemy and will require further continuous treatment and care.

715. As a result of the April 23, 2005 terrorist attack and the injuries suffered, Cody Stagner has experienced and will continue to experience severe physical and mental anguish and extreme emotional pain and suffering.

716. Plaintiff Richard Allen Stagner is a citizen of the United States and is domiciled in the State of Kentucky. Richard Allen Stagner is the father of Cody Stagner.

717. Plaintiff Carmen Maria Stagner is a citizen of the United States and is domiciled in the State of Kentucky. Carmen Maria Stagner is the mother of Cody Stagner.

718. Plaintiff Steven Rick Stagner is a citizen of the United States and is domiciled in the State of Kentucky. Steven Rick Stagner is the brother of Cody Stagner.

719. As a result of the April 23, 2005 Terrorist Attack and the injuries suffered by Cody Stagner, his immediate family listed above experienced and continue to experience severe mental anguish, extreme emotional pain and suffering and diminished capacity for companionship, comfort, advice and counsel.

## 17. THE APRIL 28, 2005 ATTACK – TIKRIT

### R. THOMAS ANDREW NORRIS

720. Plaintiff Thomas Andrew Norris is a citizen of the United States and is domiciled in the State of Pennsylvania.

721. On April 28, 2005, at approximately 0900, Thomas Andrew Norris, age 21, was serving as a service member in the U.S. Army National Guard with the 1st Battalion, 112th Infantry Regiment. At the time, Mr. Norris held the rank of E-4.

722. Mr. Norris was performing his duties in Tikrit, Iraq, where his unit was training members of the Iraqi Army to conduct traffic control points (TCPs). While Iraqi Army personnel conducted the TCP, Mr. Norris's platoon provided perimeter security. Mr. Norris was positioned as

a gunner when he was attacked by a vehicle-borne improvised explosive device (VBIED). The explosive device contained seven 155mm rounds packed with PE4 and daisy-chained together.

723. As a result of the April 28, 2005 Terrorist Attack, Mr. Norris sustained shrapnel injuries to his left ear, right hand, and the posterior portion of his left shoulder, as well as scarring.

724. Following the attack, Mr. Norris was evacuated to the FOB for evaluation and treatment. He was subsequently awarded the Purple Heart for wounds sustained during the attack and also received the Combat Infantryman Badge.

725. Mr. Norris continued his military service following the April 28, 2005 Terrorist Attack and was honorably discharged from the Army National Guard on October 1, 2022.

726. Mr. Norris has received a total disability rating of 100% Permanent and Total from the Department of Veterans Affairs, including a 0% rating for traumatic brain injury (TBI).

727. As a result of the April 28, 2005 Terrorist Attack and the injuries suffered, Thomas Andrew Norris has experienced and will continue to experience severe physical and mental anguish and extreme emotional pain and suffering.

## 18. THE MAY 22, 2005 ATTACK – TIKRIT

### S. MATTHEW A. SWEIGART

728. Plaintiff Matthew A. Sweigart is a citizen of the United States and is domiciled in the State of Pennsylvania.

729. Matthew A. Sweigart was a Specialist serving with Alpha Company, 1st Battalion, 112th Infantry Regiment, Pennsylvania National Guard.

730. On May 22, 2005, while providing security on a Personal Security Detachment in Tikrit, Iraq, a suicide vehicle-borne improvised explosive device detonated next to Sweigart. Sergeant Carl Morgain was killed in the attack.

731. Sweigart sustained facial injuries and scarring from shrapnel, requiring surgery, as well as ruptured eardrums.

732. As a result of the May 22, 2005 Terrorist Attack and the injuries suffered, Matthew A. Sweigart has experienced and will continue to experience severe physical and mental anguish and extreme emotional pain and suffering.

## 19. THE JULY 3, 2005 ATTACK – BAGHDAD

### T. ERIC L. WAGNER

733. Plaintiff Eric L. Wagner is a citizen of the United States and is domiciled in the State of Virginia.

734. On July 3, 2005, Eric L. Wagner, age 40, was serving in the U.S. Army. At the time, Wagner held the rank of Lieutenant with a military occupational specialty of 88A (Transportation).

735. At approximately 1100 hours on July 3, 2005, Wagner was riding as a passenger in an M1114 up-armored HMMWV, with his squad returning to base after completing a route clearance mission when his element was struck by an improvised explosive device (IED). Wagner was knocked unconscious in the attack and does not recall the sequence of events. SGT Ryan J. Montgomery was killed in the attack.

736. As a result of the July 3, 2005 Terrorist Attack, Wagner sustained significant injuries including shrapnel wounds to his right side, abdominal trauma, and broken teeth. He will require further continuous treatment and care.

737. As a result of the July 3, 2005 Terrorist Attack, and the injuries suffered, Eric L. Wagner has experienced and will continue to experience, severe physical and mental anguish and extreme emotional pain and suffering.

738. Wagner has received a combined disability rating of 100% from the Department of

Veterans Affairs (as of January 2019), including a 70% rating for TBI.

## 20. THE AUGUST 1, 2005 ATTACK – NAJAF

### U. TODD HAZLETT

739. Plaintiff Todd Hazlett is a citizen of the United States and is domiciled in the State of Wyoming.

740. On August 1, 2005, Todd Hazlett, age 26, was serving as a peacekeeping service member in the U.S. Army, with the 2668th Transportation Company. At the time, Mr. Hazlett held the rank of Specialist.

741. Mr. Hazlett was performing his duties as an Infantryman in Najaf, Iraq. While on convoy security right off route Tampa, he was caught in a complex attack of IED, RPG, and small arms fire.

742. As result of the August 1, 2005 Terrorist Attack, Mr. Hazlett suffered a TBI and suffers from PTSD. Mr. Hazlett will require further continuous treatment and care.

743. As a result of the August 1, 2005 Terrorist Attack, and the injuries suffered, Todd Hazlett has experienced and will continue to experience, severe physical and mental anguish and extreme emotional pain and suffering.

744. Mr. Hazlett has received a disability rating of 100% by the Veteran's Administration.

## 21. THE AUGUST 11, 2005 ATTACK – SOUTHERN IRAQ

### V. MARCUS N. HERNDON

745. Plaintiff Marcus N. Herndon is a citizen of the United States and is domiciled in Bangkok, Thailand.

746. On August 11, 2005, Marcus N. Herndon, age 24, was serving as a peacekeeping

service member in the U.S. Army, with the 2668 Transportation Company, 1st Corps Support Command (COSCOM). At the time, Mr. Herndon held the rank of Sergeant.

747. Mr. Herndon was performing his duties as the driver of Humvee on convoy security in Southern Iraq when he was attacked by a vehicle-borne improvised explosive device (VBIED).

748. The weapon used to attack and injure Mr. Herndon was a VBIED containing homemade explosives (HME). There was a local rally at the time, and a trigger man was inside a white truck.

749. As a result of the August 11, 2005 Terrorist Attack, Mr. Herndon sustained significant injuries including traumatic brain injury (TBI), hearing loss, spinal injuries.

750. Mr. Herndon received treatment for his wounds in country. He was awarded the Combat Action Badge for actively engaging or being engaged by the enemy. He will require further continuous treatment and care.

751. As a result of the August 11, 2005 Terrorist Attack, and the injuries suffered, Marcus N. Herndon has experienced and will continue to experience, severe physical and mental anguish and extreme emotional pain and suffering.

752. Mr. Herndon has received a disability rating of 100% by the Veteran's Administration.

### 22. THE AUGUST 31, 2005 ATTACK – SAMARRA

#### W. JIMMY OATES

753. Plaintiff Jimmy Oates is a citizen of the United States and is domiciled in the State of North Carolina.

754. On August 31, 2005, at the age of 31, Mr. Oates was serving honorably in the United States Army as a Staff Sergeant with the 1st Battalion, 15th Infantry Regiment, 3rd Brigade

Combat Team, 3rd Infantry Division. At the time of the incident, Mr. Oates was serving in Samarra, Iraq, in the performance of his military duties as a Combat Engineer and peacekeeping serviceman.

755. On that date, Mr. Oates was participating in a patrol mission involving the identification and disposal of an improvised explosive device (IED). During the course of the mission, the vehicle in which Mr. Oates was traveling struck an IED. The resulting terrorist attack caused a devastating explosion and resulted in the death of Sergeant Monta Ruth.

756. Mr. Oates was seriously injured in the August 31, 2005 terrorist attack. Among the significant injuries he sustained was a traumatic brain injury (TBI), along with other physical and psychological injuries resulting from the blast. His injuries were sustained in the course of his military service and as a direct result of the attack by enemy forces.

757. In recognition of the wounds he suffered in combat, Mr. Oates was awarded the Purple Heart. His injuries have had a profound and lasting impact on his life and continue to require medical treatment, care, and support. The nature and severity of his injuries necessitate ongoing and potentially continuous treatment and care.

758. As a direct and proximate result of the August 31, 2005 terrorist attack and the injuries he sustained, Mr. Oates has experienced, and will continue to experience, significant physical pain, mental anguish, emotional distress, and suffering. The consequences of the attack have affected his physical well-being and emotional and psychological health and have imposed continuing challenges that he must endure as a result of the injuries sustained while serving his country.

759. Mr. Oates continues to live with the lasting effects of the injuries he suffered on August 31, 2005. His service, the circumstances of the attack, and the resulting injuries have permanently altered the course of his life and continue to require treatment, care, and support.

### X. ANTWAIN VAUGHN AND FAMILY

760. Plaintiff Antwain Vaughn is a citizen of the United States and is presently domiciled in the State of Georgia.

761. On August 31, 2005, Antwain Vaughn, age 26, was serving as a peacekeeping service member with the U.S. Army with echo 115. At the time Mr. Vaughn held the rank of Staff Seargeant.

762. Mr. Vaughn was performing his duties as a combat engineer while in Samarra, Iraq.

763. While escorting EOD while going from one mission to another, Mr. Vaughn was attacked by an improvised explosive device (IED) and small arms fire. Mr. Vaughn sustained injuries to include a traumatic brain injury (TBI), facial fractures, a brain infection that had to be removed and he also lost his left eye.

764. As a result of the August 31, 2005, terrorist attack and the injuries suffered, Antwain Vaughn has experienced and will continue to experience, severe physical and mental anguish and extreme emotional pain and suffering.

765. Plaintiff Renal Vaughn is a citizen of the United States and is domiciled in the State of New Jersey. Renal Vaughn is the parent of Antwain Vaughn.

766. Plaintiff Donald Maddox is a citizen of the United States and is domiciled in the State of Georgia. Donald Maddox is the parent of Antwain Vaughn.

767. As a result of the August 31, 2005 Terrorist Attack and the injuries suffered by Antwain Vaughn, his immediate family listed above experienced and continue to experience severe mental anguish, extreme emotional pain and suffering and diminished capacity for companionship, comfort, advice and counsel.

### Y. MORRIS RAY AND FAMILY

768. Plaintiff Morris Ray is a citizen of the United States and is presently domiciled in the State of Georgia.

769. On August 31, 2005, Morris Ray, age 26, was serving as a peacekeeping service member with the U.S. Army with the Fox Company, 1st Battalion, 15th Infantry Regiment. At the time Mr. Ray held the rank of Staff Sergeant.

770. Mr. Ray was performing his duties as an armament repairer while in Samarra, Iraq.

771. While traveling between FOB McKenzie to FOB Wilson, Mr. Ray was attacked by an improvised explosive device (IED). Mr. Ray sustained injuries to include a traumatic brain injury.

772. As a result of the August 31, 2005, terrorist attack and the injuries suffered, Morris Ray has experienced and will continue to experience, severe physical and mental anguish and extreme emotional pain and suffering.

773. Plaintiff Teja Ray is a citizen of the United States and is domiciled in the State of Georgia. Teja Ray is the spouse of Morris Ray.

774. Plaintiff Morris Ray, Sr. is a citizen of the United States and is domiciled in the State of Georgia. Morris Ray, Sr. is the father of Morris Ray.

775. Plaintiff Stephen Tiemeyer Ray is a citizen of the United States and is domiciled in the State of Florida. Stephen Tiemeyer Ray is the brother of Morris Ray.

776. Plaintiff Michael S. Ray is a citizen of the United States and is domiciled in the State of Georgia. Michael S. Ray is the brother of Morris Ray.

777. Plaintiff Devyn M. Ray is a citizen of the United States and is domiciled in the State of Georgia. Devyn M. Ray is the son of Morris Ray.

778. Plaintiff Deja A. Ray is a citizen of the United States and is domiciled in the State of Georgia. Deja A. Ray is the child of Morris Ray.

779. As a result of the August 31, 2005 Terrorist Attack and the injuries suffered by Morris Ray, his immediate family listed above experienced and continue to experience severe mental anguish, extreme emotional pain and suffering and diminished capacity for companionship, comfort, advice and counsel.

## 23. THE SEPTEMBER 19, 2005 ATTACK – MOSUL

### Z. ESTATE OF PETER JAY TOCCI AND FAMILY

780. On September 19, 2005, Peter Jay Tocci, age 24, was a contracted member of formerly Blackwater Security Consulting with the peacekeeping forces providing diplomatic security in the are of Mosul, Iraq.

781. Mr. Tocci was performing his duties as a Security Detail Member in a Consulate Motorcade in Mosul when he was attacked with VBIED and killed along with 3 others.

782. Plaintiff Mark Tocci is a citizen of the United States and is domiciled in the State of Arizona. Mark Tocci is the father of Peter Jay Tocci, and brings this action individually, and on behalf of the Estate of Peter Jay Tocci, and all heirs thereof, as its anticipated legal representative.

783. As a result of the September 19, 2005 Terrorist Attack and the fatal injuries suffered by Peter Jay Tocci, his immediate family listed above experienced and continue to experience severe mental anguish, extreme emotional pain and loss of companionship, comfort, advice and counsel.

## 24. THE OCTOBER 14, 2005 ATTACK – BALAD

### AA. DAVID RAINES

784. Plaintiff David Raines is a citizen of the United States and is domiciled in the State

of Texas.

785. On October 14, 2005, David Raines, age 30, was serving as a peacekeeping service member in the U.S. Army with 3rd Battalion, 5th Special Forces Group. At the time, Mr. Raines held the rank of Staff Sergeant.

786. Mr. Raines was performing his duties as a Special Forces Weapons Sergeant in Balad, Iraq, while returning from a raid as the gunner in his M1114 High Mobility Multi-Purpose Wheeled Vehicle (HMMWV), Mr. Raines was caught in a complex attack of Improvised Explosive Devices (IEDs) and Indirect Fire.

787. The weapons used to attack and injure Mr. Raines were IEDs made from 155mm rounds containing homemade explosives (HME); and Small Arms Fire.

788. As a result of the October 14, 2005 Terrorist Attack, Mr. Raines sustained hearing loss, a concussion, and Post Traumatic Stress Disorder (PTSD).

789. Mr. Raines was evacuated to Forward Operating Base (FOB) Paddle Water for treatment. Mr. Raines was awarded the Combat Action Badge and a Purple Heart for being engaged in fire with the enemy. He will require further continuous treatment and care.

790. As a result of the October 14, 2005 Terrorist Attack, and the injuries suffered, David Raines has experienced and will continue to experience, severe physical and mental anguish and extreme emotional pain and suffering.

791. Mr. Raines was awarded a disability rating of 90% from the Veterans Administration.

## 25. THE OCTOBER 25, 2005 ATTACK – CAMP STRIKER

### BB. ANTHONY J. DURSO AND FAMILY

792. Plaintiff Anthony J. Durso is a citizen of the United States and is domiciled in the

State of North Carolina.

793. On October 25, 2005, Anthony J. Durso, age 34, was serving as a peacekeeping service member in the U.S. Army, with the Charlie Company, 2nd Battalion, 502nd Infantry Regiment. At the time, Mr. Durso held the rank of Staff Sergeant.

794. Mr. Durso was performing his duties in Baghdad, Iraq, riding with a National Guard unit that they were relieving to check out one of Saddam's sons, when he was attacked by an improvised explosive device (IED).

795. The weapon used to attack and injure Mr. Durso consisted of a couple of Italian land mines placed under the road.

796. As a result of the October 25, 2005 Terrorist Attack, Mr. Durso sustained significant injuries including shrapnel wounds to his left leg requiring removal and sutures, as well as a Traumatic Brain Injury (TBI).

797. Mr. Durso received treatment for his wounds in country. He was awarded the Purple Heart for wounds received at the hands of the enemy and the Combat Action Badge for actively engaging or being engaged by the enemy. He will require further continuous treatment and care.

798. As a result of the October 25, 2005 Terrorist Attack, and the injuries suffered, Anthony J. Durso has experienced and will continue to experience, severe physical and mental anguish and extreme emotional pain and suffering.

799. Mr. Durso has received a disability rating of 100% by the Veteran's Administration.

800. Plaintiff Crystal Lynn Durso is a citizen of the United States and is domiciled in the State of North Carolina. Crystal Lynn Durso is the wife of Anthony Durso.

801. Plaintiff Kirk Allen Durso is a citizen of the United States and is domiciled in the State of North Carolina. Kirk Allen Durso is the son of Anthony Durso.

802. Plaintiff Kelly Louise Ashley is a citizen of the United States and is domiciled in the State of Georgia. Kelly Louise Ashley is the daughter of Anthony Durso.

803. Plaintiff Kerigan Elizabeth Durso is a citizen of the United States and is domiciled in the State of North Carolina. Kerigan Elizabeth Durso is the daughter of Anthony Durso.

804. Plaintiff Kathleen J. Dominick is a citizen of the United States and is domiciled in the State of New York. Kathleen J. Dominick is the mother of Anthony Durso.

805. As a result of the October 25, 2005 Terrorist Attack and the injuries suffered by Anthony Durso, his immediate family listed above experienced and continue to experience severe mental anguish, extreme emotional pain and suffering and diminished capacity for companionship, comfort, advice and counsel.

## 26. THE JANUARY 1, 2006 ATTACK – AS SINIYAH, BAYJI

### CC. ESTATE OF JASON LEE BISHOP AND FAMILY

806. On January 1, 2006, Jason Lee Bishop, age 31, was a peacekeeping member with 1st Squadron, 33rd Cavalry, 3rd Brigade Combat Team, 101st Airborne Division. At the time, he held the rank of Sergeant First-Class.

807. Mr. Bishop was performing his duties as vehicle commander on patrol in the vicinity of Bayji, Iraq, when he was attacked by VBIED and was killed.

808. Plaintiff Katrina Lynn Bishop Martin is a citizen of the United States and is domiciled in the State of Indiana. Katrina Lynn Bishop Martin is the wife of Jason Lee Bishop, and brings this action individually, and on behalf of the Estate of Jason Lee Bishop, and all heirs thereof, as its anticipated legal representative.

809. As a result of the January 1, 2006 Terrorist Attack and the fatal injuries suffered by Jason Lee Bishop, his immediate family listed above experienced and continue to experience

severe mental anguish, extreme emotional pain and loss of companionship, comfort, advice and counsel.

### 27. THE JANUARY 5, 2006 ATTACK – RAMADI

#### DD. JASON RUSK

810. Plaintiff Jason Rusk is a citizen of the United States and is domiciled in the State of Nevada.

811. Jason Rusk was a 28-year-old E-4 combat medic with 2/222 when he was attacked in Ramadi, Iraq, on January 5, 2006. Just before noon, he was dismounted and providing medical support during a recruiting mission involving approximately 10 personnel.

812. The attack was a suicide bombing involving home-made explosives. Lt. Colonel Michael McLaughlin was killed in the attack.

813. Rusk sustained a traumatic brain injury, received the Combat Medic Badge, and has a 100% VA disability rating, including a 50% rating for TBI. He was honorably discharged on October 8, 2008, at Camp Williams, Utah.

814. As a result of the January 5, 2006 Terrorist Attack and the injuries suffered, Jason Rusk has experienced and will continue to experience severe physical and mental anguish and extreme emotional pain and suffering.

### 28. THE FEBRUARY 27, 2006 ATTACK – RAMADI

#### EE. BRETT JENKINS

815. Plaintiff Brett Jenkins is a citizen of the United States and is domiciled in the State of Florida.

816. On February 27, 2006, Brett Jenkins, age 19, was serving as a peacekeeping service member in the U.S. Marines, with Alpha Company, 1st Battalion, 2nd Marine Regiment. At the

time, Mr. Jenkins held the rank of Lance Corporal.

817. At the time of the attack, Mr. Jenkins was the driver of a Humvee that was on a vehicle patrol when they were ambushed by a suicide bomber, an IED and a rocket propelled grenade that was followed by heavy machine gun and small arms fire.

818. As a result of the February 27, 2006 Terrorist Attack, Mr. Jenkins suffered a traumatic brain injury (TBI) and shrapnel wounds.

819. Mr. Jenkins's received treatment for his injuries in country. He was awarded the Combat Action Badge for actively engaging or being engaged by the enemy. He will require further continuous treatment and care.

820. As a result of the February 27, 2006 Terrorist Attack, and the injuries suffered, Brett Jenkins has experienced and will continue to experience, severe physical and mental anguish and extreme emotional pain and suffering.

821. Mr. Jenkins has received a disability rating of 100% by the Veteran's Administration.

### 29. THE APRIL 12, 2006 ATTACK – MSR TAMPA

#### FF. KEELAN A. BANKS

822. Plaintiff Keelan A. Banks is a citizen of the United States and is domiciled in the State of New Mexico.

823. On April 12, 2006, Keelan A. Banks, age 23, was serving in the Maryland Army National Guard, with a primary unit assignment to the 121st Engineer Battalion, attached to 1st Squadron, 9th Cavalry Regiment (1-9 CAV). At the time, Banks held the rank of Private First Class, with a military occupational specialty of 19D (Cavalry Scout).

824. In the mid-morning of April 12, 2006, Banks was mounted in a Humvee with his

platoon, traveling on Main Supply Route (MSR) Tampa in Ramadi, Iraq, to pick up a new vehicle, when his element was struck by an improvised explosive device (IED) consisting of 105mm shells rigged to a pressure plate. An interpreter was killed in the attack.

825. As a result of the April 12, 2006 Terrorist Attack, Banks sustained significant injuries including traumatic brain injury (TBI) and a back injury.

826. He received the Combat Action Badge for actively engaging or being engaged by the enemy. He will require further continuous treatment and care.

827. As a result of the April 12, 2006 Terrorist Attack, and the injuries suffered, Keelan A. Banks has experienced and will continue to experience, severe physical and mental anguish and extreme emotional pain and suffering.

828. Banks has received a combined disability rating of 90% from the Department of Veterans Affairs, including a 10% rating for TBI.

### 30. THE APRIL 13, 2006 ATTACK – YUSUFIYA

#### GG. DANN DUANE DIXON AND FAMILY

829. Plaintiff Dann Duane Dixon is a citizen of the United States and is domiciled in the State of Tennessee.

830. On April 13, 2006, Dann Duane Dixon, age 36, was serving as a peacekeeping service member in the U.S. Army with the 67th Engineer Detachment, 5th Engineer Battalion, attached to the 101st Airborne Division. At the time, Mr. Dixon held the rank of Sergeant.

831. Mr. Dixon was performing his duties as a combat engineer in Yusufiya, Iraq.

832. While being out with the fire team doing a recon, Mr. Dixon was attacked with an improvised explosive device (IED). Mr. Dixon sustained significant injuries to include a traumatic brain injury, shrapnel, neck and back injuries. Mr. Dixon has had two cervical fusions, and his left

hip has been replaced seven times.

833. Mr. Dixon received treatment at the FOB. He was awarded the Purple Heart for his wounds received at the hands of the enemy and will require further continuous treatment and care.

834. As a result of the April 13, 2006, terrorist attack and the injuries suffered, Dann Duane Dixon has experienced and will continue to experience, severe physical and mental anguish and extreme emotional pain and suffering.

835. Plaintiff Carin Colleen Dixon is a citizen of the United States and is domiciled in the State of Tennessee. Carin Colleen Dixon is the spouse of Dann Duane Dixon.

836. Plaintiff Sydney Layne Dixon is a citizen of the United States and is domiciled in the State of Tennessee. Sydney Layne Dixon is the daughter of Dann Duane Dixon.

837. Plaintiff Garrett Alexander Dixon is a citizen of the United States and is domiciled in the State of Tennessee. Garrett Alexander Dixon is the son of Dann Duane Dixon.

838. As a result of the April 13, 2006 Terrorist Attack and the injuries suffered by Dann Duane Dixon, his immediate family listed above experienced and continue to experience severe mental anguish, extreme emotional pain and suffering and diminished capacity for companionship, comfort, advice and counsel.

## 31. THE JUNE 6, 2006 ATTACK – CAMP RAMADI

### HH. ESTATE OF ANDY ANDERSON AND FAMILY

839. On June 6, 2006, Andy D. Anderson, age 24 was serving as a peacekeeping service member with B Company, 46th Engineer Battalion. At the time, he held the rank of Sergeant.

840. Mr. Anderson was performing his duties outside a structure on Camp Ramadi when they came under Indirect Mortar Fire and he was killed along with 1 other.

841. Plaintiff Xiomara Mena is a citizen of the United States and is domiciled in the

State of Virginia. Xiomara Mena is the mother of Andy Anderson, and brings this action individually, and on behalf of the Estate of Andy Anderson, and all heirs thereof, as its anticipated legal representative.

842. Plaintiff Rafael Anderson is a citizen of the United States and is domiciled in the State of Virginia. Rafael Anderson is the brother of Andy Anderson.

843. Plaintiff Randall Anderson is a citizen of the United States and is domiciled in the State of Virginia. Randall Anderson is the brother of Andy Anderson.

844. As a result of the June 6, 2006 Terrorist Attack and the fatal injuries suffered by Andy Anderson, his immediate family listed above experienced and continue to experience severe mental anguish, extreme emotional pain and loss of companionship, comfort, advice and counsel.

## 32. THE JUNE 15, 2006 ATTACK – RAMADI

### II. THOMAS VORMWALD AND FAMILY

845. Plaintiff Thomas Vormwald is a citizen of the United States and is domiciled in the State of Michigan.

846. On June 15, 2006, Thomas Vormwald, age 19, was serving as an Infantryman in the U.S. Marines, with India Company, 3rd Battalion, 8th Marines. At the time, Mr. Vormwald held the rank of Lance Corporal.

847. Mr. Vormwald was performing his duties in Ramadi, Iraq. While leaving a house they were in to provide overwatch for the company, Mr. Vormwald was injured by an IED.

848. As a result of the June 15, 2006 Terrorist Attack, Mr. Vormwald sustained significant injuries including a TBI, complex post-traumatic stress disorder (CPTSD), anxiety, and neurological injuries.

849. Mr. Vormwald received treatment for his injuries in country. He was awarded the

Combat Action Badge for actively engaging or being engaged by the enemy.

850. As a result of the June 15, 2006 Terrorist Attack, and the injuries suffered, Thomas Vormwald has experienced and will continue to experience, severe physical and mental anguish and extreme emotional pain and suffering.

851. Mr. Vormwald has received a disability rating of 100% by the Veteran's Administration.

852. Plaintiff Thomas E. Vormwald is a citizen of the United States and domiciled in the State of Ohio. Thomas E. Vormwald is the father of Thomas Vormwald.

853. Plaintiff Penny Vormwald is a citizen of the United States and domiciled in the State of Ohio. Penny Vormwald is the mother of Thomas Vormwald.

854. As a result of the June 15, 2006 Terrorist Attack and the injuries suffered by Thomas Vormwald his immediate family listed above experienced and continue to experience severe mental anguish, extreme emotional pain and suffering and diminished capacity for companionship, comfort, advice and counsel.

855. Plaintiff Thomas E. Vormwald is a citizen of the United States and is domiciled in the State of Ohio. Thomas E. Vormwald is the father of Thomas Vormwald.

856. As a result of the June 15, 2006 Terrorist Attack and the injuries suffered by Thomas Vormwald, his immediate family listed above experienced and continue to experience severe mental anguish, extreme emotional pain and suffering and diminished capacity for companionship, comfort, advice and counsel.

## 33. THE JUNE 21, 2006 ATTACK – BAGHDAD

### JJ. ESTATE OF JASON JAMES BUZZARD AND FAMILY

857. On June 21, 2006, Jason James Buzzard, age 21, was in the U.S. Army as a

peacekeeping member with 2nd Battalion, 8th Infantry Regiment, 2nd Brigade Combat Team, 4th Infantry Division. At the time he held the rank of Sergeant.

858. Mr. Buzzard was part of a convoy headed to a Forward Operating Base when his vehicle was struck by an EFP near Iskandariyah where he was killed.

859. Plaintiff Michele Chastine Buzzard is a citizen of the United States and is domiciled in the State of Kentucky. Michele Chastine Buzzard is the wife of Jason James Buzzard, and brings this action individually, and on behalf of the Estate of Jason James Buzzard, and all heirs thereof, as its anticipated legal representative.

860. Plaintiff Michala Rae Buzzard is a citizen of the United States and is domiciled in the State of Kentucky. Michala Rae Buzzard is the sister of Jason James Buzzard.

861. Plaintiff Tristin Buzzard is a citizen of the United States and is domiciled in the State of Kentucky. Tristin Buzzard is the brother of Jason James Buzzard.

862. As a result of the June 21, 2006 Terrorist Attack and the fatal injuries suffered by Jason James Buzzard, his immediate family listed above experienced and continue to experience severe mental anguish, extreme emotional pain and loss of companionship, comfort, advice and counsel.

## 34. THE AUGUST 6, 2006 ATTACK – AL ANBAR PROVINCE

### KK. JEFFERY I. WHALEY AND FAMILY

863. Plaintiff Jeffery I. Whaley is a citizen of the United States and is domiciled in the State of Delaware.

864. On August 6, 2006, Jeffery I. Whaley, age 19, was serving as a peacekeeping service member in the U.S. Marines with 2nd Battalion, 8th Marines. At the time, Mr. Whaley held the rank of Private First Class.

865. Mr. Whaley was performing his duties as an infantryman in the Anbar Province in Iraq.

866. While patrolling and packing sand bags, Mr. Whaley was attacked by a suicide vehicle IED. As a result of the August 6, 2006, terrorist attack, Mr. Whaley sustained significant injuries to include a TBI and concussion.

867. Mr. Whaley was awarded a combat action badge for the injuries he received at the hands of the enemy and will require further continuous treatment and care.

868. As a result of the August 6, 2006, terrorist attack and the injuries suffered, Jeffery I. Whaley has experienced and will continue to experience, severe physical and mental anguish and extreme emotional pain and suffering.

869. Plaintiff Dawn Marie Hibbs is a citizen of the United States and is domiciled in the State of Delaware. Dawn Marie Hibbs is the mother of Jeffery I. Whaley.

870. Plaintiff Donald Hibbs is a citizen of the United States and is domiciled in the State of Delaware. Donald Hibbs is the stepfather of Jeffery I. Whaley.

871. As a result of the August 6, 2006 Terrorist Attack and the injuries suffered by Jeffery I. Whaley, his immediate family listed above experienced and continue to experience severe mental anguish, extreme emotional pain and suffering and diminished capacity for companionship, comfort, advice and counsel.

## 35. THE AUGUST 27, 2006 ATTACK – BAGHDAD

### LL. JONATHAN FLOOD

872. Plaintiff Jonathan Flood is a citizen of the United States and is domiciled in the State of Arkansas.

873. Jonathan Flood, 26, was an E-4 Specialist, MOS 11B Infantry, assigned to the 1st

Battalion, 23rd Infantry Regiment, 2nd Infantry Division, and stationed at Fort Lewis, Washington, when he was attacked in Baghdad, Iraq, on August 27, 2006.

874. Specialist Flood was conducting a presence patrol with a platoon traveling in four Strykers. He was a passenger in the lead Stryker when an IED, identified as a mortar used as an IED, detonated. Private Daniel Dolan and Specialist Kenneth Cross, the vehicle's driver and team commander, were killed. Flood self-evacuated to Balad.

875. Flood sustained a spinal injury and traumatic brain injury. He received a Purple Heart. He was medically separated from the Army at Fort Hood, Texas, on July 25, 2011.

876. As a result of the August 27, 2006 Terrorist Attack and the injuries suffered, Jonathan Flood has experienced and will continue to experience severe physical and mental anguish and extreme emotional pain and suffering.

## 36. THE SEPTEMBER 11, 2006 ATTACK – AL ANBAR PROVINCE

### MM. JACK GURNEY

877. Plaintiff Jack Gurney is a citizen of the United States and is domiciled in the State of Florida.

878. On September 11, 2006, Jack Gurney, age 23, was serving as a peacekeeping serviceman in the U.S. Army with Alpha Company, 54th Engineer Battalion. At the time, Mr. Gurney held the rank of Sergeant.

879. Mr. Gurney was performing his duties as an engineer in the Al Anbar Province, Iraq. While performing route security clearance and looking for IEDs, Mr. Gurney was attacked by an IED. SPC Harley Dean Andrews was killed in the attack.

880. As a result of the September 11, 2006 terrorist attack Mr. Gurney sustained significant injuries to include TBI, neck and back injuries.

881. As a result of the September 11, 2006, terrorist attack and the injuries suffered by Jack Gurney, he has experienced and will continue to experience, severe physical and mental anguish and extreme emotional pain and suffering.

### 37. THE SEPTEMBER 28, 2006 ATTACK – BAGHDAD

#### NN. BRIAN M. BUITH

882. Plaintiff Brian M. Buith is a citizen of the United States and is domiciled in the State of South Carolina.

883. On September 28, 2006, Brian M. Buith, age 19, was serving as a peacekeeping serviceman in the U.S. Army, with Alpha Troop, attached to the 3rd Stryker Brigade Combat Team, 2nd Infantry Division. At the time, Mr. Buith held the rank of Private (E-3).

884. The day of the attack, Mr. Buith was performing his duties conducting vehicle checkpoint operations as a Stryker rear gunner. During vehicle checkpoint operations at Forward Operating Base Falcon, Dora, Baghdad, Iraq, an explosion ripped through his person, knocking Mr. Buith to the ground severely injured.

885. The weapon used to attack and injure Mr. Buith was an Iranian-funded and insurgent-facilitated Vehicle-Borne Improvised Explosive Device (VBIED) consisting of 700 lbs of home-made explosives.

886. As a result of the September 28, 2006 Terrorist Attack, Mr. Buith sustained significant injuries due to traumatic brain injury (TBI) and shrapnel wounds to his face and arm.

887. Mr. Buith was treated locally at FOB Falcon and subsequently medically evacuated. He will require continuous treatment for traumatic brain injury (TBI) resulting from the concussive blast effects of the VBIED. Mr. Buith was awarded the Purple Heart for being wounded at the hands of the enemy.

888. As a result of the September 28, 2006 Terrorist Attack, and the injuries he suffered, Brian M. Buith has experienced, and will continue to experience, severe mental anguish and extreme emotional pain and suffering.

889. Mr. Buith has been rated as 90% disabled, with 30% specifically attributed to Traumatic Brain Injury (TBI), by the Veteran's Administration.

## 38. THE OCTOBER 14, 2006 ATTACK – BAGHDAD

### OO. JASON YOUNG AND FAMILY

890. Plaintiff Jason Young is a citizen of the United States and is domiciled in the State of California.

891. On October 14, 2006, Jason Young, age 27, was serving in the California Army National Guard, assigned to 1st Battalion, 184th Infantry Regiment, 29th Separate Infantry Brigade, attached to 4th Battalion, 64th Armor Regiment, 3rd Infantry Division. At the time, Young held the rank of Specialist (E-4).

892. In the late morning, close to midday, on October 14, 2006, Young was manning Checkpoint 3 in the Green Zone, Baghdad, Iraq, as part of a squad-size element drawn from a larger platoon-size patrol, when the checkpoint was attacked. Three Iraqi civilians were killed in the attack.

893. As a result of the October 14, 2006 Terrorist Attack, Young sustained significant injuries including traumatic brain injury (TBI), deafness in his right ear, left foot pain, and tinnitus.

894. Young later underwent surgical implantation of a bone-anchored hearing aid related to his injuries. He received the Combat Infantryman Badge as a blanket award for the deployment. He will require further continuous treatment and care.

895. As a result of the October 14, 2006 Terrorist Attack, and the injuries suffered, Jason

Young has experienced and will continue to experience, severe physical and mental anguish and extreme emotional pain and suffering.

896. Young has received a combined disability rating of 100% from the Department of Veterans Affairs, including a 70% rating for TBI.

897. Plaintiff Monique Marie Young is a citizen of the United States and is domiciled in the State of California. Monique Marie Young is the spouse of Jason Young.

898. Plaintiff Corbin Christopher Young is a citizen of the United States and is domiciled in the State of California. Corbin Christopher Young is the son of Jason Young.

899. Plaintiff Kaylee Faye Young is a citizen of the United States and is domiciled in the State of California. Kaylee Faye Young is the daughter of Jason Young.

900. As a result of the October 14, 2006 Terrorist Attack and the injuries suffered by Jason Young, his immediate family listed above experienced and continue to experience severe mental anguish, extreme emotional pain and suffering and diminished capacity for companionship, comfort, advice and counsel.

**PP. ESTATE OF JOSEPH MICHAEL KANE AND FAMILY**

901. On October 14, 2006, Joseph Michael Kane, 35, was serving as a peacekeeping serviceman with 1st Battalion, 67th Armor Regiment, 2nd Brigade, 4th Infantry Division. At the time he held the rank of Staff Sergeant.

902. Mr. Kane's element was conducting a movement to the Island Patrol Base, Baghdad, Iraq when his vehicle was struck by Command-Wired IED and he was killed.

903. Plaintiff Michelle Louise Kane is a citizen of the United States and is domiciled in the State of Alabama. Michelle Louise Kane is the wife of Joseph Michael Kane, and brings this action individually, and on behalf of the Estate of Joseph Michael Kane, and all heirs thereof, as

its anticipated legal representative.

904. Plaintiff Brendan Kane is a citizen of the United States and is domiciled in the State of Washington. Brendan Kane is the son of Joseph Michael Kane.

905. Plaintiff Daniel Kane is a citizen of the United States and is domiciled in the State of Alabama. Daniel Kane is the son of Joseph Michael Kane.

906. Plaintiff Mikayla Coffin is a citizen of the United States and is domiciled in the State of Alabama. Mikayla Coffin is the daughter of Joseph Michael Kane.

907. As a result of the October 14, 2006 Terrorist Attack and the fatal injuries suffered by Joseph Michael Kane, his immediate family listed above experienced and continue to experience severe mental anguish, extreme emotional pain and loss of companionship, comfort, advice and counsel.

## 39. THE DECEMBER 27, 2006 ATTACK – AL-KARMAH

### QQ. CHARLES W. ADKINS, JR. AND FAMILY

908. Plaintiff Charles W. Adkins Jr. is a citizen of the United States and is domiciled in the State of Arkansas.

909. On December 27, 2006, Charles W. Adkins Jr., age 50, was serving in the U.S. Army as Commander/Team Leader of Military Transition Team (MiTT) 0142, advising the 3rd Battalion, 1st Brigade, 4th Iraqi Army Division, based at India Base, Fallujah, Iraq. At the time, Adkins held the rank of Major.

910. Adkins was moving through Al-Karmah, Iraq — on an alternate supply route, struck in the center of town, shortly after departing riding in the front passenger seat of a High Mobility Multipurpose Wheeled Vehicle (HMMWV), when his element was struck in a complex attack. An IED concealed in a pothole detonated, killing eight soldiers and wounding four others.

Adkins helped evacuate the wounded and returned to the scene, where a second IED / VBIED detonated, injuring every man in his HMMWV.

911. As a result of the December 27, 2006 Terrorist Attack, Adkins sustained significant injuries including shrapnel wounds and traumatic brain injury (TBI).

912. He was assisting in evacuating other wounded rather than being evacuated himself; pull from medical records]. Adkins received the Combat Action Badge for actively engaging or being engaged by the enemy. He was awarded the Purple Heart approximately five years after the attack. He will require further continuous treatment and care.

913. As a result of the December 27, 2006 Terrorist Attack, and the injuries suffered, Charles W. Adkins Jr. has experienced and will continue to experience, severe physical and mental anguish and extreme emotional pain and suffering.

914. Adkins has received a combined disability rating of 100% from the Department of Veterans Affairs, including a 10% rating for TBI.

915. Plaintiff Kathy Lynn Adkins is a citizen of the United States and is domiciled in the State of Arkansas. Kathy Lynn Adkins is the wife of Charles W. Adkins, Jr.

916. As a result of the December 27, 2006 Terrorist Attack and the injuries suffered by Charles W. Adkins, Jr., his immediate family listed above experienced and continue to experience severe mental anguish, extreme emotional pain and suffering and diminished capacity for companionship, comfort, advice and counsel.

## 40. THE FEBRUARY 16, 2007 ATTACK – AL KUT

### RR. TONY RIOS

917. Plaintiff Tony Rios is a citizen of the United States and is domiciled in the State of Texas.

918. On February 16, 2007, Tony Rios, age 26, was serving as a peacekeeping service member in the U.S. Marines, with the 1st Battalion, 4th Marines. At the time, Mr. Rios held the rank of Corporal.

919. Mr. Rios was performing his duties as the vehicle commander of his Humvee on a route patrol with the 25th Infantry Division in Alkut, Iraq, when he was attacked by an improvised explosive device (IED) and small arms fire.

920. The weapons used to attack and injure Mr. Rios included a mortar used as an IED and small arms fire.

921. As a result of the February 16, 2007 Terrorist Attack, Mr. Rios sustained significant injuries including Traumatic Brain Injury (TBI), tinnitus, hearing loss, and scarring on his left ankle.

922. Mr. Rios received treatment for his injuries in country. He was awarded the Purple Heart for wounds received at the hands of the enemy. He will require further continuous treatment and care.

923. As a result of the February 16, 2007 Terrorist Attack and the injuries suffered, Tony Rios has experienced and will continue to experience severe physical and mental anguish and extreme emotional pain and suffering.

### 41. THE MARCH 9, 2007 ATTACK – FALLUJAH

#### SS. ESTATE OF DENNIS JAMES VEATER AND FAMILY

924. On March 9, 2007, Dennis James Veater, age 20, was serving as a peacekeeping service member with Marine Wing Support Squadron 472 in Fallujah, Iraq. At the time, he held the rank of Lance Corporal.

925. Mr. Veater was performing his duties as part of a mounted security patrol when he

was attacked with an IED.

926. Mr. Veater suffered shrapnel wounds and was MEDEVAC to Fallujah Surgical Center for care where he died from his wounds.

927. Plaintiff Angalene M. Snipes is a citizen of the United States and is domiciled in the State of Pennsylvania. Angalene M. Snipes is the son of Dennis James Veater, and brings this action individually, and on behalf of the Estate of Dennis James Veater, and all heirs thereof, as its anticipated legal representative.

928. Plaintiff Dominick Snipes is a citizen of the United States and is domiciled in the State of Pennsylvania. Dominick Snipes is the son of Dennis James Veater.

929. As a result of the March 9, 2007 Terrorist Attack and the fatal injuries suffered by Dennis James Veater, his immediate family listed above experienced and continue to experience severe mental anguish, extreme emotional pain and loss of companionship, comfort, advice and counsel.

**TT. JUSTIN BURGHART AND FAMILY**

930. Plaintiff Justin Burghart is a citizen of the United States and is domiciled in the State of Kansas.

931. On March 9, 2007, Justin Burghart, age 20, was serving in the U.S. Marine Corps, assigned to Combat Logistics Battalion 6, based at Camp Lejeune. At the time, Burghart held the rank of Private (E-1).

932. Burghart was riding as a passenger in a Logistics Vehicle System (LVS) as part of a squad conducting a mounted patrol delivering supplies in Fallujah, Al Anbar Province, Iraq, in the morning hours, when his element was struck by an improvised explosive device constructed of home-made explosives, employed in conjunction with mortar rounds rigged as an IED. Lance

Corporal Dennis J. Veater was killed in the attack.

933. As a result of the March 9, 2007 Terrorist Attack, Burghart sustained significant injuries including traumatic brain injury (TBI). Burghart received the Purple Heart and the Combat Action Ribbon for actively engaging or being engaged by the enemy. He will require further continuous treatment and care.

934. As a result of the March 9, 2007 Terrorist Attack, and the injuries suffered, Justin Burghart has experienced and will continue to experience, severe physical and mental anguish and extreme emotional pain and suffering.

935. Burghart has received a combined disability rating of 70% from the Department of Veterans Affairs.

936. Plaintiff Kimberlee Annette Burghart is a citizen of the United States and is domiciled in the State of Kansas. Kimberlee Annette Burghart is the mother of Justin Burghart.

937. As a result of the March 9, 2007 Terrorist Attack and the injuries suffered by Justin Burghart, his immediate family listed above experienced and continue to experience severe mental anguish, extreme emotional pain and suffering and diminished capacity for companionship, comfort, advice and counsel.

## 42. THE MAY 2, 2007 ATTACK – BAGHDAD

### UU. BENJAMIN DELLINGER

938. Plaintiff Benjamin Dellinger is a citizen of the United States and is domiciled in the State of Florida.

939. Ben Dellinger, 25, was a Staff Sergeant (SSG), MOS 11B, assigned to A Company, 1/504 PIR, 82nd Airborne Division, and stationed at Fort Bragg when he was attacked in Baghdad, Iraq, on May 2, 2007.

940. Dellinger was conducting a dismounted platoon patrol around midday when an IED detonated. He was medically evacuated to BIAP. An Iraqi police officer was killed in the attack.

941. Dellinger suffered a broken right foot, a left leg amputation, a shattered clavicle, and soft tissue injuries. He received a Purple Heart and he was honorably discharged in 2009 at Walter Reed.

942. As a result of the May 2, 2007 Terrorist Attack and the injuries suffered, Benjamin Dellinger has experienced and will continue to experience severe physical and mental anguish and extreme emotional pain and suffering.

## 43. THE MAY 4, 2007 ATTACK – ROUTE SWORD

### VV. MATTHEW C. ALLGOOD AND FAMILY

943. Plaintiff Matthew C. Allgood is a citizen of the United States and is domiciled in the State of Texas.

944. On May 4, 2007, Matthew C. Allgood, age 26, was serving in the Texas Army National Guard as an infantryman (MOS 11B), assigned to the 144th Infantry Division. At the time, Allgood held the rank of Sergeant (E-5).

945. Allgood was conducting convoy operations along Route Sword at night, riding mounted as part of a six-gun-truck element, when his convoy was struck in a complex attack involving an improvised explosive device and an explosively formed penetrator (EFP), constructed of home-made and plastic explosives, incorporating small arms fire, rocket-propelled ordnance, and heavy machine gun fire.

946. As a result of the May 4, 2007 Terrorist Attack, Allgood sustained significant injuries including traumatic brain injury (TBI), hearing loss, and injuries requiring mouth reconstruction surgery. He was CASEVAC'd to base medical for treatment. Allgood received the

Combat Infantry Badge for actively engaging or being engaged by the enemy. He will require further continuous treatment and care.

947. As a result of the May 4, 2007 Terrorist Attack, and the injuries suffered, Matthew C. Allgood has experienced and will continue to experience, severe physical and mental anguish and extreme emotional pain and suffering.

948. Allgood has received a combined disability rating of 100% from the Department of Veterans Affairs, including a 50% rating for TBI.

949. Plaintiff Kennith Eugene Allgood is a citizen of the United States and is domiciled in the State of Texas. Kennith Eugene Allgood is the father of Matthew C. Allgood.

950. Plaintiff Anja Allgood is a citizen of the United States and is domiciled in the State of Texas. Anja Allgood is the mother of Matthew C. Allgood.

951. Plaintiff Christopher K. Allgood is a citizen of the United States and is domiciled in the State of Texas. Christopher K. Allgood is the brother of Matthew C. Allgood.

952. As a result of the May 4, 2007 Terrorist Attack and the injuries suffered by Matthew C. Allgood, his immediate family listed above experienced and continue to experience severe mental anguish, extreme emotional pain and suffering and diminished capacity for companionship, comfort, advice and counsel.

## 44. THE JUNE 8, 2007 ATTACK – CAMP WAR HORSE

### WW. CALVIN V. EDWARDS AND FAMILY

953. Plaintiff Calvin V. Edwards is a citizen of the United States and is domiciled in the State of Pennsylvania.

954. On June 8, 2007, Calvin V. Edwards, age 37, was serving as a peacekeeping service member in the U.S. Army, with the 368th Transportation Company, 11th Transportation Battalion,

7th Transportation Brigade Expeditionary. At the time, Mr. Edwards held the rank of Sergeant.

955. Mr. Edwards was performing his duties during mission preparation at Camp Warhorse, Iraq, when he was attacked by RPGs and indirect fire.

956. As a result of the June 8, 2007 Terrorist Attack, Mr. Edwards sustained significant injuries including TBI and PTSD.

957. Mr. Edwards received treatment for his injuries in country. He will require further continuous treatment and care.

958. As a result of the June 8, 2007 Terrorist Attack, and the injuries suffered, Calvin V. Edwards has experienced and will continue to experience, severe physical and mental anguish and extreme emotional pain and suffering.

959. Mr. Edwards has received a disability rating of 100% by the Veteran's Administration.

960. Plaintiff Linda Doreen Edwards is a citizen of the United States and is domiciled in the State of Pennsylvania. Linda Doreen Edwards is the wife of Calvin Edwards.

961. As a result of the June 8, 2007 Terrorist Attack and the injuries suffered by Calvin Edwards, his immediate family listed above experienced and continue to experience severe mental anguish, extreme emotional pain and suffering and diminished capacity for companionship, comfort, advice and counsel.

## 45. THE JUNE 10, 2007 ATTACK – AL-DORA

### XX. PAUL DAVID SPERRY AND FAMILY

962. Plaintiff Paul David Sperry is a citizen of the United States and is domiciled in the State of Oklahoma.

963. On June 10, 2007, Paul David Sperry was serving as a peacekeeping service

member in the U.S. Army with A Company, 2nd Battalion, 3rd Infantry Regiment, while operating in the Al-Dora area of Baghdad, Iraq.

964. Mr. Sperry was performing his duties during dismounted operations when his unit was attacked by an improvised explosive device (IED) consisting of a triple-stack anti-tank mine. Army Staff Sergeant Brian M. Long was killed in the attack, and six Coalition soldiers were wounded.

965. As a result of the June 10, 2007 Terrorist Attack, Mr. Sperry sustained a severe traumatic brain injury (TBI), a dislocated left shoulder, loss of his left adrenal gland and part of his pancreas, nerve damage, and hearing damage.

966. As a result of the June 10, 2007 Terrorist Attack and the injuries he suffered, Paul David Sperry has experienced and will continue to experience severe physical and mental anguish and extreme emotional pain and suffering.

967. Plaintiff Tyler Christopher Sperry is a citizen of the United States and is domiciled in the State of Colorado. Tyler Christopher Sperry is the son of Paul David Sperry.

968. As a result of the June 10, 2007 Terrorist Attack and the injuries suffered by Paul David Sperry, his immediate family listed above experienced and continue to experience severe mental anguish, extreme emotional pain and suffering and diminished capacity for companionship, comfort, advice and counsel.

## 46. THE JULY 19, 2007 ATTACK – BAGHDAD

### YY. ESTATE OF RONALD LEE COFFELT AND FAMILY

969. On July 19, 2007, Ronald Lee Coffelt, age 36, was a peacekeeping service member with the U.S. Army's 503rd Military Police Battalion, 16th Military Police Brigade. At the time, he held the rank of Sergeant.

970. Mr. Coffelt was traveling toward Forward Operating Base Shield when he was attacked by an EFP and was killed.

971. Plaintiff Deborah Kathleen Coffelt is a citizen of the United States and is domiciled in the State of New Mexico. Deborah Kathleen Coffelt is the wife of Ronald Lee Coffelt, and brings this action individually, and on behalf of the Estate of Ronald Lee Coffelt, and all heirs thereof, as its anticipated legal representative.

972. Plaintiff Daniel Cheradon Phillips is a citizen of the United States and is domiciled in the State of Utah. Daniel Cheradon Phillips is the son of Ronald Lee Coffelt.

973. Plaintiff Alexander Paul Phillips is a citizen of the United States and is domiciled in the State of New Mexico. Alexander Paul Phillips is the son of Ronald Lee Coffelt.

974. Plaintiff Rachel Nicole Phillips-Coffelt is a citizen of the United States and is domiciled in the State of Texas. Rachel Nicole Phillips-Coffelt is the daughter of Ronald Lee Coffelt.

975. Plaintiff Johnathan Wayne Coffelt is a citizen of the United States and is domiciled in the State of New Mexico. Johnathan Wayne Coffelt is the son of Ronald Lee Coffelt.

976. Plaintiff Hannah MaKayla Lee Coffelt is a citizen of the United States and is domiciled in the State of New Mexico. Hannah MaKayla Lee Coffelt is the daughter of Ronald Lee Coffelt.

977. As a result of the July 19, 2007 Terrorist Attack and the fatal injuries suffered by Ronald Lee Coffelt, his immediate family listed above experienced and continue to experience severe mental anguish, extreme emotional pain and loss of companionship, comfort, advice and counsel.

### ZZ. JUSTIN HUMPHREYS

978. Plaintiff Justin Humphreys is a citizen of the United States and is domiciled in the State of Ohio.

979. On July 19, 2007, Justin Humphreys was serving as an E-4 Specialist with the U.S. Army's 118th Military Police Company, 503rd Military Police Battalion, 16th Military Police Brigade, XVIII Airborne Corps.

980. Specialist Humphreys was on patrol in Baghdad, Iraq, operating as the driver of an up-armored Humvee when two Explosively Formed Penetrators (EFPs) detonated. Sergeant Ronald Lee Coffelt was killed during the attack.

981. As a result of the July 19, 2007 Terrorist Attack, Specialist Humphreys suffered shrapnel wounds to his right arm and right leg and was evacuated to the Green Zone for further medical treatment.

982. As a result of the July 19, 2007 Terrorist Attack and the injuries suffered, Justin Humphreys has experienced and will continue to experience severe physical and mental anguish and extreme emotional pain and suffering.

## 47. THE FEBRUARY 1, 2008 ATTACK – SOUTH BAGHDAD

### AAA. DANIEL SUGDEN

983. Plaintiff Daniel Sugden is a citizen of the United States and is domiciled in the State of Georgia.

984. On February 1, 2008, Daniel Norman Sugden, age 22, was serving as a peacekeeping service member in the U.S. Army with the 1st Battalion, 35th Armor Regiment, 1st Armored Division. At the time, Mr. Sugden held the rank of Specialist.

985. Mr. Sugden was on a mounted patrol and performing his duties as a Gunner of a

Mine-Resistant Ambush Protected (MRAP) vehicle in Baghdad, Iraq, when he was attacked by an IED, mine, and indirect fire.

986. The weapons used to attack and injure Mr. Sugden included homemade explosives (HME), mortars as indirect fire, an anti-tank mine, a rocket used as an IED, RPGs, and small arms fire.

987. As a result of the February 1, 2008 Terrorist Attack, Mr. Sugden sustained significant injuries, including a Traumatic Brain Injury (TBI).

988. Mr. Sugden received treatment for his injuries in country. He was awarded the Combat Action Badge (CAB) for actively engaging or being engaged by the enemy. He will require further continuous treatment and care.

989. As a result of the February 1, 2008 Terrorist Attack and the injuries suffered, Daniel Sugden has experienced and will continue to experience severe physical and mental anguish and extreme emotional pain and suffering.

## 48. THE MAY 21, 2009 ATTACK – DORA, BAGHDAD

### BBB. ESTATE OF PAUL FARRIS BROOKS AND FAMILY

990. On May 21, 2009, Paul Farris Brooks, age 34, was a U.S. Army peacekeeping service member with 935th Aviation Support Battalion. At the time, he held the rank of Staff Sergeant.

991. Mr. Brooks was part of a foot patrol to meet local Iraqi officials, when they were attacked by a PBIED at an outdoor market and he was Killed along with many others.

992. Plaintiff Nicole Brooks is a citizen of the United States and is domiciled in the State of Missouri. Nicole Brooks is the spouse of Paul Farris Brooks, and brings this action individually, and on behalf of the Estate of Paul Farris Brooks, and all heirs thereof, as its anticipated legal

representative.

993. As a result of the May 21, 2009 Terrorist Attack and the fatal injuries suffered by Paul Farris Brooks, his immediate family listed above experienced and continue to experience severe mental anguish, extreme emotional pain and loss of companionship, comfort, advice and counsel.

### 49. THE APRIL 23, 2007 ATTACK – AS SADAH

#### CCC. FAMILY OF MAX FIRBY

994. The injuries sustained by Max Firby in the April 23, 2007 Terrorist Attack, and the facts and circumstances of that attack, are the subject of claims presently being litigated in Philippon, et al. v. Islamic Republic of Iran, et al., No. 1:26-cv-00242-ACR (D.D.C.). The following Plaintiffs are immediate family members of Max Firby who assert claims for loss of solatium herein.

995. Plaintiff Rebecca Lynne Wernholm is a citizen of the United States and is domiciled in the State of Michigan. Rebecca Lynne Wernholm is the sister of Max Firby.

996. Plaintiff Kelly Dawn Thorne is a citizen of the United States and is domiciled in the State of Michigan. Kelly Dawn Thorne is the sister of Max Firby.

997. As a result of the April 23, 2007 Terrorist Attack and the injuries suffered by Max Firby, the immediate family members listed above experienced and continue to experience severe mental anguish, extreme emotional pain and suffering and diminished capacity for companionship, comfort, advice and counsel.

### 50. THE JULY 17, 2010 ATTACK – TAL AFAR

#### DDD. FAMILY OF JOHN CARROLL BARTHOLOMEW II

998. The injuries sustained by John Carroll Bartholomew II in the July 17, 2010 Terrorist

Attack, and the facts and circumstances of that attack, are the subject of claims presently being litigated in Philippon, et al. v. Islamic Republic of Iran, et al., No. 1:26-cv-00242-ACR (D.D.C.). The following Plaintiffs are immediate family members of John Carroll Bartholomew II who assert claims for loss of solatium herein.

999. Plaintiff Tamiya Allajah Bartholomew is a citizen of the United States and is domiciled in the State of Florida. Tamiya Allajah Bartholomew is the child of John Carroll Bartholomew II.

1000. As a result of the July 17, 2010 Terrorist Attack and the injuries suffered by John Carroll Bartholomew II, the immediate family members listed above experienced and continue to experience severe mental anguish, extreme emotional pain and suffering and diminished capacity for companionship, comfort, advice and counsel.

## 51. THE MAY 19, 2006 ATTACK – RAMADI

### EEE. FAMILY OF ANTHONY E. YIP, JR.

1001. The injuries sustained by Anthony E. Yip, Jr. in the May 19, 2006 Terrorist Attack, and the facts and circumstances of that attack, are the subject of claims presently being litigated in *Philippon, et al. v. Islamic Republic of Iran*, et al., No. 1:26-cv-00242-ACR (D.D.C.). The following Plaintiffs are immediate family members of Anthony E. Yip, Jr. who assert claims for loss of solatium herein.

1002. Plaintiff Marqus Anthony Yip is a citizen of the United States and is domiciled in the State of Pennsylvania. Marqus Anthony Yip is the son of Anthony E. Yip, Jr..

1003. As a result of the May 19, 2006 Terrorist Attack and the injuries suffered by Anthony E. Yip, Jr., the immediate family members listed above experienced and continue to experience severe mental anguish, extreme emotional pain and suffering and diminished capacity

for companionship, comfort, advice and counsel.

## 52. THE AUGUST 25, 2008 ATTACK – BAGHDAD

### FFF. FAMILY OF VICTOR D. CABRAL

1004. The injuries sustained by Victor D. Cabral in the August 25, 2008 Terrorist Attack, and the facts and circumstances of that attack, are the subject of claims presently being litigated in *Philippon, et al. v. Islamic Republic of Iran*, et al., No. 1:26-cv-00242-ACR (D.D.C.). The following Plaintiffs are immediate family members of Victor D. Cabral who assert claims for loss of solatium herein.

1005. Plaintiff Araceli Cabral is a citizen of the United States and is domiciled in the State of Texas. Araceli Cabral is the spouse of Victor D. Cabral.

1006. As a result of the August 25, 2008 Terrorist Attack and the injuries suffered by Victor D. Cabral, the immediate family members listed above experienced and continue to experience severe mental anguish, extreme emotional pain and suffering and diminished capacity for companionship, comfort, advice and counsel.

## 53. THE NOVEMBER 12, 2004 ATTACK – BAGHDAD

### GGG. FAMILY OF TRAVIS JOE PALMER

1007. The injuries sustained by Travis Joe Palmer in the November 12, 2004 Terrorist Attack, and the facts and circumstances of that attack, are the subject of claims presently being litigated in *Philippon, et al. v. Islamic Republic of Iran*, et al., No. 1:26-cv-00242-ACR (D.D.C.). The following Plaintiffs are immediate family members of Travis Joe Palmer who assert claims for loss of solatium herein.

1008. Plaintiff Faye Lynn Cushing is a citizen of the United States and is domiciled in the State of New York. Faye Lynn Cushing is the mother of Travis Joe Palmer.

1009. Plaintiff Josh James Palmer is a citizen of the United States and is domiciled in the State of New York. Josh James Palmer is the brother of Travis Joe Palmer.

1010. As a result of the November 12, 2004 Terrorist Attack and the injuries suffered by Travis Joe Palmer, the immediate family members listed above experienced and continue to experience severe mental anguish, extreme emotional pain and suffering and diminished capacity for companionship, comfort, advice and counsel.

**54. THE MAY 18, 2005 ATTACK – RAMADI**

**HHH. ESTATE OF ANTWAN L. WALKER AND FAMILY**

1011. On May 18, 2005, Army Sergeant Antwan L. Walker, age 22, was serving with the 2nd Forward Support Battalion, 2nd Infantry Division, Fort Carson, Colorado. Sergeant Walker was killed when Camp Ramadi was attacked by enemy forces using indirect fire.

1012. Plaintiff Andrea Y. Pringle is a citizen of the United States and is domiciled in the State of Florida. Andrea Y. Pringle is the mother of Antwan L. Walker, and brings this action individually, and on behalf of the Estate of Antwan L. Walker, and all heirs thereof, as its anticipated legal representative.

1013. Plaintiff Harold Pringle is a citizen of the United States and is domiciled in the State of Florida. Harold Pringle is the stepfather of Antwan L. Walker.

1014. Plaintiff Ottah Khalfani is a citizen of the United States and is domiciled in the State of Arizona. Ottah Khalfani is the brother of Antwan L. Walker.

1015. Plaintiff Tiffney Walker is a citizen of the United States and is domiciled in the State of Florida. Tiffney Walker is the sister of Antwan L. Walker.

1016. As a result of the May 18, 2005 Terrorist Attack and the fatal injuries suffered by Antwan L. Walker, his immediate family listed above experienced and continue to experience

severe mental anguish, extreme emotional pain and loss of companionship, comfort, advice and counsel.

**55. THE JUNE 6, 2005 ATTACK – FALLUJAH**

**III. FAMILY OF ROBERT T. MININGER**

1017. On June 6, 2005, Marine Lance Corporal Robert T. Mininger, age 21, was serving with 3rd Battalion, 8th Marine Regiment, Regimental Combat Team 8, 2nd Marine Division, II Marine Expeditionary Force. Lance Corporal Mininger died of wounds sustained in an explosion while conducting combat operations in Fallujah, Iraq. Lance Corporal Jonathan L. Smith was also killed.

1018. Plaintiff Paula Zwillinger is a citizen of the United States and is domiciled in the State of Georgia. Paula Zwillinger is the mother of Robert T. Mininger.

1019. Plaintiff Gregory Mininger is a citizen of the United States and is domiciled in the State of Georgia. Gregory Mininger is the brother of Robert T. Mininger.

1020. Plaintiff Thomas Mininger is a citizen of the United States and is domiciled in the State of Georgia. Thomas Mininger is the father of Robert T. Mininger.

1021. As a result of the June 6, 2005 Terrorist Attack and the fatal injuries suffered by Robert T. Mininger, his immediate family listed above experienced and continue to experience severe mental anguish, extreme emotional pain and loss of companionship, comfort, advice and counsel.

**56. THE OCTOBER 23, 2005 ATTACK – RAMADI**

**JJJ. FAMILY OF JONATHAN ROSS SPEARS**

1022. The fatal injuries sustained by Jonathan Ross Spears in the October 23, 2005 Terrorist Attack, and the facts and circumstances of that attack, were litigated in *Swinney v. Islamic*

*Republic of Iran*, No. 1:20-cv-02316-ACR (D.D.C.). The Estate of Marie A. Spears asserts Marie A. Spears's claim for loss of solatium herein.

1023. Marie A. Spears was a citizen of the United States and was domiciled in the State of Florida. Marie A. Spears was the mother of Jonathan Ross Spears. Marie A. Spears is deceased. Plaintiff Timothy Spears, solely in his representative capacity, brings this action on behalf of the Estate of Marie A. Spears as its anticipated legal representative.

1024. As a result of the October 23, 2005 Terrorist Attack and the fatal injuries suffered by Jonathan Ross Spears, Marie A. Spears experienced severe mental anguish, extreme emotional pain and loss of companionship, comfort, advice and counsel.

## 57. THE FEBRUARY 2, 2007 ATTACK – MAHMUDIYAH

### KKK. CHRISTOPHER K. ALLGOOD AND FAMILY

1025. Plaintiff Christopher K. Allgood is a citizen of the United States and is domiciled in the State of Texas.

1026. On February 2, 2007, Christopher K. Allgood, age 22, was serving as an E-4 in the U.S. Army with the 2nd Battalion, 15th Field Artillery Regiment, 2nd Brigade Combat Team, 10th Mountain Division. Mr. Allgood was serving as the gunner of an HMMWV during a supply movement from FOB Lutafiyah toward a combat outpost in the Baghdad/Mahmudiyah area when an EFP/IED detonated in front of his position. The attack killed Captain Kevin C. Landeck and Staff Sergeant Terrence D. Dunn.

1027. As a result of the February 2, 2007 Terrorist Attack, Christopher Allgood experienced extreme blast pressure, significant memory problems, and symptoms consistent with a traumatic brain injury, and he was removed from patrol duties for approximately one month while he recovered.

1028. As a result of the February 2, 2007 Terrorist Attack and the injuries suffered, Christopher K. Allgood has experienced and will continue to experience severe physical and mental anguish and extreme emotional pain and suffering.

1029. Plaintiff Kennith Eugene Allgood is a citizen of the United States and is domiciled in the State of Texas. Kennith Eugene Allgood is the father of Christopher Allgood.

1030. Plaintiff Anja Allgood is a citizen of the United States and is domiciled in the State of Texas. Anja Allgood is the mother of Christopher Allgood.

1031. Plaintiff Matthew C. Allgood is a citizen of the United States and is domiciled in the State of Texas. Matthew C. Allgood is the brother of Christopher Allgood.

1032. As a result of the February 2, 2007 Terrorist Attack and the injuries suffered by Christopher Allgood, his immediate family listed above experienced and continue to experience severe mental anguish, extreme emotional pain and suffering and diminished capacity for companionship, comfort, advice and counsel.

## 58. THE APRIL 26, 2004 ATTACK – BAGHDAD

### LLL. FAMILY OF DARREN MILES

1033. The injuries sustained by Darren Miles in the April 26, 2004 Terrorist Attack, and the facts and circumstances of that attack, are the subject of claims presently being litigated in *Philippon, et al. v. Islamic Republic of Iran*, et al., No. 1:26-cv-00242-ACR (D.D.C.). The following Plaintiffs are immediate family members of Darren Miles who assert claims for loss of solatium herein.

1034. Plaintiff Ashley Jean Miles is a citizen of the United States and is domiciled in the State of New Mexico. Ashley Jean Miles is the daughter of Darren Miles.

1035. Plaintiff Mary Ann Watson is a citizen of the United States and is domiciled in the

State of Alabama. Mary Ann Watson is the sister of Darren Miles.

1036. As a result of the April 26, 2004 Terrorist Attack and the injuries suffered by Darren Miles, the immediate family members listed above experienced and continue to experience severe mental anguish, extreme emotional pain and suffering and diminished capacity for companionship, comfort, advice and counsel.

## VII. ALL OF THE TERRORIST ATTACKS WERE ACTS OF INTERNATIONAL TERRORISM

652. At no time during the Relevant Period, nor due to actions of United States and Coalition Forces in Iraq, did the United States declare war or enact an Authorization for the use of military force against Iran, nor did the United States or Coalition Forces engage in an armed conflict with the military forces of Iran, nor did Iran's military forces or their agents engage in lawful acts of war against Coalition Forces or U.S. nationals, including Plaintiffs.

653. At no time relevant to this Action did the United States engage in an armed conflict with the military forces of Iran, nor did Iran's military forces or their agents engage in lawful acts of war against Coalition Forces and U.S. nationals, including Plaintiffs.

654. At no time relevant to this Action did the operatives of Hezbollah, the IRGC, the IRGC-QF, the Special Groups, Ansar al Islam and/or other Iranian-sponsored terrorists who killed and injured Plaintiffs carry fixed distinctive signs recognizable at a distance, carry arms openly, conduct their operations in accordance with the laws and customs of war, or enjoy any form of combatant immunity for their acts.

655. The specific attacks alleged herein were all carried out by terrorists and terrorist organizations, including designated FTOs, SDGTs, SDTs, and/or SDNs (all with the substantial and material support of Defendants), and not by armed forces of recognized governments or

military forces.

656. The conduct of Iran, IRGC, IRGC-QF, Hezbollah, Al Qaeda, Ansar al Islam, the Special Groups and/or other Iranian-supported terrorists, including the FTOs, SDGTs, SDTs, and/or SDNs, including those responsible for perpetrating the Terrorist Attacks which resulted in the injuries or deaths of Plaintiffs, violated the laws of armed conflict (including, e.g., AAH operatives masquerading as members of U.S. armed forces, targeting civilians and torturing and executing defenseless hostages), and the widespread and intentional attacks upon U.S. nationals (including Plaintiffs), British, Iraqi, and other civilians and United Nations personnel, constituted a substantial, rather than an incidental, part of their objectives and conduct.

657. The deaths and injuries Plaintiffs sustained were not the result of, nor did they occur in the course of, a declared war with Iran, or an armed conflict between the United States and Iran.

658. The acts of the IRGC, IRGC-QF, Hezbollah, the Special Groups, Al Qaeda and/or Ansar al Islam (including the FTOs, SDGTs, SDTs, and/or SDNs responsible for perpetrating the Terrorist Attacks) that injured or killed Plaintiffs were acts of international terrorism within the meaning of 18 U.S.C. § 2331, involving violent acts intended to influence the United States and the United Nations by coercion (by coercing the withdrawal of Coalition Forces from Iraq) and to intimidate and coerce the Iraqi population, and were also acts constituting terrorist activities within the meaning of 8 U.S.C. § 1182(a)(3)(B)(iii)-(iv), and/or engaging in terrorism within the meaning of 22 U.S.C. § 2656f.

659. The acts of Iran, the IRGC, IRGC-QF, Hezbollah, Al Qaeda, Ansar al Islam, Special Groups and/or other Iranian-sponsored terrorists that injured the Plaintiffs were acts of torture, hostage taking and extrajudicial killing as defined by 28 U.S.C. §§ 1605A(h)(2) and 1605A(h)(7), and acts of international terrorism as defined by of 18 U.S.C. § 2331.

660. The Terrorist Attacks at issue here were acts of international terrorism that were enabled by Defendant's provision of massive financial and material support and resources as defined by 28 U.S.C. § 1605A(h)(3) and 18 U.S.C. § 2339A, which caused the injuries to and/or deaths of Plaintiffs. Without Iran's provision of such material support, on the scale that such support was provided, the IRGC, IRGC-QF, Hezbollah, the Special Groups, Al Qaeda, Ansar al Islam and/or other Iranian proxies would not have been unable to conduct the thousands of acts of international terrorism on the scale and with the lethality they perpetrated, including the Terrorist Attacks, which caused the deaths, maiming, or otherwise injuring of Plaintiffs and Plaintiffs' family members.

## VIII. THE ACTS OF IRAN CAUSED PLAINTIFFS' INJURIES AND DEATHS

661. As discussed herein, Iran has a long history of materially supporting the Special Groups, Al Qaeda, Ansar al Islam, and other terrorists, including the FTOs, SDGTs, SDTs, SDNs and/or other Iranian sponsored terrorist responsible for the Terrorist Attacks which killed or injured Plaintiffs. Simply put, Iran is no stranger to supporting terrorist attacks perpetrated by FTOs and other terrorist organizations against U.S. nationals with the intent to terrorize, kill or cause severe bodily and emotional harm.

662. Here, Iran provided material support and resources to the Terrorist Groups and other individuals, including the FTOs, SDGTs, SDTs, SDNs and other terrorists who perpetrated the Terrorist Attacks which killed or injured Plaintiffs.

663. These individuals who committed, and the Terrorist Groups who carried out, the Terrorist Attacks alleged herein were directly and materially supported by Iran and/or its Agents & Proxies. This material support included, but is not limited to, expert advice, training,

intelligence, funding, munitions, weapons, raw materials, logistical support, command and control, diplomatic cover, permissive environment, operational authority, safe passage and sanctuary in areas within Iraq (and in Iran and Lebanon) controlled either by Hezbollah/IRGC-QF trained, equipped, and directed Shia Special Groups, and/or in areas within Iraq controlled by Iranian-supported Sunni elements including, but not limited to, Al Qaeda and Ansar al Islam.

664. Without Iran's support, the Terrorist Groups and other individuals and organizations, including the FTOs, SDGTs, SDTs, and/or SDNs responsible for the Terrorist Attacks which resulted in Plaintiffs being killed or injured would not have been able to carry out such Terrorist Attacks with the scale and lethality in which they were perpetrated.

## IX. CLAIMS FOR RELIEF

665. Plaintiffs bring the following claims against all Defendants.

### 1. FIRST CLAIM FOR RELIEF AGAINST ALL DEFENDANTS ON BEHALF OF EACH PLAINTIFF IDENTIFIED HEREIN WHO SURVIVED AN ACT OF INTERNATIONAL TERRORISM FOR DEFENDANTS' MATERIAL SUPPORT TO ACTS OF EXTRAJUDICIAL KILLING, TORTURE AND HOSTAGE TAKING THAT RESULTED IN PERSONAL INJURY UNDER 28 U.S.C. § 1605A(C)

666. Plaintiffs repeat and re-allege each and every allegation of the foregoing paragraphs as if fully set forth herein.

667. Iran is, and was at all times relevant, a State Sponsor of Terrorism within the meaning of § 1605A(h)(6).

668. Plaintiffs identified in the foregoing paragraphs were grievously injured by Defendants' provision of material support (within the meaning of § 1605A(h)(3)) to Hezbollah,

the IRGC, MOIS, Special Groups, AQ, AAI and the Terrorist Groups who planned, conspired and provided substantial support to extrajudicial killings, attempted extrajudicial killings, torture and hostage takings that injured the Plaintiffs.

669. As a direct and proximate result of the willful, wrongful, and intentional acts of the Defendants and their agents, Plaintiffs identified in the foregoing paragraphs were injured and endured severe physical injuries, extreme mental anguish, pain and suffering, loss of solatium, and economic losses including medical expenses and lost income.

670. Plaintiffs' compensatory damages include, but are not limited to, their severe physical injuries, extreme mental anguish, pain and suffering, and any economic losses determined by the trier of fact.

671. Defendants are jointly and severally liable for the full amount of Plaintiffs' compensatory damages, including physical injuries, extreme mental anguish, pain and suffering and any pecuniary loss.

672. Defendants' acts in providing material support for acts of extrajudicial killing, torture, and hostage-taking were intended to inflict, and would reasonably result in, severe emotional distress on the Plaintiffs.

673. Because Defendants and their Agents routinely relied upon and controlled MOIS, IRISL, Mahan Air, KAA, and/or the Iranian National Oil Company to provide material support to FTOs and Terrorist Groups or other terrorists, including those responsible for the Terrorist Attacks that resulted in maiming or injury to Plaintiffs, to advance the terrorist aims and objectives of each other, its agents and instrumentalities, and the FTOs, Special Groups, and other terrorists, Defendants are equally and vicariously liable for the personal injuries caused by each other, and their agents, including MOIS, IRISL, Mahan Air, KAA, and the Iranian National Oil Company.

674. The conduct of the Defendants and their Agents was criminal, outrageous, extreme, wanton, willful, malicious, a threat to international peace and security, and a threat to the public warranting an award of punitive damages against each Defendant pursuant to 28 U.S.C. § 1605A(c).

**2. SECOND CLAIM FOR RELIEF AGAINST ALL DEFENDANTS ON BEHALF OF THE ESTATES OF PLAINTIFFS IDENTIFIED HEREIN FOR DEFENDANTS' MATERIAL SUPPORT TO ACTS OF EXTRAJUDICIAL KILLING, TORTURE AND HOSTAGE TAKING THAT RESULTED IN WRONGFUL DEATH UNDER 28 U.S.C. § 1605A(C)**

675. Plaintiffs repeat and re-allege each and every allegation of the foregoing paragraphs as if fully set forth herein.

676. Iran is, and was at all times relevant, a State Sponsor of Terrorism within the meaning of § 1605A(h)(6).

677. The Estates of Plaintiffs listed in the foregoing paragraphs assert claims on behalf of the decedents who were grievously injured by Defendants' provision of material support (within the meaning of § 1605A(h)(3)) to Hezbollah, the IRGC, MOIS, the Special Groups, AQ, AAI and the Terrorist Groups who planned, conspired and provided substantial support to extrajudicial killings, attempted extrajudicial killings, torture and hostage takings that caused the Decedents' deaths.

678. As a direct and proximate result of the willful, wrongful, and intentional acts of the Defendants and their agents, the Decedents listed in the foregoing paragraphs endured physical injury, extreme mental anguish, and pain and suffering that ultimately lead to their deaths.

679. Defendants are jointly and severally liable for the full amount of Plaintiffs'

compensatory damages, including physical injuries, extreme mental anguish, pain and suffering and any pecuniary loss (or loss of income to the estates).

680. Because Defendants and their Agents routinely relied upon and controlled MOIS, IRISL, Mahan Air, KAA, and the Iranian National Oil Company to provide material support to FTOs and Terrorist Groups or other terrorist organizations, including those FTOs, Special Groups, and other terrorist organizations responsible for the Terrorist Attacks that resulted in maiming or injury to Plaintiffs, to advance the terrorist aims and objectives of each other, its agents and instrumentalities, and the FTOs, Special Groups, and other terrorists, Defendants are equally and vicariously liable for the deaths caused by each other, and their agents, including MOIS, IRISL, Mahan Air, KAA, and the Iranian National Oil Company.

681. The conduct of the Defendants and their Agents was criminal, outrageous, extreme, wanton, willful, malicious, a threat to international peace and security, and a threat to the public warranting an award of punitive damages against each Defendant pursuant to 28 U.S.C. § 1605A(c).

### 3. THIRD CLAIM FOR RELIEF AGAINST ALL DEFENDANTS ON BEHALF OF THE IMMEDIATE FAMILY MEMBERS OF PLAINTIFFS IDENTIFIED HEREIN AS INJURED OR KILLED AS A RESULT OF DEFENDANTS' MATERIAL SUPPORT TO ACTS OF EXTRAJUDICIAL KILLING, TORTURE AND HOSTAGE TAKING FOR LOSS OF SOLATIUM AND INTENTIONAL INFLICTION OF SEVERE EMOTIONAL DISTRESS UNDER 28 U.S.C. § 1605A(C)

682. Plaintiffs repeat and re-allege each and every allegation of the foregoing paragraphs as if fully set forth herein.

683. Iran is, and was at all times relevant, a State Sponsor of Terrorism within the meaning of § 1605A(h)(6).

684. Defendants' acts in providing material support for acts of extrajudicial killing, torture, and hostage-taking were intended to inflict severe emotional distress on the Plaintiffs.

685. As a direct and proximate result of Defendants' acts, the immediate family members of individuals, identified in the foregoing paragraphs as injured or killed as a result of Defendants' acts in providing material support for acts of extrajudicial killing, torture, and hostage-taking, have suffered loss of solatium, severe emotional distress, extreme mental anguish, loss of sleep, loss of appetite, and other severe mental and physical manifestations, as well as other harms to be set forth to the trier of fact.

686. Defendants are jointly and severally liable for the full amount of Plaintiffs' damages.

687. Because Defendants and their Agents routinely relied upon and controlled MOIS, IRISL, Mahan Air, KAA. and the Iranian National Oil Company to provide material support to FTOs and Terrorist Groups or other terrorist organizations, including those FTOs, Special Groups, and other terrorist organizations responsible for the Terrorist Attacks that resulted in maiming or injury to Plaintiffs, to advance the terrorist aims and objectives of each other, their agents and instrumentalities, and the FTOs, Special Groups, and other terrorists, Defendants are equally and vicariously liable for the damages caused by each other, and their agents, including MOIS, IRISL, Mahan Air, KAA, and the Iranian National Oil Company.

688. Defendants' conduct was criminal, outrageous, extreme, wanton, willful, malicious, and constitutes a threat to the public warranting an award of punitive damages against Defendant pursuant to 28 U.S.C. § 1605A(c).

## PRAYER FOR RELIEF

**WHEREFORE,** Plaintiffs demand:

a) Judgment for all Plaintiffs against Defendants, jointly and severally, for compensatory damages, including, but not limited to: serious physical injury and related past, present and future extreme mental anguish, pain and suffering, emotional injuries, economic losses (including medical expenses and lost income), loss of consortium and/or solatium, and for further continuous treatment, care and rehabilitation in the future, in amounts to be determined at trial;

b) Judgment for Plaintiff Estates and individual heirs and beneficiaries against Defendants, jointly and severally, for compensatory damages for the extrajudicial killing of the decedents, including, but not limited to: all available wrongful death and survival claim proceeds including mental anguish, pain and suffering, economic losses, including loss of support, financial and otherwise, loss of consortium and/or solatium, any pecuniary loss (or loss of income to the estates), and all other available sums owed to the individual Estates available under the law, in amounts to be determined at trial;

c) Judgment for all Plaintiffs against Defendants, jointly and severally, for punitive damages in an amount to be determined at trial;

i. Punitive damages are warranted in this case because:

1. The conduct of Defendants and their agents demonstrates a policy of encouraging, supporting and directing a campaign of thousands or tens of thousands of deadly acts of terrorism directed at civilians and peacekeeping forces, and in particular against U.S. nationals, such that the monstrous character of the Terrorist Attacks is obvious. Specifically,

Defendants focused its finances, infrastructure, agents and instrumentalities to support, encourage and increase the infliction of maximum pain and suffering on innocent people and their families;

2. The conduct of Defendants and their agents demonstrates that it harbors a deep-seated and malicious hatred of the United States and that Defendants intentionally committed terroristic murder and extrajudicial killings, torture and hostage taking of American civilians and peacekeeping servicemen and servicewomen;
3. The conduct of Defendants and their agents is extreme and outrageous such that it demonstrates an undeniable intent to do harm and inflict severe physical and emotional distress, even on those not present at the site of the acts;
4. The Terrorist Attacks described herein and that which the Plaintiffs experienced are among the most heinous acts of deliberate violence;
5. The Defendants, their agents, and all others, should be unquestionably deterred from committing similar acts in the future;
6. Defendants still publicly deny their role in the Terrorist Attacks and disclaim even their mere presence in Iraq during the Relevant Period;
7. Defendants took purposeful and concerted steps to deny, conceal, and mask their role in the Terrorist Attacks;
8. Defendants knowingly violated U.S. and international sanctions, laws, and treaties to effectuate their purposeful campaign of terror;
9. Defendants have built their system of terrorism such that they act through

agents and instrumentalities of their state to perpetrate and perpetuate terrorism;

10. Defendants have commodified and privatized terrorism such that the core function of their agents, proxies and instrumentalities are sufficiently distinct and commercial, and not merely governmental.

d) Plaintiffs' costs and expenses;

e) All available pre and post judgment interest;

f) Plaintiffs' attorney's fees; and

g) Such other and further relief as the Court finds just and equitable.

Dated: September 11, 2026.

Respectfully submitted,

**AYLSTOCK, WITKIN, KREIS & OVERHOLTZ, PLC**

*/s/ J. Christopher Klotz*
Christopher Klotz, (D.C. Bar No. 439409)
17 East Main Street, Suite 200
Pensacola, FL 32502
Tel: (850) 202-1010
Fax: (850) 916-7449
cklotz@awkolaw.com

*Counsel for Plaintiffs*